# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------

| | | |
|---|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | : : : : : : | Master File No.: 07cv9633 (LBS)(AJP)(DFE) **CLASS ACTION** |
| This Document Relates To: ERISA ACTION | : : : : | Case No.: 07-CV-10268 (LBS)(AJP)(DFE) |

---------------------------------------

## CONSOLIDATED SUPPLEMENTAL COMPLAINT FOR
## VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

EXHIBIT C

EXH. C

## I.      INTRODUCTION

1.      Plaintiffs Carl Esposito, Barbara Boland, Alan Maltzman and Mary Gidaro ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Merrill Lynch & Co., Inc. ("Merrill Lynch," "Merrill," or the "Company"), including Merrill Lynch's proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the Merrill Lynch 401(k) Savings and Investment Plan (the "SIP"), a review of the Forms 5500 filed by the SIP, the Merrill Lynch Retirement Accumulation Plan (the "RAP"), and the Merrill Lynch Employee Stock Ownership Plan (the "Traditional ESOP") (collectively the "Plans") with the U.S. Department of Labor ("DOL"), interviews with participants of the Plans, and a review of available documents governing the operations of the Plans.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.      NATURE OF THE ACTION

2.      This is a class action brought on behalf of the Plans pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries of the Plans for violations of ERISA.

3.      The Plans are retirement plans sponsored by Merrill Lynch.

4.      Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the

- 1 -

EXHIBIT C

Plans' assets from September 25, 2006 to the present (the "Revised Class Period" or "Class Period").

5.       Defendants allowed the imprudent investment of the Plans' assets in Merrill Lynch common stock throughout the Revised Class Period even though they knew or should have known that such investment was unduly risky and imprudent due to the fact that, by June 29, 2007, the Company had accumulated at least $43 billion of net exposure to risky and illiquid collateralized debt obligation securities ("CDO securities")[1,2] and subprime mortgages,[3] which was greater than the Company's total equity value of $42 billion at that time (also referred to as "book value").  Merrill Lynch not only withheld information about the true extent of its net exposure to CDO securities and subprime mortgages (collectively "CDO and subprime exposure"),[4] but the Company repeatedly made false and misleading statements about its exposure to these risky and illiquid securities as well as their true fair market value, thereby

---

[1]       According to the Company's 2007 10-K, "collateralized debt obligations" or "CDOs" are securities "collateralized by a pool of asset-backed securities ('ABS'), for which the underlying collateral is primarily sub-prime residential mortgage loans."  *See* Merrill Lynch Annual Report (Form 10-K) (Dec. 28, 2007), at 36 (hereinafter, "2007 10-K").  Because the press often refers to "CDOs" as the investment vehicles or entities that purchase the underlying assets that are repackaged and securitized as new debt securities (*i.e.*, the issuer of the new securities), to avoid confusion, we hereinafter refer to the entire investment vehicle as the CDO and the securities issued as "CDO securities."

[2]       In its third quarter 2007 10-Q, Merrill Lynch restated its net exposure related to CDO securities as $33.9 billion (as of June 29, 2007, *see* footnote 4, *infra*), which primarily consisted of the Company's "CDO portfolio" (CDO securities held "on balance sheet") as well as "retained and warehouse exposures related to our CDO business."  *See* Merrill Lynch, Quarterly Report (Form 10-Q) (Sep. 28, 2007) (hereinafter, "Third Quarter 2007 10-Q"), at 76.

[3]       In its Third Quarter 2007 10-Q, Merrill Lynch disclosed that, as of June 29, 2007, it had net exposures related to subprime mortgages of $8.8 billion, which consisted of U.S. subprime whole loans, residual positions, residential mortgage backed securities (RMBS) and warehouse lending.  *Id.* at 74 -5.

[4]       No CDO net exposure value was disclosed in the Company's Second Quarter 2007 10-Q; the term CDO appeared only once in a generic statement.  *See* Merrill Lynch, Quarterly Report (Form 10-Q) (June 29, 2007) (hereinafter, "Second Quarter 2007 10-Q").  The first disclosure was in an October 24, 2007 8-K that stated, as of June 29, 2007, it had $40.1 billion of CDO and subprime related net exposure.  *See* Merrill Lynch Current Report 8-K (Oct. 24, 2007).  However, in its Third Quarter 2007 10-Q, the Company restated the value of its Second Quarter CDO and subprime net exposure as $42.7 billion, which was comprised of $33.9 billion of CDO related exposure and $8.8 billion of subprime mortgage related exposure.  *See* footnotes 2 and 3, *supra*.  Hereinafter, we use this updated value of $43 billion as the Company's disclosed value of its exposure to CDO and subprime securities (as of (September 28, 2007).  *See* Third Quarter 2007 10-Q.

- 2-

EXHIBIT C

artificially inflating the value of shares of Merrill Lynch stock and the Merrill Lynch Stock Fund in the Plans ("Merrill Lynch Stock Fund" or "Company Stock Fund").

6.      Meanwhile, the Company and the Plans' other fiduciaries took no steps to protect the Plan participants and beneficiaries from the risk posed by the Plans' investment in Merrill Lynch stock, and caused or allowed the Plans to continue to purchase this stock at inflated prices. After the filing of the ERISA, Securities, and Derivative consolidated amended complaints, the fiduciaries of the Plans, the Investment Committee and the Administrative Committee (described below in Section IV(B)) were on notice of the numerous failures to disclose material information that occurred prior to May 6, 2008 (as detailed in the ERISA complaint)[5] and which should have caused them to investigate whether after May 6, 2008 there had been full disclosure of material information related to Merrill Lynch's financial condition, and to take action to prevent or minimize further losses.  Nonetheless, even after May 6, 2008, Merrill Lynch (a plan fiduciary with knowledge of material facts about its own financial condition) and the other fiduciaries continued to allow Participants to purchase and hold Merrill Lynch stock, which was not only inflated due to misrepresentations and failures to disclose by the Company, but was also unduly risky.[6]

7.      For example, on July 17, 2007 after the failure of two Bear Stearns subprime related hedge funds, concerned stock analysts asked Merrill Lynch's Chief Financial Officer, Jeffrey Edwards, pointed questions about how much capital Merrill Lynch had at risk related to

---

[5]      May 6, 2008 was the end date for the class period in the Consolidated Amended Complaint filed on May 21, 2008.  The class period has been revised to be September 25, 2006 to the present, as explained in paragraph four *supra*.

[6]      As discussed *infra* (in particular in sections VII(G) amd VII(H)), additional facts have come to light subsequent to the filing of the Consolidated Amended Complaint that bear on the conduct of the Plan Fiduciaries in connection with the Plans' continued investment in Merrill Lynch stock despite 1) the Company's continued misrepresentations related to the true value of Merrill's CDO and subprime securities; and 2) publicly available information and news reports regarding the increasing riskiness of Merrill Lynch stock.  From May 6, 2008 to September 15, 2008, Merrill Lynch's stock has lost an additional 67% of its value.

EXHIBIT C

subprime mortgages, CDO securities, and warehouse lines.  *See Merrill Lynch Second Quarter 2007 Analyst Conference Call*, July 17, 2007, at 5 (hereinafter, "Second Quarter 2007 Conference Call").  In response, Merrill Lynch did not disclose the $43 billion in CDO and subprime exposure that it had at that time; rather the Company reassured the analysts and investors at large that its "aggressive risk management has put it in [an] exceptionally good position."  *Id*.  At the same time Merrill Lynch's CEO directed similar reassurances at the participants in the Plans. Just three months later, however, the Company began taking billions of dollars in write-downs (*i.e.*, losses).  Within six months the Company disclosed $23.2 billion in write-downs related to CDO and subprime related securities.[7]  2007 10-K, at 22.  As of May 21, 2008 (the date Plaintiffs filed their Consolidated Amended Complaint), disclosed losses totaled $31 billion.[8]  Based on subsequent events, the Company has disclosed additional write-downs so that total write-downs are now approximately $46 billion[9] and Merrill Lynch still acknowledges

---

[7]     According to its 2007 10-K, the write-down of $23.2 billion was comprised of $16.7 billion related to CDO exposure, $3.2 billion related to U.S. subprime residential mortgage exposure, $2.6 billion related to credit valuation adjustments from hedges on CDO securities with financial guarantors and approximately $700 million related to subprime related securities in Merrill Lynch's U.S. banks investment securities portfolio.  2007 10-K, at 22.

[8]     For 2007, Merrill Lynch reported $23.2 billion in write-downs related to CDO and subprime exposure.  *See* footnote 5, *supra*.  On April 17, 2008, the Company reported an additional $4.5 billion in write-downs and $3.1 billion in "comprehensive losses" related to its CDO and subprime exposure, which totals $30.8 billion (rounded to $31 billion).  *See* Merrill Lynch Current Report 8-K (Apr. 17, 2008), at Ex. 99.1.  Under applicable accounting rules, Merrill Lynch can elect not to classify the $3.1 billion in "comprehensive losses" from CDO and subprime securities as "write-downs" by stating that the securities that have lost value are available-for-sale rather than held to maturity. 2007 10-K, at 24, 64.  The effect is that Merrill Lynch can elect to account for the $3.1 billion in losses from these securities as "other comprehensive losses" to shareholder equity rather than as write-downs that are accounted for on the Company's income statement.  Because the only difference between write-downs and "other comprehensive losses" is whether the securities are held as available-for-sale or held to maturity, for clarity and simplicity we collectively refer to Merrill Lynch's disclosed write-downs and comprehensive losses as "write-downs" related to subprime and CDO exposure, which totaled $31 billion as of March 28, 2008.  *See* Merrill Lynch Current Report 8-K (Apr. 17, 2008), at Ex. 99.1; 2007 10-K, at 117.  *See also*, David Reilly, *A Way for Charges to Stay Off the Bottom Line*, Wall St. J., Apr. 21, 2008.

[9]     In addition to the $30.8 billion in write-downs Merrill had taken as of May 6, 2008 (as explained in footnote 8), Merrill announced further write-downs of $9.4 billion related to its CDO, subprime and mortgage positions during its July 17, 2008 Earnings Press Release.  *See* Merrill Lynch Second Quarter 2008 Analyst Conference Call (July 17, 2008).  Then just eleven days later, on July 28, 2008, the Company announced it was taking an addition $5.7 billion in write-downs related to the sale of CDO securities to Lone Star and related hedges. In total, the Company has thus taken $46 billion of write-downs related to its CDO, subprime and mortgage related securities an amount even greater than what Merrill disclosed as its initial "net exposure" of $43 billion, in October

- 4 -

EXHIBIT C

that it may continue to take additional write-downs based on its remaining exposure to CDO and subprime securities.[10]  The $46 billion in write-downs that Merrill Lynch has suffered thus far is the predictable result of Merrill Lynch's decision to wager its *own* capital on increasingly risky and illiquid CDO and subprime related securities, a process the Company started in 2006. Indeed, the Company has lost more than its initial *total* net exposure of $43 billion because the Company has been forced to take write-downs on failed hedges that were supposed to protect Merrill from loss to its CDO portfolio but ultimately did not.[11]

8.      Even now the full extent of Merrill Lynch's CDO and subprime exposure remains unknown.  The fact that Merrill Lynch has lost/written down more than it initially disclosed it held supports what many analysts have reported, that additional write-downs are imminent and the Company's actual CDO and subprime net exposure have not been fully disclosed.  For example, Brad Hintz, an analyst at Sanford Bernstein, has estimated that Merrill Lynch in fact had $150 billion in CDO and subprime exposure in July 2007 (versus the disclosed value of $43 billion in Merrill's October 2007 8-K).  Daniel Fisher, *No Thain, No Gain: Can the Man Who Saved the NYSE Revive a Badly Mauled Merrill Lynch,* Forbes, Apr. 7, 2008.  Accordingly,

of 2007.  The reason Merrill has managed to write-down/lose more that its initial net exposure of $43 billion is primarily due to the failure of hedges on its CDO and subprime securities as described in paragraphs 286, 297-305 *infra*. *See also* Ed Welsch, *The Broker Downgrade Merry-Go-Round Spins On*, WSJ: MarketBeat, Sept. 5, 2008 ("Merrill has written down more than $46 billion in assets since [June of 2007].")

[10/]      Subsequent to the $46 billion worth of write-downs, the Company still retains approximately $2.7 billion in net exposure from it CDO ($1.6 billion) and subprime securities ($1.1 billion).  In its CDO portfolio, Merrill has an $8.8 billion long position hedged by $7.2 of credit default swaps.  For subprime securities, it does not disclose its long and short positions.  *See* Merrill Lynch, Quarterly Report (Form 10-Q) (June 27, 2008).  Again, the reason that Merrill Lynch still retains subprime and CDO exposure despite having taken write-downs in excess of its initial net exposure is that Merrill actually had to take losses on several failed hedges that were ostensibly protecting Merrill from losses to its CDO and subprime securities.

[11/]      As discussed *infra*, Merrill repeatedly highlighted its "net exposure" in its financials, which theoretically reduced its gross exposure with hedges in the form of credit default swaps.  However, the Company did not truly remove the risk from its balance sheet by purchasing credit default swaps for its CDO and subprime securities because it purchased many of those credit default swaps from counterparties with doubtful ability to make good on their obligations.  In fact, the credit default swaps were used to create the appearance that risk had been removed from the Company's balance sheet when in fact the risk persisted in the form of credit risk posed by financially weak counterparties.  Not surprisingly Merrill was forced to take additional write-downs for the value it paid for the credit default swaps after they failed.

EXHIBIT C

further disclosures of previously withheld information may necessitate further revising the proposed Class Period.

9.      Merrill Lynch withheld information about the true condition of the Company as long as it could while employees purchased and held Company stock at inflated prices. Eventually, the inevitable day of reckoning came when Merrill Lynch could no longer hide the losses it had suffered from its CDOs and subprime exposure.  Starting on October 5, 2007, the Company began to announce its write-downs in increments (as described in detail below).  As Merrill Lynch continues to increase the value of its write-downs -- currently $46 billion (which is *ten* times its initial estimate of $4.5 million on October 5, 2007), the price of its stock has lost 78 % of its  value since the beginning of the Class Period.  On September 25, 2006, the stock closed at $78.49, but as of September 15, 2008, it closed at $17.06.

10.      Merrill Lynch's Company stock was not a suitable investment for the retirement accounts of its employees due to Merrill Lynch's reckless business practices, including wagering the entire book value of the franchise on securities that were risky, illiquid and highly correlated. Merrill Lynch's rush into the uncharted waters of purchasing and holding CDO and subprime related securities exposed the Company to unacceptable levels of risk, which resulted in $46 billion of write-downs to date.

11.      Despite the latest write-downs,[12] Merrill still has wide exposure to other mortgage and real estate related debt.  As of June 27, 2008, Merrill had disclosed exposures of $33.7 billion to U.S. prime mortgages, $17.5 billion to commercial real estate portfolio, $7.45 billion to non-U.S. residential mortgages, $1.54 billion to "Alt-A" mortgages and  $1.01 billion to U.S.

---

[12]      As explained *infra*, on July 17, 2008, Merrill Lynch announced its fourth straight quarterly loss due to $9.4 billion in write-downs, which included $3.4 billion from mortgage and real estate debt (unrelated to CDOs or subprime).

EXHIBIT C

subprime mortgages, which totals an additional $61.2 billion in exposure to other (non-CDO) mortgage and related real estate debt. *See* Merrill Lynch, Quarterly Report (Form 10-Q) (June 27, 2008); *See also* Sweta Singh, *Wall Street Analysts See Bigger 2008 for Merrill*, Reuters, July 29, 2008. Additionally, as the Wall Street Journal reported on September 10, 2008, Merrill Lynch's "problem assets"[13] exceeded its shareholder equity by 1.9 to 1.0. *See* Susanne Craig, Randall Smith, Serena Ng and Matthew Karnitschnig, *Lehman Faces Mounting Pressures*, Wall St. J., Sept. 10, 2008.

12.     Moreover, unrelated to its CDO and subprime exposure, Merrill Lynch also has "significant" off-balance sheet exposure. The Company has disclosed $90 billion in off-balance sheet exposure as of December 2007, which was an increase of 65% from December 2006 and, in fact, the majority of that increase was in just one quarter (off-balance sheet exposure rose 52% from September to December of 2007).[14] As of June 27, 2008, the value of these off-balance sheet exposures was $66.2 billion. *See* Merrill Lynch, Quarterly Report (Form 10-Q) (June 27, 2008). In addition the Company had $70 billion dollars in "total return swaps" that were not consolidated into its financial statements (*i.e.*, derivative contracts that may require Merrill Lynch to repurchase certain assets) as of December 2007.[15] Merrill Lynch did not quantify the value of its "total return swaps" in its June 2008 10-Q.

---

[13]     The article defined "problem assets" to include "commercial and residential mortgage, real estate and leveraged finance assets reported for [the] second quarter and adjusted for subsequent asset sales[.]" *Id.*

[14]     Merrill Lynch acknowledges in both its 2006 and 2007 10-Ks that, "As a part of our normal operations, we enter into various off-balance sheet arrangements that may require future payments." The total value of the Company's "significant" off-balance exposure was $54.5 billion on December 29, 2006, $59.3 billion on September 28, 2007, and $89.8 billion on December 28, 2007. *See* Merrill Lynch Annual Report (Form 10-K) (Dec. 29, 2006) (hereinafter, "2006 10-K"), at 43; 2007 10-K, at 50. *See also* Third Quarter 2007 10-Q.

[15]     The Company disclosed in its 2007 10-K, "We also fund selected assets, including CDOs and CLOs [collateralized loan obligations, which are securities where the payments are backed with receivables from loans] via derivative contracts with third party structures that are not consolidated on our balance sheets. Of the total notional amount of these total return swaps, approximately $24 billion is term financed through facilities provided by commercial banks, $35 billion of long term funding is provided by third party special purpose vehicles and $11 billion is financed with asset backed commercial paper conduits. In certain circumstances, we may be required to

EXHIBIT C

13.     Finally, Merrill Lynch has taken on even greater risk through other derivative contracts in the form of guarantees.[16]  The Company disclosed that its "maximum payout/notional [value]" was $4.6 *trillion* as of December 28, 2007, which was $2.7 trillion, or 157% greater than the Company's "maximum payout" value a year before.[17]  As of June 27, 2008, the maximum payout of these guarantees was $4.2 *trillion*.  *See* Merrill Lynch, Quarterly Report (Form 10-Q) (June 27, 2008).

14.     In short, during the Class Period, Merrill Lynch's stock was an artificially inflated, unduly risky, and inappropriate investment option for participants' retirement savings. Because the Plans' fiduciaries knew or should have known of these circumstances, they breached their fiduciary duties by failing to take action to protect the Plans from the massive losses that occurred.

15.     Specifically, Plaintiffs allege in Count I that the Defendants who were responsible for the investment of the Plans' assets breached their fiduciary duties to the Plans' participants and beneficiaries in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Merrill Lynch stock.  In Count II, Plaintiffs allege that the Defendants, who were responsible for the selection, monitoring and removal of the Plans' other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate.  In Count III, Plaintiffs allege that the Defendants, with

---

purchase these assets which would not result in additional gain or loss to us as such exposure is already reflected in the fair value of our derivative contracts."  2007 10-K, at 137.

[16]     The Company disclosed that "Merrill Lynch enters into certain derivative contracts that meet the accounting definition of a guarantee under FASB Interpretation No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indebtedness of Others ("FIN 45"), [which] defines guarantees to include derivative contracts that contingently require a guarantor to make payment to a guaranteed party based on changes in an underlying (such as changes in the value of interest rates, security prices, currency rates, commodity prices, indices, etc.), that relate to an asset, liability or equity security of a guaranteed party.  Derivatives that meet the FIN 45 definition of guarantees include certain written options and credit default swaps (contracts that require Merrill Lynch to pay the counterparty the par value of a referenced security if that referenced security defaults)."  *Id.* at 137.

[17]     The maximum payout for its derivative contracts was $1.8 trillion as of December 2006.

EXHIBIT C

knowledge of the risks associated with Merrill Lynch stock, breached their duty to disclose necessary information to co-fiduciaries.  In Count IV, Plaintiffs allege that the Defendants responsible for providing information to participants and beneficiaries breached their duty to inform the Plans' participants by failing to provide complete and accurate information regarding the soundness of Merrill Lynch stock and the prudence of investing and holding retirement contributions in Merrill Lynch equity.  In Count V, Plaintiffs allege that various Defendants breached their duties and responsibilities as co-fiduciaries, among other things, failing to remedy breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

16.     As more fully explained below, during the Class Period, Defendants with responsibility for the plan investments imprudently permitted the Plans to hold and acquire billions of dollars in Merrill Lynch stock despite the Company's undisclosed $43 billion in exposure to risky and illiquid assets, namely its CDO and subprime related securities.  Based on publicly available information for the Plans, it appears that Defendants' breaches have caused the Plans to lose nearly $ 3.0 billion of retirement savings.

17.     This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

18.     ERISA §§ 409(a) and 502(a)(2) authorizes participants such as the Plaintiffs to sue in a representative capacity for losses suffered by the Plans as a result of breaches of

EXHIBIT C

fiduciary duties.  Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plans whose Plan accounts were invested in Merrill Lynch common stock during the Class Period.

19.     In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

### III.     JURISDICTION AND VENUE

20.     **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

21.     **Personal Jurisdiction.**  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

22.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Merrill Lynch has its principal place of business in this district.

EXHIBIT C

## IV.    PARTIES

### A.    Plaintiffs[18]

23.    **Plaintiff Carl Esposito** is a resident of Suffolk, New York.  He worked for Merrill Lynch beginning in December, 1989, and left the Company in July, 2002.  He is a participant in the SIP, the Traditional ESOP, and the RAP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Merrill Lynch shares in the Plans during the Class Period.

24.    **Plaintiff Barbara Boland** is a resident of Metuchen, New Jersey.  She worked for Merrill Lynch beginning in 1980 and left the Company in 2007.  She is a participant in the SIP, the Traditional ESOP, and the RAP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1102(7) and 1132(a), and held Merrill Lynch shares in the Plans during the Class Period.

25.    **Plaintiff Alan Maltzman** is a resident of Monroe Township, New Jersey.  He worked for Merrill Lynch beginning in 1956, and left the Company in 1996.  He is a participant in the SIP, the Traditional ESOP and the RAP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Merrill Lynch shares in the Plans during the Class Period.

26.    **Plaintiff Mary Gidaro** is a resident of Princeton, New Jersey.  She began working for Merrill Lynch in 1987, and is a current employee.  She is a participant in the SIP, the Traditional ESOP and the RAP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Merrill Lynch shares in the Plans during the Class Period..

### B.    Defendants

27.    **Defendant Merrill Lynch & Co., Inc.**  Merrill Lynch, a Delaware corporation, is a holding company with its principal place of business at 4 World Financial Center, 250 Vesey

---

[18]/    Plaintiffs may propose additional class representatives when they move for certification of the proposed Class.

EXHIBIT C

Street, New York, New York.  Merrill Lynch is one of the world's largest wealth management, capital markets, and advisory companies with approximately $1.8 trillion in assets under management.  Prior to the fourth quarter of 2006, Merrill Lynch reported its business activities in three business segments:  Global Markets and Investment Banking ("GMI"), Global Private Client ("GPC"), and Merrill Lynch Investment Managers ("MLIM").  Effective with the merger with BlackRock, Inc. ("BlackRock"), on September 29, 2006, MLIM ceased to exist as a separate business segment.  As a result, a new business segment, Global Wealth Management ("GWM") was created, which consists of GPC and Global Investment Management ("GIM").  GWM and GMI are now the Company's two major business segments.  Merrill Lynch has over 64,000 employees in these two business segments.  The Company owns a 45 percent voting interest and approximately half of the economic interest of BlackRock.  Merrill Lynch common stock is listed on the New York Stock Exchange and trades under the ticker symbol "MER."

28.     **Defendant E. Stanley O'Neal.**  The Merrill Lynch Board of Directors (hereinafter the "Board") is the governing body of Merrill Lynch under its charter, its bylaws, and applicable Delaware law, and, pursuant to the Plans' documents, was charged with responsibility for appointing the Plans' Trustees.  The Board is composed of outside directors and one inside director, E. Stanley O'Neal.  Defendant O'Neal served as a member of the Board of Merrill Lynch from 2001 until his retirement effective October 30, 2007.  Defendant O'Neal also served as the Company's Chief Executive Officer from December 2002 until his retirement.

29.     The Board had and exercised responsibility for appointing the Trustee of the Plans, which is a fiduciary function under ERISA.  Accordingly, Plaintiffs name Defendant O'Neal as a member of the Board who exercised appointment authority with respect to the

Trustee.[19]  In addition, Defendant O'Neal engaged in acts of Plan administration by communicating extensively with employees regarding the Company and Company stock, the single largest asset of the Plans.

30.     **Senior Vice President, Human Resources Defendants.**  As explained in more detail below, the Senior Vice President, Human Resources (a.k.a. Senior Vice President, Leadership and Talent Management) Defendants, and their functional successors, had certain fiduciary responsibilities with respect to the Plans, including appointment and oversight responsibilities.  On information and belief, the following served as Senior Vice President, Human Resources during the Class Period:

(a)     Defendant Peter Stingi.

31.     The identity(ies) of the remaining Senior Vice President, Human Resources Defendant(s) is currently unknown to Plaintiffs and is therefore named fictitiously as John and Jane Doe 1.  Once the identity(ies) of the remaining Senior Vice President, Human Resources Defendant(s) is ascertained, Plaintiffs will seek leave to join him/her under his/her true name.

32.     Defendant Stingi and John and Jane Doe 1, as well as their functional successors, are referred to as the "Senior Vice President, Human Resources Defendants."

33.     **Administrative Committee Defendants**.[20]  As explained in more detail below, the Plans assigned certain fiduciary responsibilities and duties to the Administrative Committee. The Administrative Committee members have certain responsibilities over the assets in the SIP

---

[19]     Plaintiffs reserve the right to amend the Complaint, or seek leave to do so if necessary, to add additional Director Defendants as necessary and appropriate under the circumstances.

[20]     As of the date of the filing of this Consolidated Amended Complaint, Plaintiffs have not been provided  the identities of persons who served on the Administrative and Investment Committees.  While it appears from the Plan Documents that there was one Administrative Committee and one Investment Committee for each of the three Plans, Plaintiffs do not know if the same persons served on the Administrative Committees for all three Plans, nor do they know if the same persons served on the Investment Committees for all three Plans.  For the sake of convenience, Plaintiffs shall refer to the three Administrative Committees as the "Administrative Committee" and the three Investment Committees as the "Investment Committee" unless otherwise noted.

- 13-

EXHIBIT C

and RAP, and have full authority and power to administer and construe the SIP, RAP and Traditional ESOP.  On information and belief, the individual Administrative Committee Defendants are as follows:

> (a)     **Defendant Louis DiMaria** has served as a member of the SIP Administrative Committee.

34.     The identities of the remaining members of the Administrative Committee are currently unknown to Plaintiffs and are therefore named fictitiously as John and Jane Does 2-10.  Once the identities of additional Administrative Committee members are ascertained, Plaintiffs will seek leave to join them under their true names.

35.     Defendant DiMaria and John and Jane Does 2-10 are referred to as the "Administrative Committee Defendants."

36.     **Investment Committee Defendants**.[21]  As explained in more detail below, the Investment Committee Defendants have the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds.  The Investment Committee consists of a group of senior executives, but does not include directors or executive officers.  SIP 2006 11-K.  The identities of the Investment Committee Defendants are currently unknown to Plaintiffs and are therefore named fictitiously as John and Jane Does 11-20.  Once the identities of the Investment Committee Defendants are ascertained, Plaintiffs will seek leave to join them under their true names.

37.     John and Jane Does 11-20 are referred to as the "Investment Committee Defendants."

---

[21]     *See* footnote immediately preceding.

- 14-

EXHIBIT C

## V.    DEFENDANTS' FIDUCIARY STATUS

### A.    The Nature of Fiduciary Status.

38.    **Named Fiduciaries.**  Every ERISA plan must have one or more "named fiduciaries."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

39.    ***De Facto* Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

40.    Each of the Defendants was a fiduciary with respect to one or all of the Plans and owed fiduciary duties to one or all of the Plans and the participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

41.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under

EXHIBIT C

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

42.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

43.     Instead of delegating all fiduciary responsibility for the Plans to external service providers, Merrill Lynch chose to assign the appointment and removal of the Administrative and Investment Committee Defendants to the Senior Vice President, Human Resources Defendants, who, in turn, selected Merrill Lynch employees, officers and agents to perform most fiduciary functions.

44.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.     Merrill Lynch's Fiduciary Status.**

45.     Pursuant to the SIP, RAP and Traditional ESOP Plan documents, the Company was the "administrator" and "plan administrator" with respect to the Plans, as those terms are defined in ERISA § 3(16)(A), 29  U.S.C. § 1002(16)(A), and in the Internal Revenue Code of 1986 § 414(g), respectively.  SIP Plan Document § 8.1.2; RAP Plan Document § 8.1; Traditional ESOP Plan Document § 10.1.

EXHIBIT C

46. On information and belief, in order to comply with ERISA, the Company and the Administrative Committee exercised responsibility for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA. *See, e.g.,* ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). In this regard, the Company and the Administrative Committee disseminated the Plans' documents and related materials which, among other things, incorporated by reference Merrill Lynch's misleading SEC filings, thus converting such materials into fiduciary communications.

47. Further, on information and belief, the Company exercised *de facto* authority and control with respect to the *de jure* responsibilities of the Administrative Committee, the Investment Committee, and Senior Vice President, Human Resources Defendants, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing plan documents to the those Defendants, without relieving them of any such responsibility.

48. Additionally, through its authority to amend the Plans and separately through its authority to name and remove the Senior Vice President, Human Resources Defendants, Merrill Lynch was responsible for appointing and monitoring the Senior Vice President, Human Resources. Thus, according to DOL regulations, the Company exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

49. Moreover, by exercising control over the conduct of the Senior Vice President, Human Resources Defendants, Merrill Lynch became responsible for appointing and monitoring

EXHIBIT C

the Investment Committee Defendants and the Administrative Committee Defendants with respect to each of the Plans.

50.     Further, Merrill Lynch, at all applicable times, on information and belief, has exercised control over the activities of its employees in connection with their performance of fiduciary functions with respect to the Plans, including the Investment Committee Defendants and Administrative Committee Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Merrill Lynch is, thus, responsible for the activities of its employees as fiduciaries with respect to the Plans through traditional principles of agency and *respondeat superior* liability.

51.     Finally, under basic tenets of corporate law, Merrill Lynch is imputed with the knowledge that its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to Merrill Lynch.

52.     Consequently, in light of the foregoing duties, responsibilities, and actions, Merrill Lynch was both a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**C.      Defendant O'Neal's Fiduciary Status.**

53.     The Board is charged with the appointment, monitoring and removal of the Trustees and execution of the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Plans and exercised this responsibility.  SIP Plan

EXHIBIT C

Document § 9.1.1; RAP Plan Document § 9.1; Traditional ESOP Plan Document § 11.1.  Thus, as a member of the Board who exercised responsibility for appointing the Trustee, Defendant O'Neal is an appointing fiduciary under ERISA.

54.     In addition, throughout the Class Period, Defendant O'Neal made numerous statements, many of which were incomplete and inaccurate, to employees, and thus to Plan participants, regarding the Company, and future prospects of the Company specifically with regard to the risk, or purported lack thereof, faced by the Company as a result of its subprime and CDO exposure.  These statements, which were made in, among other places, Company memos and newsletters sent to all employees, were made in an ERISA fiduciary capacity because they contained information about the likely future of the Plans' benefits, in particular the value and prudence of the Plans' largest single investment, Merrill Lynch stock, and, thus were acts of Plan administration under controlling legal precedent.

55.     Consequently, in light of the foregoing duties, responsibilities, and actions, as a member of the Board (the sole insider Director), and as a result of his communications with the Plans' participants which constitute acts of Plan administration, Defendant O'Neal was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period  in that he exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**D.     Senior Vice President, Human Resources Defendants' Fiduciary Status.**

56.     Pursuant to the SIP, RAP and Traditional ESOP Plan Documents, the Administrative Committee Defendants and the Investment Committee Defendants were

- 19-

EXHIBIT C

appointed by the Senior Vice President, Human Resources.  SIP Plan Document § 10.1.1 and §

10.2.1; RAP Plan Document § 8.2 and § 8.3; Traditional ESOP Plan Document §10.2 and § 10.3.

Accordingly, the Senior Vice President, Human Resources Defendants had the duty to monitor,

and to remove, the members Administrative Committee and the Investment Committee.  Thus,

according to DOL regulations, the Senior Vice President, Human Resources Defendants

exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

  57. Consequently, in light of the foregoing duties, responsibilities, and actions, the

Senior Vice President, Human Resources Defendants were *de facto* fiduciaries of the Plans

within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they

exercised discretionary authority or discretionary control respecting management of the Plans,

exercised authority or control respecting management or disposition of the Plans' assets, and/or

had discretionary authority or discretionary responsibility in the administration of the Plans.

**E. Administrative Committee Defendants' Fiduciary Status.**

  58. Pursuant to the SIP and the RAP Plan Documents, "[i]f Designated Investment

Alternatives are established [by the Investment Committee]", then the Administrative Committee

"may, in its sole discretion, permit Participants and Beneficiaries to determine the portion of

their Accounts that shall be invested in each Designated Investment Alternative and shall

determine what transfers between Designated Investment Alternatives and other Trust assets

shall be permissible."  SIP Plan Document 2005 Amendment § 11.1.2; RAP Plan § 5.1.

  59. Additionally, according to the SIP, RAP and Traditional ESOP Plan documents,

the Administrative Committee is the "named fiduciary" of the Plans, as that term is defined

under ERISA, with authority to manage and control the operation and administration of the

- 20-

EXHIBIT C

Plans.  SIP Plan Document § 8.1.1; RAP Plan Document § 8.1; Traditional ESOP Plan

Document § 10.1.

60.     Pursuant to the SIP, RAP and Traditional ESOP Plan documents, the

Administrative Committee had the "exclusive authority and right to interpret the Plan provisions

and to exercise discretion where necessary or appropriate in the interpretation and administration

of the Plan and to decide any and all matters arising thereunder or in connection with the

administration of the Plan…".  SIP Plan Document § 10.1.3; RAP Plan Document § 8.2;

Traditional ESOP Plan Document § 10.2.  At all relevant times, the "decisions, actions and

records of the Administrative Committee [are] conclusive and binding….".  SIP Plan Document

§ 10.1.3; RAP Plan Document § 8.2; Traditional ESOP Plan Document § 10.2.

61.     In addition, the Administrative Committee has the following powers and duties:

(a)     The Administrative Committee shall have the power to promulgate such
rules and procedures, to maintain or cause to be maintained such records and to
issue such forms as it shall deem necessary or desirable for the administration of
the Plan.

(b)     Subject to the terms of the Plan and applicable law, the Administrative
Committee shall determine the time and manner in which all elections authorized
by the Plan shall be made or revoked.

(c)     The Administrative Committee may direct that such amounts be withheld
from any payment due under this Plan as required to comply with applicable
income tax law.

(d)     The Administrative Committee shall have such other rights, powers, duties
and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e)     The Administrative Committee shall exercise all of its powers and
responsibilities in a nondiscriminatory manner.

(f)     The Administrative Committee may designate persons, including persons
other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry
out the specified responsibilities of the Administrative Committee and shall not be
liable for any act or omission of a person so designated.

- 21-

EXHIBIT C

SIP Plan Document § 10.1.3; RAP Plan Document § 8.2; Traditional ESOP Plan Document § 10.2.

62.     On information and belief, in order to comply with ERISA, the Company and the Administrative Committee exercised responsibility for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner, by providing participants with information and materials required by ERISA.  *See, e.g.,* ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).  In this regard, the Company and the Administrative Committee disseminated the Plans' documents and related materials which, among other things, incorporated by reference Merrill Lynch's misleading SEC filings, thus converting such materials into fiduciary communications.

63.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Administrative Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**F.     Investment Committee Defendants' Fiduciary Status.**

64.     Pursuant to the SIP, RAP and Traditional ESOP Plan Documents, the Investment Committee is the "named fiduciary" with authority to establish Designated Investment Alternatives (in the SIP and the RAP), manage and control all Trust assets, and appoint one or more Investment Managers.  SIP Plan Document § 8.1.1; RAP Plan Document § 8.1; Traditional ESOP Plan Document § 10.1.

EXHIBIT C

65.     In addition, the Investment Committee has the following powers and duties:

(a)     The Investment Committee shall establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA.

(b)     The Investment Committee shall have the power to direct the assets of the Trust be held in a master trust consisting of assets of qualified plans maintained by the Company or an Affiliate.

(c)     The Investment Committee shall have the authority to establish Designated Investment Alternatives and permit the investment of Accounts in Company Stock

(d)     The Investment Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e)     The Investment Committee shall exercise all of its powers and responsibilities in a nondiscriminatory manner.

(f)     The Investment Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Investment Committee and shall not be liable for any act or omission of a person so designated.

SIP Plan Document § 10.2.3; RAP Plan Document § 8.3; ESOP Plan Document § 10.3

(establishing Designated Investment Alternatives -- section (c) above -- is not included in the

Investment Committee's duties in regard to the Traditional ESOP).

66.     Additionally, the Investment Committee established investment objectives for the

Designated Investment Alternatives in the SIP.  SIP Plan Document § 11.1.1.

67.     Further, prior to or after investment in one or more Designated Investment

Alternatives in the RAP, the Investment Committee had the authority to invest all or a portion of

the Trust Fund in short-term securities.  RAP Plan Document § 5.1.

68.     Moreover, pursuant to the ESOP Plan Document, the Investment Committee was

required to "establish and carry out a funding policy and method consistent with the objectives of

the Plan and the requirements of ERISA."  Traditional ESOP § 10.3.

- 23-

EXHIBIT C

69.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Investment Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## VI.     THE PLANS

70.     The Plans, sponsored by Merrill Lynch, are "employee pension benefit plans," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plans are neither defendants nor Plaintiffs.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants and beneficiaries.

71.     The assets of an employee benefit plan, such as the Plans here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, State Street Bank and Trust Company ("State Street") was co-trustee of the Plans, with certain authority and duties as described in the Trust Agreements with respect to the Company stock held in trust pursuant to the terms of the Trust Agreements.  Merrill Lynch Trust Company was the other co-trustee of the Plans, with the authority to hold, manage and control, subject to the authority and duties allocated to State Street, the assets of the Plans held in trust pursuant to the terms of the Trust Agreements.  SIP Trust Agreement; RAP Trust Agreement Effective October

- 24-

EXHIBIT C

1, 1989; Traditional ESOP Trust Agreement Effective July 1, 1989.  All contributions made to

the Plans constitute a form of deferred compensation.

A.      **Merrill Lynch & Co., Inc. 401(k) Savings& Investment Plan.**

72.     The SIP became effective on October 1, 1987.  The purpose of the Plan is to

provide eligible employees with a supplemental source of retirement income.  *See* Merrill Lynch

& Co., Inc. 401(k) Savings & Investment Plan, As restated, including amendments adopted

through January 1, 2007 (hereinafter the "SIP Plan Document") at i.

73.     Effective July 1, 2000, employees became eligible to participate in the SIP at

commencement of their employment and upon compliance with the enrollment procedures under

the Plan.  *Id.* § 2.1(d).

74.     Individual notional accounts are maintained for each SIP participant.[22]  SIP Plan

Document § 3.5; SIP Plan Document, 2007 SIP Plan Amendment at No. 3.

75.     Throughout the Class Period, participants in the SIP were permitted to defer a

percentage of their base compensation for investment in the Plan.  SIP participants were allowed

to contribute between 1% and 25% of their base compensation, up to an annual maximum of

$15,000.  SIP Plan Document § 3.2.2.

76.     Prior to January 1, 2007, the Company matched 50% of the first 6% of a

participant's contributions, up to an annual maximum Company contribution of $2,000, after one

year of service.  *Id.* § 3.3.1.  Effective January 1, 2007, the Company matches 100% of the first

4% of a participant's contributions, up to a maximum of $3,000 annually for employees with

eligible compensation of less than $300,000, after one year of service.  2007 SIP Plan

---

[22]    Participants' accounts may be comprised of various subaccounts such as:  an Employer Contributions
Subaccount; a 401(k) Subaccount; a Rollover Contributions Subaccount; a Deferred Profit Sharing Account; a
Vocon Account; a Transferred Employer Contributions Subaccount; and a Roth Elective Deferral Subaccount,
which are credited with contributions, plus any investment earnings and minus any losses.  *Id.*

EXHIBIT C

Amendment at No. 2.  For employees with eligible compensation equal to or greater than $300,000 the maximum annual Company contribution is $2,000.  *Id*.

77.     Participants become fully vested in the Employer Contributions made to their Employer Contributions Subaccount upon the completion of five years of service.  SIP Plan Document § 4.1.3.

78.     Throughout the Class Period, the Investment Committee selected the investment options (a.k.a. "Designated Investment Alternatives") that were made available to participants in the SIP for investment of their retirement savings.  SIP Plan Document § 11.1.1.

79.     Participants direct the investment of their contributions and Company contributions into the various Designated Investment Alternatives.  SIP 2006 11-K at 5; 401(k) Plan Chapter: Investing Your 401(k) Balance.

80.     The Designated Investment Alternatives consisted of various mutual funds, and, in addition, the Merrill Lynch Stock Fund.  SIP Plan Document § 11.1.1; Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan, Annual Report (Form 11-K) at 7 (Dec. 31, 2006) (hereinafter the "2006 Form 11-K").

81.     The Merrill Lynch Stock Fund was not a required feature of the SIP.  Rather, whether to offer the Merrill Lynch Stock Fund as a Plan investment option was a discretionary decision assigned by the governing Plan documents to the Investment Committee (SIP Plan Document §§ 10.2.3(c) & 11.1.1), and, to the extent that the Investment Committee chose to offer the Merrill Lynch Stock Fund, the amount of money that could be allocated to the Merrill Lynch Stock Fund was a discretionary decision assigned by the governing Plan documents to the Administrative Committee.  *Id*. § 11.1.2.

- 26-

EXHIBIT C

82.     While certain provisions of the SIP purported to eliminate the right of either

Committee to dispose of investments in a Designated Investment Alternative, the Investment

Committee and the Administrative Committee each separately had the discretionary authority

under the terms of the SIP to preclude any new investments by Plan Participants in the Merrill

Lynch Stock Fund.  *Id*. §§ 10.2.3(c); 11.1.1-2; 11.1.1(i).

83.     Additionally, nothing in the SIP could limit the ability of the Plan fiduciaries to

remove the Merrill Lynch Stock Fund as an investment alternative or divest assets invested in the

option as a consequence of ERISA's mandate to follow plan documents only to the extent

consistent with ERISA, and the obligation under ERISA to prudently manage the Plans'

investments.

84.     Accordingly, the Investment Committee and the Administrative Committee each

had the authority and responsibility to require that Plan participants transfer their investments in

the Merrill Lynch Stock Fund to another Designated Investment Alternative, or in the case of the

Investment Committee had the authority and responsibility to liquidate those investments, once it

became imprudent to remain invested in Merrill Lynch stock or in the Merrill Lynch Stock Fund

to the extent that it was comprised of Merrill Lynch stock.

85.     Because the Company exercised *de facto* control over the decisions of the

Investment Committee and the Administrative Committee, including the decision not to inquire

into the prudence of investments in the Merrill Lynch Stock Fund or otherwise take any action to

protect the SIP participants from the risks of investing in Merrill Lynch stock, the decision to

permit continued investment in the Merrill Lynch Stock Fund during the Class Period (both as to

new money and money already invested) was a decision made by the members of the Investment

EXHIBIT C

Committee and the Administrative Committee, each acting under the effective direction and control of the Company.

**B.      Merrill Lynch Retirement Program.**

86.      Effective January 1, 1997, all U.S. employees of Merrill Lynch are eligible to participate in the Retirement Program after completing one year of service.  *See* Merrill Lynch & Co., Inc. Retirement Accumulation Plan, As restated, including amendments adopted through January 1, 2007 (hereinafter the "RAP Plan Document") § 2.1(b); Merrill Lynch & Co., Inc. Employee Stock Ownership Plan, As restated, including amendments adopted through January 1, 2007 (hereinafter the "Traditional ESOP Plan Document") § 2.1(b).

87.      Once an employee is eligible for the Retirement Program, two accounts are set up: the RAP and the Traditional ESOP.  *See* Retirement Chapter: Retirement Program Contributions.

88.      Merrill Lynch makes all contributions to the RAP and ESOP accounts; participants may not contribute their own funds to these accounts.  *See* Retirement Chapter: Facts First.

89.      The Company's contributions to the RAP accounts are made in cash.  The Company's contributions to the Traditional ESOP are made in stock, except as may be necessary to repay ESOP debt.  During the Revised Class Period, the Company's contributions to the Traditional ESOP were made substantially in cash to service and repay ESOP acquisition debt. These contributions resulted in the allocation of Merrill Lynch stock to the accounts of participants..

90.      Contributions to a participant's RAP and Traditional ESOP account are based, in part, on their years of service and their eligible compensation.  Retirement Chapter: Retirement Program Contributions.  The maximum annual eligible compensation used to determine

EXHIBIT C

contributions is set by the Internal Revenue Service ("IRS").  *Id.*  This amount was $225,000 in

2007.  *Id.*  Contributions range from 2% to 8% of a participant's eligible compensation for the

year, depending on a participant's years of service.  *Id.*

91.     The following is a summary of the steps taken by Merrill Lynch to determine if

the Retirement Program contributions are made in the form of Company stock, cash, or both:

> **Step 1: Annual Contributions**
> Merrill Lynch looks at each participant's length of service as of each
> January 4 and his or her eligible compensation to determine the amount of
> annual contributions to each participant's Retirement Program accounts.
> Then, all of these contributions are added together to determine the total
> amount of annual contributions required.
>
> **Step 2: Amount of Merrill Lynch Common Stock to Be Contributed**
> Merrill Lynch determines the number of shares of Merrill Lynch common stock
> that will be contributed to [or allocated to] participants' accounts for that year.
>
> **Step 3: Market Value of Shares of Merrill Lynch Common Stock**
> Merrill Lynch calculates the market value of the shares that will be contributed to
> [or allocated to] participants' accounts (from Step Two). The market value of
> Merrill Lynch common stock is determined using the New York Stock Exchange
> closing price on the last business day of the year.
>
> **Step 4: Determining the Percentage of Merrill Lynch Common Stock
> and/or Cash**
> The market value of these shares is then divided by the total annual contribution
> amount (from Step One).  The outcome of this calculation is a percentage – that
> percentage determines the split of cash and Merrill Lynch common stock that will
> be contributed to [or allocated to] participants' accounts. For example, if the
> percentage is 7%, this means that 7% of that annual contribution will be made in
> Merrill Lynch common stock to ESOP accounts and 93% will be made in cash to
> RAP accounts.

*See* Retirement Chapter: Retirement Program Contributions.  *See also* RAP Plan Document
§ 3.5.

92.     Effective January 1, 2007, participants in the Retirement Program become 100%

vested in their Company Retirement Contribution Account after three years of service.  RAP

Plan Document, 2007 RAP Plan Amendment at No. 2; Traditional ESOP Plan Document, 2007

EXHIBIT C

Plan Amendment at 2.  Previously, participants became fully vested upon the completion of five years of service.  RAP Plan Document § 4.1; Traditional ESOP Plan Document § 5.1.

**1.      Merrill Lynch & Co., Inc. Retirement Accumulation Plan ("RAP").**

93.      The RAP became effective on January 1, 1989.  The purpose of the Plan is to provide employees with a supplemental source of retirement income.  RAP Plan Document at i.

94.      Merrill Lynch makes annual Retirement Contributions to the RAP utilizing the method described above.  The Retirement Contributions to the RAP are in the form of Basic Credits.  *Id.* § 3.2.  Basic Credits are varied based on a participant's years of service and are allocated in an amount equal to a percentage of a participant's eligible compensation for the year in which they were a qualified participant.  *Id.*  For those who were participants in the RAP as of January 4, 1989, and met certain age and service requirements, the Company also makes Supplemental Credits and Additional Supplemental Credits to their accounts.  *Id.* § 3.3.  The Company's contributions to the RAP are reduced by the value of Merrill Lynch shares allocated to the participant's Traditional ESOP account.  *Id.* § 3.5.

95.      Throughout the Revised Class Period, the Plan fiduciaries, by and through the Investment Committee, selected the investment options that were made available to RAP participants for investment of their retirement savings.  *Id.* §§ 5.1 & 8.3(c).  The options consisted of various mutual funds, and, in addition, the Merrill Lynch Stock Fund.  Merrill Lynch 2007 Annual Report, *available at* *http://files.shareholder.com/downloads/MER/197622170x0x174107 /*f9fd43ab-b71b-4da0-b78b-17bb96ad7b8d/annual_report_2007_complete.pdf, at 140.

96.      Plan participants direct how they want their RAP contributions invested.  RAP Plan Document § 5.1; Retirement Chapter: Investing Your RAP Account Balance.

- 30-

EXHIBIT C

97.     RAP participants may not elect to have their contributions invested directly into Merrill Lynch stock, but may invest any portion of their account balance into Merrill Lynch stock by processing a fund transfer.  Retirement Chapter: Investing Your RAP Account Balance.

98.     In order for RAP participants to withdraw the Merrill Lynch stock held in their RAP accounts, participants must be vested and at least 59½ years old at the time of withdrawal if the ESOP shares in their RAP account were acquired as a result of Merrill Lynch contributions to the RAP and/or fund transfers to Merrill Lynch stock.  Retirement Chapter:  ESOP Diversification.  There are no withdrawal restrictions if a participant transfers the Merrill Lynch stock held in their Traditional ESOP account to their RAP account.  *Id.* § 3.6.

99.     The Merrill Lynch Stock Fund was not a required feature of the RAP.  Rather, whether to offer the Merrill Lynch Stock Fund as a Plan investment option was a discretionary decision assigned by the governing Plan documents to the Investment Committee (RAP Plan Document §§ 5.1 & 8.3(c)), and, to the extent that the Investment Committee chose to offer the Merrill Lynch Stock Fund, the amount of money that could be allocated to the Merrill Lynch Stock Fund was a discretionary decision assigned by the governing Plan documents to the Administrative Committee.  *Id.* § 5.1.

100.    While certain provisions of the RAP purported to eliminate the right of either the Investment Committee or the Administrative Committee to dispose of investments in a Designated Investment Alternative, the Investment Committee and the Administrative Committee each separately had the discretionary authority under the terms of the RAP to preclude any new investments by Plan participants in the Merrill Lynch Stock Fund.  *Id.* §§ 5.1 & 8.3(c).

- 31-

EXHIBIT C

101.    Additionally, the Investment Committee has the discretion, prior to or after investment in one or more investment alternatives, to invest "all or a portion of the Trust Fund" in "short-term securities issued on an interim basis or guaranteed by the United States of America or any agency or instrumentality thereof or any other prudent investments of a short-term nature that earn income." *Id.* § 5.1.

102.    Further, nothing in the RAP limits the ability of the Plan fiduciaries to remove the Merrill Lynch Stock Fund as an investment alternative or divest assets invested in the option as a consequence of ERISA's mandate to follow plan documents only to the extent consistent with ERISA, and the obligation under ERISA to prudently manage the Plans' investments.

103.    Accordingly, the Investment Committee and the Administrative Committee each had the authority and responsibility to require that Plan participants transfer their investments in the Merrill Lynch Stock Fund to another Designated Investment Alternative, or in the case of the Investment Committee had the authority and responsibility to liquidate those investments, once it became imprudent to remain invested in Merrill Lynch stock or in the Merrill Lynch Stock Fund to the extent that it was comprised of Merrill Lynch stock.

104.    Because the Company exercised *de facto* control over the decisions of the Investment Committee and the Administrative Committee, including the decision not to inquire into the prudence of investments in the Merrill Lynch Stock Fund or otherwise take any action to protect the RAP participants from the risks of investing in Merrill Lynch stock, the decision to permit continued investment in the Merrill Lynch Stock Fund during the Revised Class Period (both as to new money and money already invested) was a decision made by the members of the Investment Committee and the Administrative Committee, each acting under the effective direction and control of the Company.

- 32-

EXHIBIT C

### 2.    Merrill Lynch & Co., Inc. Employee Stock Ownership Plan.

105.    The Traditional ESOP became effective on July 1, 1989.  The purpose of the Plan is to provide employees with a supplemental source of retirement income.  *See* Merrill Lynch & Co., Inc. Employee Stock Ownership Plan, as restated, including amendments adopted through January 1, 2007 (hereinafter the "Traditional ESOP Plan Document") at i.

106.    The Traditional ESOP is a stock bonus plan under § 401(a) of the Internal Revenue Code and is subject to the applicable provisions of ERISA.  *Id.*

107.    Merrill Lynch makes annual contributions to the Traditional ESOP as described above.  Contributions to the Traditional ESOP are made in Merrill Lynch stock or cash as required to service and repay debt owed by the Traditional ESOP, resulting in the allocation of Merrill Lynch shares to the accounts of participants in the Traditional ESOP.  Merrill Lynch 2007 Annual Report at 140.  Participants do not exercise any authority or control over this investment decision.

108.    Upon completion of five years of service, participants in the Traditional ESOP are able to diversify their account by:  transferring their shares to their RAP account; rolling over to an IRA or other tax-qualified retirement plan; transferring to a Merrill Lynch Brokerage Account; or by taking a cash distribution.  *See* Retirement Chapter:  ESOP Diversification.

109.    Further, nothing in the Traditional ESOP limits the ability of the Investment Committee to liquidate all or a portion of the Plan's investment in Merrill Lynch stock as prudence dictates.

110.    Indeed, the Investment Committee is granted responsibility for "the investment of Trust assets" and is required to "establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA."  Traditional ESOP § 10.3.

EXHIBIT C

111.   Because the Company exercised *de facto* control over the decisions of the Investment Committee, including the decision not to inquire into the prudence of investments in the Merrill Lynch Stock Fund or otherwise take any action to protect the Traditional ESOP participants from the risks of investments in Merrill Lynch stock, the decision to permit continued investment in the Merrill Lynch Stock Fund during the Revised Class Period (both as to new money and money already invested) was a  decision made by the members of the Investment Committee, acting under the effective direction and control of the Company.

**C.     ESOP Fiduciaries are Bound by Core ERISA Fiduciary Duties.**

112.   In addition to the designation of the Traditional ESOP as a purported ESOP, the portions of the SIP and the RAP that are invested in Merrill Lynch stock are also designated as purported ESOPs.  SIP Plan Document § 1.40; RAP Plan Document § 1.34.

113.   An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities."  29 U.S.C. § 1107(d)(6)(A).  On information and belief, the SIP and the RAP did not satisfy all of the statutory and regulatory mandates with respect to ESOP design and/or operation.  For example, the SIP and RAP are not designed to invest primarily in qualifying employer securities in violation of 29 C.F.R. § 2550.4073-6(b).

114.   Even if the portions of the SIP and the RAP designated as ESOPs satisfy all of the applicable regulatory requirements for this designation, just like 401(k) Plan fiduciaries generally, fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to Plan participants.

115.   Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the purported ESOP components of the

- 34-

EXHIBIT C

SIP and RAP as well as for the Traditional ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.

**D.     The Plans Incurred Significant Losses during the** Revised Class Period**.**

116.    During the Revised Class Period, Merrill Lynch stock represented significant portions of the Plans' assets.

117.    As of December 31, 2006, the SIP held approximately 16.4 million shares of Merrill Lynch stock, then having a market value of approximately $1.5 billion, and representing 28% of the net assets of the Plan.  2006 Form 11-K at 11.

118.    As of December 31, 2006, the RAP held approximately 12 million shares of Merrill Lynch stock, then having a market value of approximately $1.1 billion, and representing 38% of the net assets of the Plan.  RAP Form 5500 for year end Dec. 31, 2006, *available at* http://www.freeerisa.com/5500/InstantView.asp?mainID=18994202.

119.    As of December 31, 2006, the ESOP held approximately 22 million shares of Merrill Lynch stock, then having a market value of approximately $2.09 billion, and representing 99% of the net assets of the Plan.  Traditional ESOP Form 5500 for year end Dec. 31, 2006. *available at* http://www.freeerisa.com/5500/InstantView.asp?mainID=18994211.

120.    Despite the Plans' massive investment in Merrill Lynch stock, Defendants took no action to protect the Plans from the risks that the Company's reckless and improper conduct created.  Defendants continued to hold the Plans' shares of Merrill Lynch stock and compounded the problem (and the losses) by purchasing additional shares during the Revised Class Period. Plaintiffs estimate a principal loss approaching $3.0 billion.

- 35-

EXHIBIT C

## VII.   FACTS BEARING ON FIDUCIARY BREACH

**A.    Merrill Lynch Stock Was an Imprudent Investment for the Plans during the Revised Class Period Because the Company Amassed Unprecedented and Undisclosed Levels of CDO & Subprime Exposure Resulting in $46 Billion in Write-downs and the Precipitous Decline in the Company's Stock Price.**

121.    During the Revised Class Period, Merrill Lynch accumulated exposure to risky and illiquid CDO and subprime related securities that exceeded the total book value of the Company and made it imprudent for the Plans' fiduciaries to continue to cause or allow the Plans to purchase Merrill Lynch stock, to offer Merrill Lynch stock as an investment option for the Plans, to accept the match of employee contributions in inflated Merrill Lynch stock, and to maintain the Plans' significant investment in the stock.  Third Quarter 2007 10-Q; *See also* Fisher, *supra* at 9.

122.    As a result of Merrill Lynch's CDO and subprime exposure, its additional $61.2 billion of other mortgage and real estate debt-related exposure,[23] its off-balance sheet exposure of at least $66 billion, its highly-leveraged and illiquid balance sheet,[24] its mismanagement of risk, and its persistent refusal to disclose all material information about its true financial condition, the Company's stock posed an unduly large risk of significant loss, which could not be prudently borne by Merrill Lynch's employee retirement plans.  This risk was separate and distinct from the risk inherently posed by concentration of investment in the stock of a single issuer (here Merrill Lynch); the level of risk posed by the Plans' investment in Merrill Lynch stock would have been inappropriate even if diversified across multiple issuers in various

---

[23]    *See* Merrill Lynch, Quarterly Report (Form 10-Q) (June 27, 2008).

[24]    Merrill Lynch's leverage ratio (total assets / equity capital) steadily increased from 15.2x in 2003 to 19.9x in 2006 and then steeply increased to 27.8x in 2007  as a result of the $23.2 billion write-down (loss of capital) the Company suffered due to its CDO and subprime exposure.  *See* Merrill Lynch Annual Report (Form 10-K) (Dec. 31, 2003), Merrill Lynch Annual Report (Form 10-K) (Dec. 31, 2004), Merrill Lynch Annual Report (Form 10-K) (Dec. 31, 2005), 2006 10-K, 2007 10-K.  *See also* discussion of growing amounts of illiquid Level 3 assets, *infra*.

EXHIBIT C

disparate industries and geographic areas, each posing a similar level of risk to that presented by Merrill Lynch Stock.

123.    While a fiduciary's duty of prudence does not include a general duty to diversify with respect to company stock in an ERISA-governed retirement plan, a fiduciary may not ignore circumstances, such as those here, which increase the risk of loss to participants and beneficiaries and the overall magnitude of that potential loss to an imprudent and unacceptable level.

124.    These risks were exacerbated by false and misleading statements issued by Merrill Lynch that caused the price of Company stock to be artificially inflated.  As the DOL, the agency charged with responsibility for enforcing ERISA, has stated, it is never prudent for a retirement plan fiduciary to purchase company stock that he knows or should know is artificially inflated.  Brief of the Secretary of Labor as Amicus Curie Supporting Appellants and Requesting Reversal at 15-16, *Phelps v. Calpine Corp., et al.*, (9th Cir. 2006) (No. 06-15013).

125.    A variety of circumstances contributed to the unacceptable level of risk borne by Plan participants as a result of the Plans' massive investment in Merrill Lynch stock, including, but not limited to:

- The Company aggressively grew its CDO business, even as credit markets deteriorated, subprime mortgage defaults increased, and housing prices fell;

- After the subprime mortgage debacle was well under way (by late 2005),  Merrill Lynch decided to use its own capital to purchase CDO securities that its customers were rejecting in order to continue collecting additional underwriting fees;

- Merrill Lynch increased its CDO underwriting volume in 2006 and 2007 in the face of a stagnating CDO market, which forced the Company to take large amounts of CDO securities onto its own balance sheet;

EXHIBIT C

- As a result, by June 29, 2007, Merrill Lynch accumulated $43 billion in exposure to CDOs and subprime related securities, which was greater than the entire equity value of the Company;

- The Company failed to acknowledge, manage and accurately disclose the risks associated with owning such risky and illiquid securities;

- The Company repeatedly made false, misleading and incomplete statements to its employees and the investing public regarding the true level of its exposure to CDO securities and subprime mortgages, which caused the price of Merrill Lynch stock to be artificially inflated;

- Merrill Lynch continued to mis-mark its subprime and CDO related investments throughout 2006 and 2007 based on assumptions that disregarded the actual housing market, credit market, and liquidity conditions;

- The Company lacked a Chief Risk Officer until September 10, 2007;

- Merrill Lynch's desperation to reduce its CDO and subprime exposure led the Company to: (a) underwrite and sell these securities without disclosing the true risk and illiquidity of these securities to its customers; and (b) purchase costly hedges for its CDO and subprime exposure from counterparties with doubtful ability to make good on their obligations in order to create the appearance that risk had been removed from the Company's balance sheet when in fact the risk persisted in the form of credit risk posed by financially weak counterparties;[25]

- Even following its write-downs, the Company's off-balance sheet exposure continued to grow, and was at least $90 billion as of December 2007;[26]

- The Company's additional $61.2 billion of other mortgage and real estate debt-related exposure (non-CDO or subprime securities), which have also resulted in write-downs;

- Merrill Lynch's "maximum payout/notional [value]" for other derivative contracts in the form of guarantees rose from $1.8 trillion as of December 2006 to $4.6 trillion as of December 2007;[27]

- The Company had $70 billion dollars in "total return swaps" that may require Merrill Lynch to repurchase certain assets, which was not consolidated into its

---

[25] Merrill Lynch acknowledges in its 2007 10-K that its estimate of its CDO and subprime exposure is contingent on, *inter alia*, "the financial strength of counterparties, such as financial guarantors, with whom we have economically hedged some of our exposure to these assets . . . [and that its] ability to mitigate our risk by selling or hedging our exposures is also limited by the market environment." 2007 10-K, at 19.

[26] Merrill's off-balance sheet exposure was last disclosed as $66 billion as of June 2008.

[27] Merrill's maximum payout for guarantees was last disclosed as $4.2 trillion as of June 2008.

EXHIBIT C

financial statements (as of December 2007, the last date this value was reported in Merrill Lynch's SEC filings);

- The Company's increasingly leveraged balance sheet grew steadily from 15.2x in 2003 to 19.9x.  Then in 2006 it increased steeply to 27.8x in 2007 as a result of the $23.2 billion write-down (loss of equity) the Company suffered due to its CDO and subprime exposure; and

- Finally, even Merrill Lynch's on-balance sheet assets became increasingly illiquid and difficult to value, as evidenced by the fact that the Company continued to shift greater assets from Level 2 to Level 3 (as discussed in detail below).

The risk of significant loss to the Plans was exacerbated by the fact that Merrill Lynch stock constituted a significant portion of the Plans' total assets, as illustrated above in Section VI(D).  Astonishingly, given the purpose of the Plans – to allow employees to save for retirement – the Plans' fiduciaries did not undertake any meaningful action to protect the Plans from the losses that have been caused by the Plans' holding billions of dollars of Merrill Lynch stock and acquiring even more Merrill Lynch stock while exigent circumstances have beset Merrill Lynch during the Revised Class Period.  For example, the Plans' fiduciaries continued to offer Merrill Lynch stock as an investment option and purchased additional shares even while the stock was plunging in value as a result of the collapse of the CDO and subprime markets.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plans lost approximately $3.0 billion.

126.    Defendants Merrill Lynch and O'Neal allowed employees to pay inflated prices for Merrill Lynch stock during the Revised Class Period and took no action, as senior management bet the Company's entire franchise value on risky and illiquid securities, many of

EXHIBIT C

which have been downgraded to junk rated securities[28] or are in default[29] and which have led to write-downs of $46 billion.

1. **Background:  The Rise and Fall of Subprime Mortgage Lending.**

127.    The term " subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics:  weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."  *See* Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd., *Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* Mar. 27, 2007, *available at* http://www.federalreserve.gov/newsevents/testimony/Braunstein20070327a.htm.

128.    Between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.  Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

129.    In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to qualify for certain loans and allowing borrowers to finance a greater percentage of a home's

---

[28]/    For example, "Norma" is a CDO underwritten by Merrill Lynch.  In March 2007, all three rating agencies initially rated 75% of its securities as AAA securities (the remaining 25% were rated as investment grade).  Within less than a year, Moody's downgraded seven of the nine tranches to junk and Fitch downgraded all nine tranches to junk.  Carrick Mollenkamp and Serena Ng, *Wall Street Wizardry Amplified Credit Crisis --- A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch*, Wall St. J., Dec. 27, 2007.  Similarly, in May 2008, Fitch downgraded to junk three classes of a CDO underwritten by Merrill Lynch ("TORO I"), where the underlying portfolio consists of subprime residential mortgage backed securities (46%), CDO securities (25%), and other non-subprime mortgage related securities (29%).  The three tranches that were downgraded to junk were initially rated AAA, AA and BBB (all investment grade).

[29]/    According to the *Financial Times*, "Merrill Lynch, [stet] has underwritten 26 CDO deals in default according to Total Securitization."  Michael Mackenzie, *Credit Vehicle Defaults Continue to Climb*, Financial Times, Apr. 23, 2008, *available at* http://www.totalsecuritization.com.

EXHIBIT C

value or to carry a higher debt load (*e.g.*, "no money down"). *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005; S*ee also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down,* USA Today, Jan. 17, 2006.

130.     In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers.  Examples of typical subprime mortgages are:  interest-only mortgages, which allow borrowers to pay only interest for a period of time (typically 5–10 years); "pick a payment" loans, for which borrowers choose their monthly payment (full payment, interest only, or a minimum payment which may be lower than the payment required to reduce the balance of the loan); and initial fixed rate mortgages that quickly convert to variable rates.  *See* Liz Moyer, *Beware the Interest-Only Mortgage,* Forbes, July 6, 2005; *See also* Ruth Simon, *New Type of Mortgage Surges in Popularity*, Wall St. J., Apr. 19, 2006, and Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* Sept. 29, 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.  These novel terms combined with the lowered lending standards contributed to the likelihood that many borrowers would default.

131.     As a result of these various incentives for subprime mortgages, subprime mortgage originations grew from $120 billion in 2001 to $625 billion in 2005.  Simon & Hagerty, *supra.*  Meanwhile, in late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased risks for borrowers and lenders in the overheated housing markets.  Simon, *supra.*

- 41-

EXHIBIT C

132.     The housing troubles emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes which caused the interest rates on variable rate loans, including mortgage loans, to rise.  In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, issued new guidelines for mortgage lenders.  *Id.*; *See also* Testimony of Sandra L. Thompson, *supra*.  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.  *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System*, supra*.

133.     However, most subprime lenders failed to heed these and other warnings.  "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005."  Simon & Hagerty, *supra*.  Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate expired.  However, because housing prices were falling, borrowers could not readily re-sell the property for a profit when they could not pay their increased monthly payments, causing mortgage defaults to increase significantly.

134.     In 2006, subprime mortgage exposure grew even riskier as lenders originated a large number of "liar loans" (no-documentation and low-documentation loans).  This practice constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.  Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.  Mortgage industry research reported in April 2006 revealed that 90% of borrowers had

- 42-

EXHIBIT C

overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases.  *Id.*

### 2.      Merrill Lynch Becomes Global Leader in CDO Underwriting.

135.      Merrill Lynch undertook a dramatic transformation of its Fixed-Income, Currencies and Commodities ("FICC") business between 2003 and 2006.  Merrill Lynch rapidly increased its CDO underwriting business, which resulted in the Company's ascent "from bit player to powerhouse in the lucrative business of bundling loans into salable securities."  Serena Ng and Carrick Mollenkamp, *Merrill Takes $8.4 Billion Credit Hit --- It Plunged Into CDOs In '03, Hiring Pioneer Of the Debt Securities,* Wall St. J., Oct. 25, 2007.

136.      Merrill Lynch's CDO business was spearheaded by a young banker, Christopher Ricciardi, who joined the Company in 2003.  As Managing Director and Head of Global Structured Credit Products for the Company, he was responsible for the origination and structuring of all CDOs, Structured Funds and Structured Credit Derivatives.  As a result of Ricciardi's aggressive expansion of the CDO business, Merrill Lynch leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.2 billion of deals, to the top global underwriter of CDOs in 2004, 2005, and 2006.  CDO underwriting became an increasingly important profit center for Merrill Lynch, which earned $400 million in CDO underwriting profits in 2005.  Serena Ng and Carrick Mollenkamp, *Pioneer Helped Merrill Move Into CDOs*, Wall St. J., Oct. 25, 2007.

137.      CDOs are usually constructed from a portfolio of fixed-income assets and are used to spread the risk of the underlying assets. These assets are divided into different tranches of debt securities:  senior tranches, mezzanine tranches, and equity tranches.  Losses are applied in reverse order of seniority so junior tranches offer higher coupons (interest rates) to

- 43-

EXHIBIT C

compensate for the added default risk.  But the system only works if the underlying asset backed securities held by the CDO are uncorrelated -- that is, if they are unlikely to go bad all at once. Mollenkamp & Ng, *supra*.

138.     To the contrary, CDOs holding only subprime related investments, such as residential mortgage backed securities (RMBS), credit default swaps,[30] and other instruments dependent on mortgages for their value, were highly correlated because they held only subprime securities and were therefore vulnerable to a rise in defaults on subprime mortgage loans.[31] Nonetheless, because of the high yields associated with subprime mortgages, these mortgages became very attractive for investment banks securitizing CDOs.  *See* David E. Vallee, *FDIC Outlook, A New Plateau for the U.S. Securitization Market*, *available at* http://www.fdic.gov/bank/analytical/regional/ro20063q/na/2006_fall01.html.

### 3.     The Deterioration of the Subprime Mortgage and CDO Market.

139.     Because all subprime loans were vulnerable to falling home prices; all of Merrill Lynch's subprime related securities (*e.g.*, RMBS, CDOs and CDO squared or CDO cubed securities)[32] had the same vulnerabilities.  *See* footnote 13, *supra*.

140.     The sharp increase in defaults and falling home prices that started in 2005 eroded the value of all tranches of the RMBS and CDO securities that Merrill Lynch underwrote.  In turn, because RMBS yields were falling, the yields on the CDO bonds sank as well.  *See* Shawn

---

[30]     These swaps, in essence, are insurance contracts that pay out if the securities backed by subprime mortgages decline in value.  Such swaps trade more actively, with their values rising and falling based on market sentiments about subprime default risk.

[31]     Merrill Lynch acknowledged that the valuation of its CDO and subprime related securities "continue to be impacted by external market factors including default rates [and] a decline in the value of the underlying property." 2007 10-K.

[32]     CDOs that securitized assets comprised of CDO securities are referred to as "CDO squared" and CDOs that add another layer of securitization are referred to as "CDO cubed."  Mollenkamp & Ng, *supra*.

- 44-

EXHIBIT C

Tully, *Wall Street's Money Machine Breaks Down:  The Subprime Mortgage Crisis Keeps Getting Worse - and Claiming More Victims,* Fortune, Nov. 12, 2007.

141.    The ABX index was launched in January of 2006.  Because securities backed by subprime mortgages trade privately and infrequently, their values are hard to determine.  The ABX family of indexes (including the ABX 06-2 sub index) was designed to reflect their values based on instruments called credit-default swaps.  These swaps, in essence, are insurance contracts that pay out if the securities backed by subprime mortgages decline in value.  *See* Kate Kelly, *How Goldman Won Big On Mortgage Meltdown:  A Team's Bearish Bets Netted Firm Billions*, Wall St. J., Dec. 14, 2007.  *See also CDS IndexCo and Markit Launch Synthetic ABS Index; ABX.HE, an Asset-Backed Credit Derivative Index, Allows Investors to Go Long or Short U.S. Sub-Prime Residential Mortgages*, Business Wire, Jan. 17, 2006.

### 4.    The Fatal Error:  Underwriting Fees Leads Merrill Lynch to Expose its Own Balance Sheet to Risky and Illiquid CDO Securities.

142.    As the *Wall Street Journal* reported: "For much of the mortgage boom, Merrill was able to sell the bulk of the CDOs it underwrote to investors all over the world.  But from late 2005 onwards, it became harder for the investment bank to find buyers for the growing volume of mortgage CDOs it was arranging.  Many investors felt they had invested enough money in this asset class, and financial guaranty companies, which wrote credit insurance on many CDOs, were getting skittish about their growing exposures to mortgage securities in a slowing housing market."  Randal Smith & Jed Horowitz, *Merrill Takes $8.4 Billion Credit Hit*, Wall St. J., Oct. 25, 2007.

143.    When demand for CDO securities waned in late 2005, Merrill Lynch was unwilling to give up the underwriting fees so it began purchasing the AAA tranches of the CDO securities with its own capital.  *Id.*  As reported in the financial press, Defendant O'Neal pushed

EXHIBIT C

this strategy of buying CDO securities with Merrill Lynch's own capital.  Executives that resisted, such as fixed income adviser Jeff Kronthal, were fired.  *See* Gary Weiss, *The Taming of Merrill Lynch,* May 2008, *available at* http://www.portfolio.com/executives/features/2008/04/14/Thain-Heading-Up-Merrill-Lynch#page3; *See also* Fisher, *supra*.

144.    "Merrill took the top tranches onto its own balance sheet," said Scott Sprinzen, an analyst with S&P.  "The amounts were staggering."  Tully, *supra*.

145.    "That decision turned out to be one of the worst miscalculations in the annals of risk management."[33]  *Id.*  "It's like me buying all those buildings out there just to get a little fee. It wouldn't make sense," a Merrill official stated in the financial press.  Weiss, *supra*. Ultimately, when credit markets tightened, the Company could not borrow sufficient cash to keep the CDOs afloat.[34]  *See* Peter Eavis, *CDOs explained:  How These Debt Vehicles Led to Big Losses at Big Banks -- and Why There May Be More to Come*, Fortune, Nov. 26, 2007.

146.    In response to the decreased demand for CDOs, Mr. Ricciardi (then head of Merrill Lynch's CDO business) had budgeted for no growth in 2006 in mortgage CDOs before he left the Company in February 2006.

147.    But following Mr. Ricciardi's departure, Dow Kim (then head of markets and investment banking) sought to reassure the CDO group that Merrill Lynch remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs.  Ng & Mollenkamp, *supra*.

---

[33]    The underwriter of a CDO issuance typically acts as a middleman by underwriting the CDO issuance for a fee, but does not retain a proprietary interest in the issued securities.  Fisher, *supra*.

[34]    As described in detail below, Merrill Lynch's inability to liquidate the CDO securities it held on its balance sheet during the credit crisis, may also have led Merrill Lynch to engage in various activities.  The Company has been sued for fraud and misrepresentation as underwriter for not disclosing the true nature of the underlying securities.   In addition, Merrill Lynch has been accused of selling CDO securities to investors by hiding the fact that they were actually CDOs or other subprime related securities.

EXHIBIT C

148.     In 2006, Merrill Lynch sharply boosted its issuance of CDO securities to $44 billion, compared to $14 billion in 2005.  Its fees from CDOs jumped to more than $700 million in 2006.  *Id.*  But to earn these fees Merrill Lynch had to continue purchasing CDO securities.

149.     Indeed, throughout 2006 Merrill Lynch continued purchasing the CDO securities that its customers were rejecting, despite the deterioration of the subprime and CDO markets and warnings from its own analyst that a subprime meltdown was imminent.  Tully, *supra*.

**5.     Published Warnings Place Plan Fiduciaries on Notice of Need To Investigate Risks at Merrill Lynch.**

150.     On September 25, 2006, Kenneth Bruce, Merrill Lynch's own analyst, warned his clients that demand for subprime bonds "could dissipate quickly," exposing their holders to losses.  Bruce specifically warned that rising chances of an "asset fire-sale" could cause prices to fall.  Al Yoon, *"Irrational" Mortgage Bond Prices Polarize Market*, Reuters, Sept. 25, 2006.

151.     On September 25, 2006, *Reuters* reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against subprime-related securities since late 2005."  *Reuters* also reported warnings that worsening credit quality in housing would soon sting holders of subprime mortgage bonds and there was plenty data to support their views.  *Id.*

152.     In mid-November 2006, Ownit Mortgage Solutions, Inc. (one of the mortgage lenders from which Merrill Lynch bought loans to repackage into mortgage backed securities) defaulted on its credit line and Merrill Lynch seized the company's assets and demanded that Ownit buy back the poorly performing loans.  Because it did not have the cash to buy back all its defaulting loans, Ownit declared bankruptcy in December 2006.  Bradley Keoun, *Ownit Mortgage, Part-Owned by Merrill, Shuts Down This Week*, Bloomberg, Dec. 7, 2006.

- 47-

EXHIBIT C

153.    On December 5, 2006, a Merrill Lynch analyst reported that losses on recent subprime deals could be 6% to 8% if home prices were flat in 2007 and in double digits if home prices fell by 5%.  The analyst's report further stated that falling home prices could trigger losses not only in riskier classes of mortgage-backed securities, but also in investment grade bonds. Simon & Hagerty, *supra*.

154.    On December 15, 2006, the *Wall Street Journal* reported that: ". . . investors are watching to see if the effects [of subprime crisis] will be felt in CDOs.  That's because the mortgage-lending money trail ends at the asset-backed CDOs, which are backed largely by subprime mortgage bonds."  *See* Danielle Reed, *Eyeing CDOs for Signs of Trouble – To Gauge Subprime Fallout, Bond Investors Scrutinize Esoteric Concerns of Market*, Wall St. J., Dec. 15, 2006.

155.    On December 20, 2006, the *Center for Responsible Lending* issued a report predicting the worst foreclosure crisis in the modern mortgage market.  Ron Nixon, *Study Predicts Foreclosure for 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006.  Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings.  *Id.*

156.    In January 2007, as concerns about subprime mortgages grew, the ABX 06-2 dropped from about 95 to below 90.  Traders using the ABX index to bet against subprime mortgages were booking large profits.  Kate Kelly, *How Goldman Won Big On Mortgage Meltdown: A Team's Bearish Bets Netted Firm Billions*, Wall St. J., Dec.14, 2007.

157.    Nonetheless, on January 1, 2007, to gain access to a larger number of subprime mortgages, Merrill Lynch paid $1.3 billion for First Franklin, a mortgage company that catered to subprime borrowers.  As *Reuters* reported: "The First Franklin deal puzzled analysts because

EXHIBIT C

the market for subprime loans was souring in a hurry when the deal was announced.  Home price appreciation that allowed subprime borrowers to refinance and escape sharp increases in mortgage payments had also come to a halt."  Yoon, *supra.*

158.    On January 3, 2007, *Consumer Affairs* published an article that warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of substandard materials, and the signs point to even more pain in the housing market as a result."  Martin H. Bosworth, *Subprime Lender Implosion: Bad Omen For Housing,* Consumer Affairs, Jan. 3, 2007.

159.    Indeed, by early 2007, the collapse of the subprime lending industry was well underway.  By late February 2007, the ABX 06-2 index fell close to 60.  *See* Kate Kelly, *supra.*

160.    On March 11, 2007, the *New York Times* reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy.  Morgenson, *Crisis Looms In Market for Mortgages, supra.*

161.    On March 14, 2007, *Bloomberg News* reported that "[b]ond investors rattled by mounting losses in subprime U.S. mortgages say that trouble is brewing in collateralized debt obligations, or CDOs."  Caroline Salas and Darrell Hassler, *Around the Markets:  Investors Worry That a Bust Awaits the CDO Market*, Bloomberg News, Mar. 14, 2007.  Investors "need to worry a good bit" about subprime delinquencies spilling over into the CDO market, said Mark Adelson, head of structured finance research at Nomura Securities in New York.  *Id.*

162.    Lehman Brothers reported that, as of March 2007, CDOs backed by asset-backed securities had already lost about $20 billion in value as delinquencies increased.  *Id.*

- 49-

EXHIBIT C

163.    On March 29, 2007, the *Wall Street Journal* reported that New Century Financial

Corp., the largest U.S. subprime lender ,was at the "brink of bankruptcy" because it could not

pay back loans it took from Wall Street banks:

> Increased defaults were hammering [subprime] loans . . . and its lenders were
> preparing to declare it in default.
>                                       ***
> By extending generous credit to subprime lenders, Wall Street firms financed the
> borrowing binge that helped fuel the housing boom.  Those firms now are turning
> off the money spigot.  They see more borrowers having trouble paying off those
> mortgages in a slowing economy, which has made investors less willing to pour
> money into the sector.
>                                       ***
> Wall Street isn't yet free of risk from the mess.  If it drags down the economy or
> weighs too much on the housing market, the banks will feel pain like everybody
> else.  The firms also could see losses if the value of mortgages they accepted as
> collateral falls too far or if their risk-hedging strategies weren't up to snuff.
>                                       ***
> And burned investors and borrowers could sue the Wall Street banks, arguing that
> they shouldn't have allowed things to get out of hand. A lawsuit seeking class-
> action status, filed on March 19 in federal court in California, includes Morgan
> Stanley and Bear Stearns as defendants, alleging that they included false
> statements in documents describing New Century's plans to sell new preferred
> shares of itself to the public.

Gregory Zuckerman, *How Street Hit Lender -- 'Subprime' King New Century Was Down*

*but Not Quite Out; Then, Banks Shut Cash Spigot*, Wall St. J., Mar. 29, 2007.

164.    On March 30, 2007, *Reuters* reported that the subprime mortgage crises was

making investors wary of CDOs, or bonds secured by other bonds:

> Wall Street is cooking up even riskier deals offering bigger returns to lure hedge
> fund investors…called CDO squared.  Many buyers have been skeptical of CDO
> squareds,[35] however.  A flurry of CDO squared deals could make any deeper
> fallout from the subprime mortgage crises even worse.  Prices on some risky
> subprime mortgage securities have sunk even lower than junk bonds, although
> they retain high-grade ratings from credit agencies. Many CDOs are supported by
> subprime loans, and have so far lost about $20 billion in market value, Lehman
> Brothers said.  Meanwhile, CDO managers have sold billions of dollars' worth of

---

[35]    CDOs that securitized assets comprised of CDO securities are referred to as "CDO squared."

EXHIBIT C

> credit insurance on CDOs in recent months, throwing these derivatives into 'synthetic' CDO squared deals. One scenario is that subprime CDOs will be especially vulnerable to further subprime turmoil because of their appetite for derivatives. That, Nomura's Adelson says, could potentially lead to an "absolute bloodbath."

Neil Shah, *Subprime Mortgage Scare Spurs even Fancier CDOs,* Reuters, Mar. 30, 2007.

165. On April 2, 2007, New Century filed for Chapter 11 bankruptcy. Julie Creswell, *New Century Files for Bankruptcy*, N.Y. Times, April 2, 2007.

166. On April 12, 2007, some analysts questioned the risk posed by Merrill Lynch's exposure to the subprime mortgage market, given the depressed market. Defendant O'Neal unequivocally dismissed those concerns. Defendant O'Neal's statements were highly misleading. As *MarketWatch* reported:

> Analysts at Banc of America Securities said Merrill's subprime losses could make bonds that it issues riskier than rivals such as Bear Stearns Cos., the biggest issuer of mortgage-backed securities on Wall Street.
>
> But speaking Thursday [April 12, 2007] in Philadelphia, Chief Executive Stanley O'Neal told Dow Jones that reports have "exaggerated and misunderstood the nature of the business and how it's managed … and it's not consistent with what I would assess the state of the business to be."

David Weidner, *Merrill Results Could Shed Light On Exposure,* MarketWatch, Apr. 12, 2007.

167. On April 19, 2007, responding to questions during an earnings call with Wall Street analysts, Edwards commented on the First Franklin acquisition stating that it may not add to earnings by the end of 2007, as was expected, due to a "difficult environment for the origination, securitization and trading of nonprime mortgage loans and securities in the U.S." *See* Jed Horowitz and Randall Smith, *Merrill Shrugs Off Stock, Subprime Woes as Profit Skyrockets,* Wall St. J., Apr. 20, 2007. Edwards stated that, in the face of the subprime crisis, Merrill Lynch "just powered on through." *Id.*

-51-

EXHIBIT C

168.    On April 24, 2007, the *Wall Street Journal* reported that S&P and Moody's, the agencies that had rated subprime related securities, "have a reputation dilemma . . . Now, some critics are asking why they did not spot the mess in subprime mortgages -- which cater to especially risky homeowners."  The companies are "implicitly admitting that [their] initial assumptions . . . did not adequately predict the damage that was to come."  Serena Ng, *Subprime Cloud Overshadows S&P, Moody's*, Wall St. J., Apr. 24, 2007.

169.    On May 3, 2007, UBS announced that it would close its subsidiary, Dillon Read Capital Management, due to mortgage losses.  *Shareholder Report on UBS's Write-downs*, UBS AG, Apr. 18, 2008.

170.    On May 14, 2007, despite the deteriorating market for CDO and subprime related securities, Dow Kim, head of Merrill Lynch's investment banking business, stated that "we are growing our leading CDO business."  *See* Greg Fleming and Dow Kim, *UBS 2007 Financial Services Conference*, May 14, 2007, *available at* http://files.shareholder.com/downloads/MER/98834184x0x100475/8009ea49-f245-4a26-b08d-140ceab31db1/UBS%20Conference0514_2007-Remarks.pdf.

171.    On June 20, 2007, Merrill Lynch seized $800 million in assets from two Bear Stearns hedge funds that were involved in securities backed by subprime loans, which Merrill Lynch then sold.  *Merrill Sells Assets Seized From Hedge Funds*, CNNMoney.com, June 20, 2007.

172.    On June 27, 2007, the *Financial Times* reported that around the globe investors were leery of the pricing methods banks were using to value CDO securities.  The hedge funds wrote-down the value of their CDO securities by almost 50% during the Spring of 2007.  Saskia

EXHIBIT C

Scholtes, *Worries Grow About the True Value of Repackaged Debt,* Financial Times, June 27, 2007.

173.    On June 27, 2007, Christopher Whalen of Institutional Risk Analytics, a consultancy, stated: "The lack of a publicly quoted market for CDOs and like assets is exacerbating the liquidity problems for these assets beyond the underlying economics, for example, in subprime real estate." *Id.* Amitabh Arora, head of interest rate strategies at Lehman Brothers, pointed to a further potential impact from the Bear Stearns upheaval: "The bigger risk now is that it calls into question CDOs as a financing vehicle in the corporate credit market – I think in the next six to 12 months we will see a significant reassessment of CDOs as a financial vehicle not just in the subprime world but the corporate world too." *Id.*

174.    In July, 2007, the two Bear Stearns hedge funds filed for bankruptcy. Jeremy Herron, *Bear Stearns Hedge Funds File For Bankruptcy Protection*, Associated Press, Aug.1, 2007.

175.    Nonetheless, Merrill Lynch underwrote $28 billion in mortgage CDO securities in the first half of 2007, a pace that would have exceeded the record-breaking $44 billion in CDO securities the Company underwrote in 2006. Merrill Lynch, Quarterly Report (Form 10-Q) (June 29, 2007), at 97.

176.    During the summer of 2007, the credit crunch intensified and demand for CDOs completely stagnated. In addition to the CDO securities that Merrill Lynch purchased, it "got stuck with subprime assets they had intended to eventually place in CDO entities. In addition, as underwriters of the deals, some were also left with large amounts of CDO bonds they could no longer sell." Eavis, *supra*.

- 53-

EXHIBIT C

177.    Throughout the summer of 2007, the *Wall Street Journal* published several

articles predicting that Wall Street banks that were heavily involved in underwriting subprime

securities, such as Merrill Lynch, had losses hidden on their books and in off balance sheet

vehicles.  For example, on August 2, 2007, the *Wall Street Journal* reported:

> Investors have long complained about the lack of transparency when it comes to
> huge financial firms, whose balance sheets are so big that they can easily mask
> multimillion-dollar gains or losses.  Analysts and investors currently cite several
> potential factors that could help hide subprime wounds.  Corporate executives and
> fund managers may still be relying on inflated values for mortgage-related
> securities.  The widespread use of off-balance-sheet vehicles by banks and other
> financial institutions may also enable them to shift losses elsewhere.  And a menu
> of choices offered to companies by accounting rules allows management to decide
> whether to recognize certain losses or push bad news into the future. . . .markets
> are going to have to keep guessing about where losses are and how bad they could
> be.  While serious problems have yet to emerge for many larger financial players,
> it is "likely that institutions have large embedded losses" that are so far being
> hidden.
>
> The mystery of 'where are the losses?' has confounded hedge funds searching for
> opportunities to bet against banks whose day of reckoning has yet to come.
> 'We've been looking for financials that show losses from these securities on their
> books, and they've been very difficult to find.  It's very opaque" says Keith Long,
> president of a hedge fund with $150 million in assets.

David Reilly and Karen Richardsom, *Subprime Detectives Search in Dark for Next Victim ---*

*Wall Street Can Bury Mistakes in Fine Print,* Wall St. J., Aug. 2, 2007.

178.    By the end of June 2007, Merrill Lynch had accumulated at least $43 billion in

net exposure to CDO securities and subprime mortgages.  The warnings of trouble had

accumulated since at least September of the previous year, but in its June 2007 10-Q (published

in August of 2007), Merrill Lynch did not disclose the extent of their exposure.  Commentators

have acknowledged that Merrill Lynch was "sitting on rotting piles [of] highly suspect, thinly

traded securities [sic] [that nobody wanted to touch]."  Tully, *supra*.  As described *infra*, Merrill

Lynch withheld this information from the public until October 24, 2007, when it first disclosed

EXHIBIT C

its CDO and subprime related securities exposure.  *See* Merrill Lynch Current Report 8-K (Oct. 24, 2007).

179.    On August 6, 2007, American Home Mortgage filed for Chapter 11 bankruptcy. Associated Press, *American Home Mortgage Seeks Chapter 11 Bankruptcy Protection*, N.Y. Times, Aug. 7, 2007.

180.    On August 9, 2007, French bank BNP Paribas stopped valuing three of its funds and suspended all withdrawals by investors after United States subprime mortgage woes had caused "a complete evaporation of liquidity."  Simon Kennedy, *BNP Suspends Funds Amid Credit-Market Turmoil*, MarketWatch, Aug. 9, 2007.

181.    On August 14, 2007, Thornburg Mortgage, a jumbo mortgage lender, announced it was delaying its dividend after facing margin calls and disruptions in funding mortgages in the commercial paper and asset-backed securities markets.  Thornburg shares fell over 46% on the news.  Alistair Barr, *Thornburg Mortgage Delays Dividend Amid Margin Calls*, MarketWatch, Aug. 14, 2007.

182.    On August 16, 2007, Countrywide Financial Corporation, the biggest U.S. mortgage lender, narrowly avoided bankruptcy by taking out an emergency loan of $11 billion from a group of banks.[36]  "In the wake of the subprime meltdown, Countrywide Financial -- along with many other mortgage lenders-- finds itself with a heavily devalued loan portfolio." Evelyn M. Rusli, *Countrywide Breaks Into the Piggy Bank*, Forbes, Aug. 16, 2007.  The price of Countrywide stock dropped 20.9% in one day after news of its liquidity problems was released.

---

[36]    On August 16, 2007, Countrywide announced that its ongoing liquidity problems (due to the drop off in demand for non-agency mortgage backed securities) had forced it  to draw on its entire $11.5 billion credit line.

EXHIBIT C

183.    On August 31, 2007, President Bush announced a limited bailout of U.S. homeowners unable to pay the rising costs of their debts.  Steven R. Weisman, *Bush Plans a Limited Intervention on Mortgages*, N.Y. Times, Sept. 1, 2007.

184.    On August 31, 2007, Ameriquest, the largest subprime lender in the U.S. as of 2005, announced it was going out of business.  Jonathan Stempel, *Ameriquest Closes, Citigroup Buys Mortgage Assets*, Reuters, Sept.1, 2007.

185.    On September 14, 2007, BBC News reported a run on the bank at Northern Rock Bank (a U.K. bank), which was precipitated by liquidity problems related to the subprime crisis. The Bank of England agreed to give emergency financial support to the Northern Rock, one of the U.K.'s largest mortgage lenders.  *Northern Rock Gets Bank Bail Out*, BBC News, Sept. 13, 2007.

186.    By the Fall of 2007, the government decided to intervene in the credit crisis to prevent further damage to the economy.  On October 15, 2007, a consortium of U.S. banks backed by the U.S. government announced a "Super-SIV" between $75-80 billion to purchase mortgage backed securities whose mark-to-market value plummeted in the subprime collapse. Gillian Tett, Krishna Guha, & David Wighton, *Banks Agree $75bn Mortgage Debt Fund*, Financial Times, Oct.15, 2007.

187.    On December 21, 2007, the plan for the "super fund" was abandoned.  David Ellis and Ben Rooney, *Banks to Abandon 'Super-SIV' fund: Citigroup, JPMorgan and BofA Cancel Plans for a Mortgage Backed Securities Rescue Fund, but Leave the Door Open in Case of More Credit Woes,* CNNMoney.com, Dec. 21, 2007, *available at* http://money.cnn.com/2007/12/21/ news/companies/super_siv/index.htm.

EXHIBIT C

188.   On December 22, 2007, the *Economist* estimated subprime defaults would reach a level between $200-300 billion.  *The Credit Crunch:  Postcards From the Ledge*, The Economist, Dec. 19, 2007.

189.   On January 11, 2008, Bank of America made an agreement to bailout Countrywide for $7.16 per share, approximately 16% of its value of $44.55 per share less than a year before. *See* Mark DeCambre, *BofA to Buy Countrywide*, TheStreet.com, Jan.11, 2008, *available at* http://www.thestreet.com/s/bofa-buys-countrywide-for-4b/newsanalysis/banking/10398119.html?puc=googlefi.

**6.   Defendant Merrill Lynch Knew the CDO Securities Underwritten and Purchased by Merrill Lynch were Risky and Illiquid Securities Despite their AAA Ratings.**

190.   Given the large number of AAA CDOs that have been downgraded to junk or have defaulted, various investigatory bodies and Wall Street analysts have questioned why any tranche of correlated triple B rated assets should have received a AAA bond rating simply because it had been repackaged into a new security.

191.   For example, 75% of the issuance of one of Merrill Lynch's CDOs, Norma CDO I Ltd.  ("Norma"), was initially rated AAA despite the fact that its underlying assets were largely of credit default swaps on "triple B" (the lowest investment-grade rating) mortgage backed securities and securities of other CDOs.  Within less than a year Moody's downgraded seven of the nine tranches to junk and Fitch downgraded all nine tranches to junk.  Mollenkamp & Ng, *supra*.

192.   Similarly, in May 2008, Fitch downgraded to junk three classes of a CDO underwritten by Merrill Lynch ("TORO I"), where the underlying portfolio consists of subprime residential mortgage backed securities (46%), CDO securities (25%), and other non-subprime

- 57-

EXHIBIT C

mortgage related securities (29%). The three tranches that were downgraded to junk were initially rated AAA , AA  and BBB (all investment grade).

193.    According to Henry Paulson's Policy Statement on Financial Market Developments, underwriters of CDOs "shopped" for credit ratings in the process of issuing new CDO securities.  CDO underwriters often did not disclose to investors in their CDOs the preliminary ratings they received from the Credit Rating Agencies.  *See* The President's Working Group on Financial Markets, *Policy Statement on Financial Market Developments*, Mar. 13, 2008.

194.    In fact, Mr. Riccardi (head of Merrill Lynch CDO group) "was in frequent contact with rating firms like Moody's Investors Service and Standard & Poor's, say former analysts, pushing to get the best possible ratings on securities issued by his group. A former managing director at one rating firm says Mr. Ricciardi sometimes personally lobbied senior rating executives for better ratings[.]"  Ng & Mollenkamp, *Pioneer Helped Merrill Move into CDOs*, *supra*.

195.    Andrew Cuomo, Attorney General of New York, initiated a subprime investigation to determine whether Merrill Lynch had concealed information from credit-rating agencies (*i.e.*, the warnings it received about exceptions or mortgages that did not meet minimum lending standards) in an effort to bolster ratings of mortgage securities and make them more attractive to buyers.  *See* Kate Kelly, Amir Efrati & Ruth Simon, *State Subprime Probe Takes a New Track*, Wall St. J., Jan. 31, 2008.

196.    At the culmination of a 10-month investigation, the SEC issued a report in early July 2008 stating that the three major credit ratings (Standard & Poor's, Moody's Investors Services, and Fitch Ratings) had significant deficiencies in policies and procedures for rating

structured products tied to subprime mortgages – including conflict-of interest problems with their "issuers pay" fee model.  Marie Leone, *Subprime Slam: SEC Exposes Rating Agency Faults,* www.cfo.com/article.cfm/11699984, July 8, 2008; *See also* Sudip Kar-Gupta, *SEC Probing Main Credit Rating Agencies*, Reuters, May 26, 2008.

197.    "The whole idea," says Brad Hintz of Bernstein Research, "is taking a pool of risky, illiquid bonds and, through the magic of securitization, offering higher yields than on similarly rated securities."  Tully, *Wall Street's Money Machine Breaks Down:  The Subprime Mortgage Crisis Keeps Getting Worse-and Claiming More Victims, supra*.

198.    Merrill Lynch received fees every time it securitized and re-securitized subprime mortgages into subprime related securities (*e.g.*, CDO securities).  For example, Merrill Lynch first earned underwriting fees from repackaging (securitizing) subprime mortgages into mortgage backed securities.  Then Merrill Lynch earned additional fees by repackaging mortgage backed securities into CDO securities.  Then Merrill Lynch earned still more fees from repackaging the CDO securities into new CDO securities (known as "CDO squared" securities).  In fact those CDO securities were then sometimes repackaged again for additional underwriting fees into "CDO cubed" securities.[37]



Note: CDOs that securitize assets comprised of CDO securities are referred to as "CDO squared" and CDOs that add another layer of securitization are referred to as "CDO cubed."  Mollenkamp & Ng, *supra*.

---

[37]    Merrill Lynch's underwriting fees averaged 1.25% of its total deal volumes, or around $12.5 million for each $1 billion RMBS or CDO issuance (*i.e.*, every time assets were repackaged into new subprime related securities, they took additional underwriting fees).

EXHIBIT C

199.    The practice of re-securitizing subprime related assets that have already been securitized once, twice or even three times generated fees for the handful of big banks who were heavily involved in subprime underwriting without actually adding value in the repackaging process.  This was because the purchasers of the CDO securities was a rather small pool of investors (mostly other banks who needed CDO securities to repackage into new CDOs).  Normally the purpose of a CDO is to spread the risks of uncorrelated assets among a pool investors willing to take on different amounts of risk through the new CDO securities that are separated into tranches.  *Id.*

200.    Merrill Lynch's securitization shenanigans produced short-term gains in the form of fees, but exposed the Company to massive and unacceptable risk.  "Everyone was passing the risk to the next deal and keeping it within a closed system," says Ann Rutledge, a principal of R&R Consulting, a New York structured-finance consultancy.  "If you hold my risk and I hold yours, we can say whatever we think its worth and generate fees from that.  It's like . . . creating artificial value."  *Id.*

201.    Such cross-selling benefited banks like Merrill Lynch in the short-term because it helped support the flow of new CDOs and underwriting fees.  Each CDO sold some of its CDO securities to the next CDO, which could repackage those securities again into a new CDO issuance to provide additional underwriting fees.  Critics say the cross-selling reached such proportions that it artificially propped up the prices of CDO securities.[38]  *Id.*

202.    "It is a tangled hairball of risk," according to Janet Tavakoli, a Chicago consultant who specializes in CDOs, who described how risky Norma's CDO securities were in the

---

[38]    The Wall Street Journal reported that, according to Greg Medcraft, Chairman of the American Securitization Forum, the use of derivatives "multiplied the risk," of the newly issued CDO securities.  "The subprime mortgage crisis is far greater in terms of potential losses than anyone expected because it is not just physical loans that are defaulting."  Mollenkamp & Ng. *supra*.

EXHIBIT C

following terms:  "In March of 2007, any savvy investor would have thrown this . . . in the trash

bin."  Mollenkamp & Ng, *Wall Street Wizardry Amplified Credit Crisis – A CDO Called Norma

Left 'Hairball of Risk':  Tailored by Merrill Lynch, supra*.

203.    Moreover, the fact that Merrill Lynch paid money to enter credit default swap

contracts with non-investment grade counterparties (with doubtful ability to make good on their

obligations) to "insure" against the risk of loss of its portfolio of "super senior" CDO and

subprime securities, demonstrates that the Company knew that these securities were risky and

illiquid assets, despite their initial AAA rating.  Since then, the fact that many of Merrill Lynch's

CDOs have been downgraded to junk or are in default, confirms that the Company knew long

before they disclosed this information to its employees and the investing public.

204.    As the *Wall Street Journal* reported: "There isn't an active market for many

CDOs, and they don't have observable prices.  Instead, to value such securities, companies and

investment funds often rely on quotes from dealers, which may be unrealistic, out of date or

based on their own internal investment models."  David Reilly and Karen Richardsom, *Subprime

Detectives Search in Dark for Next Victim --- Wall Street Can Bury Mistakes in Fine Print,* Wall

St. J., Aug. 2, 2007.

205.    In addition, banks like Merrill Lynch with CDO and subprime securities, have

sold risky securities into off-balance-sheet vehicles.  "In theory, investors shouldn't have to

worry once such a sale occurs.  But in practice, banks can still bear some risk associated with

them."  *Id*.

206.    Another way companies and banks can hide losses on securities backed by risky

mortgages is to classify them for accounting purposes as being "held to maturity."  "This

effectively precludes a company or bank from selling the security, but also means that it does not

- 61-

EXHIBIT C

have to mark the security to market on its books.  Instead, the security stays on the books at its historical cost.  Investors won't know if companies tried this maneuver until they file annual results for 2007, in which case they would have to disclose the amount of securities classified this way during the year," said Edward Ketz, an accounting professor at Pennsylvania State University.  *Id.*  Such conduct by Merrill Lynch contributed to the artificial inflation of Merrill Lynch's stock price during the Revised Class Period.  (*See* discussion in footnotes 8 and 48, *supra.*)

**B.  Defendants Cause or Permit the Purchase of Merrill Lynch Stock as Defendants Merrill Lynch and O'Neal Tout Merrill Lynch's Financial Health, Despite Knowledge of Merrill Lynch's Inadequately Disclosed Stock Risk.**

207.  Throughout the Revised Class Period, Merrill Lynch repeatedly made false statements regarding its financial condition and false assurances to the Plans' participants and the public regarding the sufficiency of its risk-management processes to the Plans' participants.  These false statements caused the price of Merrill Lynch stock to be artificially inflated during the Revised Class Period.

208.  Defendant Merrill Lynch necessarily knew its own financial condition and O'Neal's position as CEO within the Company indicates that he had access to adverse undisclosed information about the Company's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided them in connection therewith.

- 62-

EXHIBIT C

209.    Because of his access to this information, Defendant O'Neal knew or should have known that Merrill Lynch's common stock was an imprudent investment during the Revised Class Period.  All of this information about the riskiness of Merrill Lynch shares was within the knowledge of Defendant Merrill Lynch.  Because of the steady drumbeat of published warnings, the remaining Defendants should have conducted an independent investigation of the risks posed by Merrill Lynch stock during the Revised Class Period, and had they done so would have learned the extent of the risk.  No prudent fiduciary would allow employees to invest in a company facing (and hiding) the tremendous risks Merrill Lynch took on during the Revised Class Period, including subprime and CDO related exposures greater than the total book value of the Company.

210.    Nonetheless, the Plans' fiduciaries continued to offer Merrill Lynch stock as an investment option and permitted the Plans to purchase additional shares even during the time that the stock collapsed in value as a result of the collapse of the CDO and subprime markets.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plans' assets devalued so quickly.

211.    Despite the Defendants' knowledge or what should have been their knowledge of Merrill Lynch's risky business practices during the Revised Class Period, the Company fostered a positive attitude toward Merrill Lynch stock as an investment for the Plans' assets. Management, including Defendant O'Neal, touted strong Company performance and stock benefits.  Employees were continually told positive news by Company executives about Merrill Lynch's growth (*e.g.*, numerous employee newsletters, memos and letters, including a July 2007 memo from Defendant O'Neal to employees, described above) and were led to believe that Merrill Lynch stock was a good investment, and that the Plans were prudently managed.

- 63-

EXHIBIT C

212.    Merrill Lynch publicly and repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be misleading, including the following.

213.    In a January 2007 newsletter addressed to employees, Merrill Lynch titled the cover story:  *Precise Execution Yields Record Quarter and Record Year.*   The Company stated: "Dear Colleagues: Congratulations on a great quarter and a great year!"   Defendant O'Neal stated: "By virtually any measure, our company completed the most successful year in its history."[39]  *See* Merrill Lynch January 2007 Memo, *Precise Execution Yields Record Quarter and Record Year,* Jan. 22, 2007.

214.    When asked about how Merrill Lynch would stay competitive with Goldman Sachs, Morgan Stanley and Lehman Brothers, Defendant O'Neal highlighted "the principal risk taking that we've accelerated and developed a lot."  Then Dow Kim stated:

> To Stan's point, I think it's fair to say that we have caught up versus a lot of these firms - Goldman, Morgan Stanley and Lehman - especially in the past 18 months or so, and the momentum is incredibly strong.  We have to stay disciplined in terms of continuing to invest in some of the key areas, but I would say that we no longer have any major gaping holes in any of the asset classes, functions or geographic locations.  It will be a matter of continuing to build out these major areas as we have done so in the past 18 months.  But we are in great shape and we have a tremendous amount of momentum going into 2007.

*Id.*

215.    On January 18, 2007, Merrill Lynch reported its financial results for the fourth quarter and full year 2006, in a release in which Defendant O'Neal touted:

> By virtually any measure, our company completed the most successful year in its history.  Revenues, earnings, earnings per share and return on

---

[39]    During a Q&A session with employees, "Management Update Q & A: 4Q and Full Year 2006," when an employee asked Defendant O'Neal whether the Company should split its stock as it approached $100 per share, Defendant O'Neal did not temper such optimism.  Instead, he said that the level of stock price (close to an all time high) provided options.

EXHIBIT C

equity all grew strongly as a result of our continued emphasis on
broadening the asset classes and capabilities we can offer clients,
expanding our geographic footprint, diversifying our business mix,
managing and deploying our capital more effectively, and investing in top
talent.

*See* Merrill Lynch Current Report 8-K (Jan. 18, 2007), at Ex. 99.1.  On that date, the Company's

stock closed at $95.40 per share.

216.    During a Fourth Quarter 2006 Earnings Call on January 18, 2007, Jeffrey N.

Edwards, Senior Vice-President and Chief Financial Officer stated:

[O]ur Investment Banking business continued to make great strides
ranking number one for the quarter in global equity and equity linked
underwriting league tables and number one in 2006 in CDO issuance for
the third year in a row as we continue to be an innovator in that space.  For
the year we also ranked in the top five in global high yield origination for
the first time since 1998, and this is the first year since 2003 that any non-
commercial bank player has cracked the top five in this crucially
important product category.

217.    On February 26, 2007, Merrill Lynch released its 2006 10-K annual report, which

mentioned the word "subprime" (or "sub-prime") only three times and never mentioned the word

"CDO" (or "Collateralized Debt Obligation").  Merrill Lynch also falsely represented that its

"risk management and control process ensures that our risk tolerance is well-defined and

understood by our businesses as well as by our executive management."  2006 10-K.  On that

date, the Company's stock closed at $86.66 per share.

218.    Merrill Lynch also stated in its 2006 10-K that it retained only $6.8 billion worth

of all securitizations in 2006, which included CDOs:

In certain instances, Merrill Lynch retains interests in the senior tranche,
subordinated tranche, and/or residual tranche of securities issued by
certain SPEs created to securitize assets.

Retained interests in securitized assets were approximately $6.8 billion
and $4 billion at December 29, 2006 and December 30, 2005,
respectively, which related primarily to residential mortgage loan and

- 65-

EXHIBIT C

> municipal bond securitization transactions. The majority of the retained
> interest balance consists of mortgage-backed securities have observable
> market prices. These retained interests include mortgage-backed
> securities that Merrill Lynch expects to sell to investors in the normal
> course of its underwriting activity.

*Id.*

219.    In a March 9, 2007 memo to employees, Merrill Lynch touted its purchase of First Franklin despite the fact that much had been made in the press at that time about potential credit problems in the U.S. non-prime mortgage markets and the operations of Merrill Lynch and other major securities firms.[40]  *See* Merrill Lynch March 2007 Memo, *Talking Points on MER's Non-Prime Mortgage Business,* Mar. 9, 2007.  The memo stated: "Part of the reason we chose First Franklin, after having looked at many other companies in the space, was the quality of its management team, which, combined with our own risk management expertise gives us confidence in our ability to manage the risks in this business across market cycles."[41]  *Id.*

220.    Strangely, the Company tried to assuage fears among employees about CDO and subprime exposure with its announcement that it had agreed to buy a mortgage originator.  The Company stated: "We do not intend to keep the loans First Franklin originates on our books -- we aim to package them into securitizations as quickly as possible and sell them to investors; this sometimes means we will keep retained interests in the securitizations on our balance sheet."  *Id.*  The Company was optimistic despite concerns about subprime stating:  "We are a global company with many, many other profitable business lines for which the environment is still quite favorable.  While it is easy to be unnerved by one sector having trouble and generating headlines

---

[40]    First Franklin is a mortgage company which catered to subprime borrowers.

[41]    Later, on March 5, 2008, Merrill Lynch announced it was discontinuing mortgage origination at First Franklin due to the deterioration of the subprime lending market.

EXHIBIT C

after a period of time where virtually all our businesses were performing strongly, it is important

to keep the business in its proper perspective." *Id.*

221. The Company went so far as to say:

Ironically, the current malaise in the sector could prove to be strongly positive for Merrill Lynch over the longer term, as the lower-quality participants run the marketplace capitulate, we should actually have the opportunity to gain market share and be better positioned for the eventual cyclical recovery. While our non-prime mortgage business is not immune to the current market environment, it is important to note that we have been through many periods in the past where individual sectors or regions have seen temporary downturns – this is nothing new, and is, in fact, expected. Nearly all of the businesses we operate in have some cyclicality to them, and it is for that reason that diversification of revenue and earnings sources is a key element of our strategy.

*Id.*

222. On April 19, 2007 Merrill Lynch issued its first quarter 2007 financial results

stating:

Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total net revenues over the past five quarters.

Merrill Lynch Current Report 8-K (Apr. 19, 2007), at Ex. 99.1.

223. Nonetheless, Defendant O'Neal stated: "This was a terrific quarter. In an

environment which was volatile at times, we took full advantage of market opportunities and

delivered value to our clients and our shareholders . . . Our product capabilities and geographic

reach are stronger and broader now than at any point in our history, and we continue to make

investments to further enhance our franchise. We remain focused on disciplined growth to

capitalize on the positive secular trends we continue to see unfold." *Id.*

224. In the first quarter conference call with analysts on April 19, 2007, Edwards, the

CFO of Merrill Lynch, stated:

I want to pause here to make a few comments about our U.S. subprime mortgage business, since I know it has been a topic of much discussion and speculation. Let me put this business into context.  As we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as our CDO activity involving subprime, including all the retained interests, you would see that revenues from subprime mortgage-related activities comprise less than 1% of our net revenues for those five quarters.  And even if you were to incorporate, pro forma, the revenues of First Franklin as if they were a part of our firm for all of 2006, the aggregate contribution would still be less than 2%.

That said, this is an asset class that will continue to be significant, both in the U.S. and worldwide.  And the strategic importance of the First Franklin acquisition was clearly evident this quarter, as having both origination and servicing capabilities enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly.

I would also point out that our risk management capabilities are better than ever, and crucial to our success in navigating turbulent markets.  In fact, we've been capitalizing on the market dislocation by recruiting the best talent from competitors, and we fully expect to emerge from this cyclical downturn even better positioned.

At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors.  Finally, it's important to understand that we manage our FICC businesses in aggregate as a portfolio and that portfolio delivered record revenues for the quarter.  On a broader basis, most FICC markets experienced a continued favorable environment characterized by both high levels of client activity and opportunities for proprietary trading, enabling outstanding results as we continue to build out our capabilities in areas that are poised for growth.

225.    During this April 19, 2007 call, Investment Analyst William Tanona, of Goldman

Sachs, asked Edwards:

**Q - William Tanona**: …And then, your commentary there in terms of sharing risk, obviously I think there is a lot of concern out there because you guys are pretty active on the CDO side and the warehouse side of that business.  Can you share your thought process as it relates to that and what the trends you are seeing there in the overall business, as well as possibly even in the subprime space there?

**A - Jeffrey Edwards**:  Well, it was a very active quarter for securitizations, both in the ABS space directly and in the CDO space broadly.  In CDOs, in addition to having a very active ABS calendar, we saw the tension in that business broadening out to other asset classes as well.  But I would point out that even

- 68-

EXHIBIT C

during the most uncertain times during the quarter, we were able to price transactions.  We priced 28 CDO transactions in the quarter, 19 of them were ABS CDOs and more than 10 of those deals were in the first couple of weeks of March, so while it was certainly a more difficult environment, we continued to see an ability to transact and to move volume.  And on the subprime business, maybe just a couple of more comments there.

While it was a difficult environment, we were able to actually increase origination volumes at First Franklin in the quarter.  And in fact, we had record volumes in both January and February.  And we did that in a background where we were enhancing our already strong underwriting standards.  We rationalized our array of products, eliminating certain products that were performing less well, and we successfully raised coupon rates.  And we also saw during the quarter the first payment defaults at First Franklin, of First Franklin-originated paper fall steadily throughout the quarter.  They started out and remain at a level far below the industry.

So I think the trends there show some signs of positiveness, and while it is early to say anything obviously about the second quarter, I'd just point out that we did our First Franklin securitization earlier in the week.  It was a $2 billion securitization and we saw spreads tighter really across all tranches from where they were a month ago, as investors have clearly begun to reengage.

*Id.*

226.    On April 24, 2007, in a letter to employees, Defendant O'Neal, stated:

Last week, the firm reported its best first quarter results ever, powered by record net revenues in each of our three main GMI businesses.  Our portfolio of businesses generated a record $6.5 billion in revenues for the quarter.  This outstanding performance shows the effectiveness of our strategy and affirms our powerful momentum. . . . Thanks to all of you, we've gotten off to a great start for 2007 and have a lot to be proud of.  It's clear that the investments we've made to diversify our platform across regions, asset classes and clients are yielding exemplary results.  Congratulations on our great start!  Stay focused.  Stay intense.  And expect to win!

*See* Merrill Lynch April 2007 Memo, *GMI Starts 2007 with Best Ever First Quarter*, Apr. 24, 2007.

EXHIBIT C

227. Merrill Lynch did not mention concerns expressed by many stock analysts during a recent earnings call about subprime exposure in general and the First Franklin acquisition in particular.[42]

228. In a letter to employees dated April 30, 2007, the Company stated "We should all have reason to feel proud of our results, which speak directly to our renewed capacity to adjust to swiftly changing market conditions." Defendant O'Neal pointed to the fact that the Company was, **"Racking Up Record Results"** and **"Succeeding in a Volatile Environment"** noting that **"**We are achieving consistent growth in revenues, earnings and returns through disciplined investing and solid execution, and I am confident that we can continue to deliver outstanding results." *See* Merrill Lynch April 2007 Memo, *A Note from Stan O'Neal: First Quarter Results*, Apr. 30, 2007.

229. On May 7, 2007, the Company reported that:

> Retained interests in securitized assets were approximately $8.7 billion and $6.8 billion at March 30, 2007 and December 29, 2006, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities that have quoted market prices. The majority of these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity, and only a small portion of the retained interests represent residual interests from subprime mortgage securitizations.

Merrill Lynch, Quarterly Report (Form 10-Q) (Mar. 30, 2007) (hereinafter, "First Quarter 2007 10-Q").

230. In a May 23, 2007 letter to employees announcing a "New Organizational Structure and Leadership Team," the Company stated: "Under Stan's leadership, we reshaped, re-engineered and rethought how we do business at Merrill Lynch. The results speak for

---

[42]/ *See* discussion *infra, page ?.*

EXHIBIT C

themselves. . . .  We are excited by the opportunities we see ahead of us – and confident that by working with each of you – we will deliver the full potential of Merrill Lynch to our clients, shareholders and employees."  *See* Merrill Lynch May 23, 2007 Memo, *New Organizational Structure and Leadership Team*, May 23, 2007.

231.    In July 2007, Merrill Lynch also reported its second-best ever net revenues for the FICC business, with little impact from exposure to mortgage-backed securities but failed to account for the actual valuation of the Company's warehouse of increasingly illiquid CDOs. Merrill Lynch continued to tout the CDO business, citing "continued innovation in the CDO space, including the development of unique new CDO products" among the second quarter highlights for FICC.  *Merrill Lynch Second Quarter 2007 Analyst Conference Call,* July 17, 2007, at 5.  Yet, the Company's FICC net revenues were in fact "partially offset by a ***decline*** in net revenues from the structured finance and investments business, which includes mortgage-related activities."  *See* Merrill Lynch Current Report 8-K (July 17, 2007), at Ex. 99.1 (emphasis added).

232.    During the July 17, 2007 earnings call, Merrill Lynch re-affirmed its risk-management capabilities.  Edwards, who was responsible for the Company's independent risk groups, explained that: "[w]hile we have seen some positive signals . . . the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize.  Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ***ours have proven to be effective in mitigating the impact on our results***."  *Merrill Lynch Second Quarter 2007 Analyst Conference Call,* July 17, 2007, at 5 (emphasis added).

EXHIBIT C

233.    Edwards also answered questions from UBS Investment Analyst Glenn Schorr

and Deutsche Bank's Mike Mayo during the call and reassured investors and the market that the

Company was prepared to weather the volatile CDO market:

**Q - Glenn Schorr**: … Can we switch to the other one that you brought up, in terms of both subprime and CDO exposure?  You are one of the largest – or the largest – underwriter of CDOs, and maybe try to give some color around myth versus reality in how people should think about a) what's on your books in terms of residuals and exposure, and b) maybe even comment on related to some of the Bear hedge funds what collateral you have taken on your books or have not.  And just overall comfort there, as well.

**A - Jeffrey Edwards**: Okay.  Well, look, again I want to make two points.  The first is that this is another example where I think proactive, aggressive risk management has put us in exceptionally good position.  Obviously the market has gone through a period of flux.  We think that remains the case.  But aggressive risk management I think has certainly helped transform our risk profile since the end of the year.  We've seen significant reductions in our exposure to lower-rated segments of the market.  Our warehouse lines are down materially, our whole-loan inventory is down materially.  As was the case in the last quarter, we will see a modest increase in our residual position, but it will be small relative to our overall retained interest piece.  And I think the majority of our exposure continues to be now in the highest credit segment of the market. …

**Q - Glenn Schorr**:   Maybe just a last thing, yes or no – obviously, yes – but point of clarification, therefore anything you're financing in your repo business or through your prime brokerage business or on your own books, you've, to the best of your knowledge at the end of quarter is marked to an effective market even if it is a mark to model type of security?

**A - Jeffrey Edwards**:  Yeah, that's right.  I mean, obviously we have a very robust process around marking these assets, and we're confident in how they were marked, how they'll mark.

\*\*\*

**Q - Mike Mayo**: …Can you remind us what percent of your earnings are related to mortgage or subprime mortgage, and if you could include in that CDOs and warehouse lines or anything else?

**A - Jeffrey Edwards**:  Well, just to remind everybody, we made the comment in the first quarter that over the previous five quarters, all of that activity as broadly as we could define it, represented less than 2%.  As I said, the business overall was down compared to last year, it was up compared to the first quarter.  I don't

think there's anything that would change that comment that I made in the first quarter.

**Q - Mike Mayo**:  Then lastly, a tougher question perhaps, how much of your capital is at risk or how much in total assets do you have that's somehow related to that same category?

**A - Jeffrey Edwards**:  Well, we obviously have a robust economic capital model that we employ to address risk around all of our different assets.  From an overall asset standpoint, again the point I would make there is that there's been, we think, an important transformation of the components of that asset base where the exposure that we retain is in the higher-rated tranches of the exposure, and what we've done is reduce exposure in some of the broader or lower-rated categories.

**Q - Mike Mayo**:  Okay. Do you have an overall number, though, for how much capital you have at risk related to subprime mortgage, CDOs, warehouse lines?

**A - Jeffrey Edwards**:  We don't disclose our capital allocations against any specific or even broader group.

*Id.*

234.    During the same Second Quarter 2007 Earning Call, Edwards claimed that: "Proactive aggressive risk management has put us in an exceptionally good position."  *Id.* However, he failed to disclose that the Company had $43 billion dollars in exposure to risky and illiquid CDO securities and subprime mortgages; that crucial information was withheld until October 24, 2007.  *See* discussion *infra*.[43]  *See also* Merrill Lynch Current Report 8-K (Oct. 24, 2007).

235.    According to the *New York Times*, Merrill Lynch's Board of Directors had been informed of its subprime exposure and CDO obligations as early as April and July 2007, respectfully.  Graham Bowley and Jenny Anderson*, Where Did the Buck Stop at Merrill*?, N.Y. Times, Nov. 4, 2007.  Despite the Company's vast exposure to CDOs and subprime mortgages,

---

[43]/    The Company first disclosed in its October 24, 2007 8-K that it had $40.1 billion of CDO and subprime related net exposure as of June 29, 2007.  *See* Merrill Lynch Current Report 8-K (Oct. 24, 2007).  However, in its September 2007 10-Q filed with the SEC on November 7, 2007, the Company restated the value of its June 29, 2007 CDO and subprime net exposure at $42.7 billion. Third Quarter 2007 10-Q.

EXHIBIT C

the Board, and in particular Defendant O'Neal, failed to take any action to decrease the risks

faced by the Company and the Plans.  The Plans' other fiduciaries likewise did nothing to protect

the Plans from the increasing risks posed by the acquisition and holding of Merrill Lynch shares

particularly in light of the failure to make adequate disclosures.

236.    Disclosing its exposure from its proprietary positions in CDO and subprime

securities was critical for employees and investors to understand the true risk of owning Merrill

Lynch stock because the subprime crisis would not have been "a dire problem for Merrill if it

hadn't gone from simply manufacturing CDOs and reaping fees to becoming a huge investor in

the CDOs it created . . . Merrill was willing, even eager, to speculate with its own balance

sheet[.]"  Tully, *supra*.

237.    In July 2007, Defendant O'Neal sent a memo to employees who were participants

in the Plans praising the Company's performance, particularly its risk management.  Defendant

O'Neal stated that despite scrutiny in the media and by clients, partners, and business prospects,

"we demonstrated our discipline, focus and resilience during a period when market conditions

were turbulent. . . . confirming the wisdom of our ongoing strategy."  *Id.*  When addressing

Merrill Lynch's CDO exposure, he commented that:  "Over the last six months, we have worked

successfully to position ourselves for a more difficult market for CDOs and been proactively

executing market strategies to significantly reduce our risk exposure.  As a result, we are very

comfortable with our current exposure to this asset class."  *Id.* (emphasis added).  Defendant

O'Neal stated: "we've been prudent in managing our exposure. . . .  As a result, recent shifts in

the tenor of the market have not exposed us to significant new downside risk, relative to many of

our competitors."  *Id.*  Defendant O'Neal thus directly communicated with employees/Plan

participants about the risks the Company faced and failed to tell the whole story.  Without

complete and accurate information regarding the true risks that employees' retirement savings faced, employees lacked information they needed to make informed decisions regarding their investment in Merrill Lynch stock in the Plans.

238.    To summarize, Merrill Lynch became the largest underwriter of CDOs over the past few years.  The Company also purchased CDO securities despite the obvious signs that the subprime and CDO markets were deteriorating.  When those markets collapsed, the Company found itself exposed to billions of dollars in losses from securities it could no longer sell because they were almost completely illiquid and had lost most, if not all, of their value.

239.    Nonetheless, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plans' participants throughout the Revised Class Period.  Defendants knew or should have known that the Company's stock price would drop drastically and that Plans' participants would lose billions, once the truth was exposed.

## C.    Merrill Lynch's Belated Disclosure Caused its Stock Price to Plummet.

240.    On September 10, 2007, Merrill Lynch named a Chief Risk Officer for the first time.  *See* Merrill Lynch September 2007 Memo, *Ed Moriarty Named Chief Risk Officer*, Sept. 10, 2007; *See also* Matthew Quin, *Risk Managers Return (Belatedly) to Street*, Financial Week, Nov. 19, 2007.

241.    On October 3, 2007, Merrill Lynch ousted Semerci, the most recent overseer of Merrill Lynch's accumulation of CDOs.  The next day, *Bloomberg News* reported that Merrill Lynch had abandoned its plans to do business with the hedge fund managed by its former executive Dow Kim.  *See* Bradley Keoun, *Merrill Severs Ties With Former Executive Kim's Fund*, Bloomberg News, Oct. 4, 2007.  *Bloomberg News* also reported that: "The company

EXHIBIT C

severed ties instead because Kim had been responsible for the mortgage and fixed-income businesses that are now causing losses."  *Id.*

242.    Unfortunately, the damage to its business had already been done.  On October 5, 2007, Merrill Lynch announced that it would take an estimated $4.5 billion loss related to the Company's exposure to CDO securities and subprime mortgages.

243.    On October 12, 2007, the *New York Times* highlighted for the public the fact that what Merrill Lynch had said to its employees in the July 2007 memo plainly contradicted the Company's true exposure to CDO and subprime securities (which was later disclosed at $43 billion as of June 29, 2007).  The *New York Times* reported that Defendant O'Neal, sent a memorandum to employees outlining the risks he claimed to see in the economy and praising the Company's performance and risk management.  "More than anything else," Defendant O'Neal wrote, "the quarter reflected the benefits of a simple but critical fact:  we go about managing risk and market activity every day at this company."  He stated that the bank was aware of the risks and had taken precautions against them.  "Over the last six months," the memo said, "we have worked successfully to position ourselves for a more difficult market for CDOs and been proactively executing market strategies to significantly reduce our risk exposure."  Anderson, *supra*.

244.    Defendant O'Neal told employees in the July 2007 memo (with $43 billion in CDO and subprime exposure) that managing risk "is what our clients pay us to do, and as you all know, we're pretty good at it."  (*See* July 2007 memo discussed above.)  As described *infra*, on October 25, 2007, O'Neal would report to the press the truth about the Company's CDO and subprime exposure and admit:  "The bottom line is that we got it wrong by being over-exposed

to subprime and we suffered as a result of an unprecedented liquidity squeeze and deterioration in that market." *Merrill Lynch Third Quarter 2007 Earnings Conference Call*, Oct. 24, 2007..

245. On September 21, 2007, Merrill Lynch closed its purchase of First Republic Bank for $1.8 billion. Based on the merger agreement, the aggregate consideration would be paid with 50% Merrill Lynch common stock and 50% cash. The exchange rate used to calculate the number of Merrill Lynch shares paid to First Republic shareholders was based on Merrill Lynch's average closing price over the five trading days preceding September 21, 2007, which was $75.02 per share. *See* Merrill Lynch, *Merrill Lynch to Acquire First Republic Bank for $1.8 Billion,* Jan. 29, 2007; *See also* Merrill Lynch, *Merrill Lynch and First Republic Bank Successfully Close Merger; Final Results of Election Regarding Merger Consideration Announced*, Sept. 21, 2007.

246. As described in a lawsuit against Merrill Lynch by First Republic shareholders,[44] to obtain approval for the merger, Merrill Lynch filed three registration statements (dated May 8, 2007, June 8, 2007 and June 21, 2007) that were materially false and misleading because none disclosed the truth about Merrill Lynch's CDO and subprime exposure. *See Conn v. Merrill Lynch & Co., Inc., et. al.,* No: 07-11626 (S.D.N.Y Dec. 28, 2007) (Class Action Complaint for Violation of Federal Securities Laws).

247. Had Merrill Lynch disclosed the truth about its CDO and subprime losses and exposure, Merrill Lynch's stock would have dropped in value -- as it did when the Company first disclosed its write-downs related to its CDO and subprime exposure starting on October 5, 2007 (as described above).

---

[44/] The Plaintiffs are now Merrill Lynch shareholders because they exchanged their First Republic shares for Merrill Lynch shares.

EXHIBIT C

248.     As a result, Merrill Lynch would have had to issue a greater number of shares to purchase First Republic, which would have had a dilutive effect on its post merger pro forma earnings per share.  As a consequence, the merger may not have been approved by First Republic's Board of Directors or its shareholders.  Merrill Lynch therefore failed to disclose the truth about its exposure and losses from CDO and subprime securities until three weeks after the merger closed and, therefore, was able to purchase First Republic with inflated stock.  *Id.*

249.     In October 2007, Defendant O'Neal addressed Merrill Lynch employees via video and "took pains to pinpoint the date that the credit crunch worsened as the day in early August when European central banks first stepped in to provide liquidity to the banking system, indicating how much conditions had deteriorated."  Randal Smith, *Merrill Loss May Be Wider Than Projected,* Wall St. J., Oct. 24, 2007.

250.     Many employees were shocked by the announcement, which directly contradicted the Company's statements in the July 2007 memo to employees that stated the Company had effectively managed risk such that it was in a positive position with respect to its CDO business despite market pressure in this area.  Although prohibited from speaking on the record, investment bankers, traders and financial advisers quietly expressed disbelief, frustration and a bit of self-interested concern over what the write-down would do to their pay.  "Money at risk doesn't bother me," one senior broker said: "It's the risk of the money.  Is it being run intelligently?  If you take a $5 billion hit, my question is, do these guys know what they are doing?"  Anderson, *supra*.

251.     "According to some analysts, the billion-dollar size of [fixed-income CDO] profits – and the soaring return on equity – should have caused directors to ask whether the risks being taken to generate higher profits warranted better controls."  Bowley & Anderson, *supra*.

EXHIBIT C

Or, as stated by one corporate and securities law professor: "[There are] no free lunches in the capital markets …If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective.  It turns out, they weren't."  *Id.*

252.    As summarized by Brian Foley, an executive compensation expert, the Merrill Lynch situation "looks like a systemic problem in terms of risk management and risk control – the whole nine yards…. There seems to be some blame to go around." *Id.*  But on October 3, 2007, the risks to Merrill Lynch were still understated and only partly disclosed.

253.    On October 25, 2007, Merrill Lynch shocked the market again by taking a write-down of $7.9 billion.  During a conference call announcing the results, Defendant O'Neal commented:

> Over the past few weeks, our FICC management team, led by David, has worked with our Finance staff to undertake a rigorous and comprehensive review of our remaining CDO and subprime related exposures.  This collective review has resulted in the use of more conservative valuation assumptions, and a total net write-down of approximately $7.9 billion for this quarter.
>
> ***
>
> The bottom line is that we got it wrong by being over-exposed to subprime and we suffered as a result of an unprecedented liquidity squeeze and deterioration in that market.  No one, no one, is more disappointed than I am in the result.
>
> ***
>
> Despite the fact that nearly all of our remaining CDO exposure is super senior, it turned out that both our assessment of the potential risk and our mitigation strategies were inadequate
>
> ***
>
> We're not, I'm not, going to talk around the fact that there were some mistakes that were made.  We, I am accountable for these mistakes, just as I am accountable for the performance of the firm overall.  And my job, our job, the leadership team's job – is to address where we went wrong and what changes were necessary, to make sure that we respond to changes in

- 79-

EXHIBIT C

> risk dynamics early, correctly, and in every asset class at every stage of
> the market's evolution.
>
> ***
>
> So, as I have mentioned, we have made a number of important changes….

*Merrill Lynch Third Quarter 2007 Earnings Conference Call*, Oct. 24, 2007.

254.    During the Third Quarter 2007 Conference Call, Defendant O'Neal reiterated the Company's failure to manage its risk and warned that additional write-downs were a possibility. *Id.*

255.    Despite the magnitude of the announcement, both Defendant O'Neal and Edwards refused to provide complete, straight-forward information regarding the Company's disposition of its inventory of CDOs.  One analyst asked the executives about apparent inconsistencies in the accounting of their subprime losses between the second and third quarter of 2007:  "As of the end of June you noted that your ABS CDO related exposure was around $32 billion, $15 billion as of the end of September.  You marked down around $6.  Where did the other $11 go?"  *Id.; See also* Third Quarter 2007 10-Q.  Defendant O'Neal repeatedly refused to comment.[45]

256.    A Lehman Brothers analyst asked whether the existing CDO exposures were held in broker/dealer accounts or on the Company's balance sheet.  Edwards reportedly declined to answer the question, saying "we've provided an extraordinarily high level of disclosure, which should be sufficient."  Third Quarter 2007 Conference Call., *supra.*

257.    During the analyst call, Standard & Poor's announced that it had downgraded Merrill Lynch's debt to A+ from AA-.  *Id.*  Merrill Lynch shares fell 5.7%, causing further significant losses to the Plans.

---

[45]/    This discrepancy was eventually explained in Third Quarter 2007 10-Q.

EXHIBIT C

258.     Neither Defendant O'Neal nor Defendant Edwards could explain why the Company's write-down of asset values – based on a fixed date in time – had nearly doubled in only three weeks.  In fact, Defendant O'Neal flip-flopped during the call, at one point acknowledging "the amount we're now indicating is one that was within the range of valuations we did at the time."  *Id.*  If that statement is true, it is reasonable to infer that the Company realized the massive write-down amount on October 4, 2007, but attempted to mitigate the information's impact on the market by releasing the bad news in increments.

259.     The Company's stock continued to drop over the next days, as rumors swirled regarding Defendant O'Neal's future at the Company and analysts downgraded the Company's stock.  News articles chronicled the FICC business's recent personnel changes and documented the risky practices implemented by young bankers who collected tens of millions of dollars in bonuses and fled the Company before its actual financial condition came to light.

260.     On October 30, 2007, Merrill Lynch announced that Defendant O'Neal had retired, effective immediately.  That day, the Company's stock closed at $65.56 per share, down 14% from a closing price of $76.00 on October 3, 2007, the day before the Company began publicly discussing its subprime losses.

261.     In its third quarter 10-Q, Merrill Lynch reclassified a significant amount of assets and liabilities from Level 2 to Level 3[46] (primarily related to CDO and subprime related

---

[46]     Merrill Lynch adopted the new accounting standard SFAS No. 157 in the first quarter of 2007.  Under SFAS No. 157, companies are required to assess the fair value of assets on their books.  Merrill Lynch was required to label its assets as Level 1, 2, or 3, based on how easy they are to price.  The three-level hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3).  SFAS No. 157 also requires that where no liquid market exists, Merrill Lynch must attempt to value assets using other observable inputs such as:  quoted prices for similar assets or liabilities in other markets, whether active or inactive; observable inputs, other than quoted prices, such as interest rates, yield curves, volatilities, prepayment speeds, loss severities, credit risks, and default rates; and inputs that are derived principally from or can be corroborated by market data.  Changes in the observability of valuation inputs may result in a reclassification for certain financial assets or liabilities.  Second Quarter 2007 10-Q.

EXHIBIT C

securities), due to a "significant decrease in the observability of market pricing for these assets and liabilities."  Third Quarter 2007 10-Q.

**D.      Merrill Lynch Takes Desperate, But Ineffective, Measures To Dump Its CDO And Subprime Exposure.**

262.      Even after the $7.9 billion write-down, analysts questioned how Merrill Lynch had reduced its exposure.  On October 24, 2007, the SEC began investigating Merrill Lynch for engaging in transactions with hedge funds designed to delay reporting its exposure to risky mortgage-backed securities.  *See* Susan Pulliam, *Deals with Hedge Funds May Be Helping Merrill Delay Mortgage Losses*, Wall St. J., Nov. 2, 2007.

263.      The Company immediately denied that it had entered into such transactions.  On the same day the *Wall Street Journal* article appeared, the Company issued a press release:

> The story is nonspecific and relies on unidentified sources.  We have no reason to believe that any such inappropriate transactions occurred.  Such transactions would clearly violate Merrill Lynch policy.

Merrill Lynch, *Merrill Lynch Responds to Wall Street Journal Story*, Business Wire, Nov. 2, 2007.

264.      Five days later, on November 7, 2007, the Company issued its quarterly report on Form 10-Q for the third quarter.  The securities filing did not address the *Wall Street Journal* article, but stated: "[o]n October 24, 2007, the SEC staff initiated an inquiry into matters related to Merrill Lynch's subprime mortgage portfolio.  Merrill Lynch is cooperating fully with the SEC in this matter."  Third Quarter 2007 10-Q.

265.      On November 26, 2007, the *Wall Street Journal* issued the following correction:

> On Nov. 2, the Journal published a page-one article on Merrill Lynch & Co. that was based on incorrect information that the firm had engaged in off-balance-sheet deals with hedge funds in a possible bid to delay the recognition of losses connected to the firm's mortgage-securities exposure.  In fact, Merrill proposed a deal with a hedge fund involving

$1 billion in commercial paper issued by a Merrill-related entity containing mortgage securities. In exchange, the hedge fund would have had the right to sell the mortgage securities back to Merrill after one year for a guaranteed minimum return. However, Merrill didn't complete the deal after the firm's finance department determined it didn't meet proper accounting criteria. In addition, Merrill says it has accounted properly for all its transactions with hedge funds.

*Corrections & Amplifications*, Wall St. J., Nov. 26, 2007.

266. The correction apparently assuaged doubts about Merrill Lynch's accounting for the $1 billion hedge-fund transaction previously reported, but it neither resolved the ongoing SEC inquiry into the Company's subprime mortgage portfolio nor mitigated the damage finally revealed on the Company's day of subprime reckoning. In fact, it confirms that Merrill Lynch itself "proposed" the extraordinary hedge fund deal, designed to conceal its actual financial condition.

267. The Company has been accused repeatedly of using fraud and misrepresentation to find buyers for the CDO securities it was still underwriting in 2007 well after CDO demand fell. Whether or not fraud can be proven, the allegations in these suits demonstrate that Merrill Lynch sought to sell the risky CDOs and subprime securities without full disclosure to the buyers (for no rational buyer with full knowledge would have purchased them), and that these securities became unmarketable before October 2007. Thus, the allegations of these suits provide more evidence that Merrill Lynch itself knew it was overexposed to these risky securities before the October disclosures.

**E.     Merrill Lynch's Improper and Highly Risky Practices Lead to Lawsuits and Governmental Investigations.**

268. Merrill Lynch is the subject of numerous civil suits and is under investigations by several federal and state authorities for fraud in the sales of CDO and subprime related securities.

- 83-

EXHIBIT C

269.     Merrill Lynch was sued by MetroPCS Communications, Inc. for fraud and misrepresentation connected with the sale of senior tranch CDO securities in October 2007.  *See MetroPCS Communications, Inc. v. Merrill Lynch & Co., Inc., et al.*, No. 07-12430 (Tex. Dallas. County Oct. 18, 2007).  MetroPCS hired Merrill Lynch as its investment advisor for its $134 million in cash reserves contingent upon compliance with MetroPCSs Investment Policy that specifically stated that "MetroPCS's risk tolerance is 'LOW' and that cash must, therefore, be invested to preserve capital and to provide liquidity."  (Emphasis in original.)

270.     MetroPCS claims that beginning in May 2007 -- well after the subprime mortgage market had started to show signs of distress:

- Merrill Lynch caused MetroPCS to begin purchasing highly risky CDO securities, which violated its investment policy;

- Merrill Lynch failed to disclose that the collateral backing many of these CDOs had wide ranging exposure to the subprime mortgage market; and

- Merrill Lynch also failed to disclose that it had a conflict of interest in urging MetroPCS to continue to buy these CDO securities because Merrill Lynch was one of the largest underwriters and sellers of such securities and in fact "held significant investments of its own in CDO [securities] and related instruments with subprime exposure and thus stood to lose significantly if the market for such instruments weakened."

*Id.*

271.     MetroPCS asserts that the investments violated its goal of holding only safe, liquid assets but that Merrill Lynch told MetroPCS that the securities were low-risk and highly liquid.

272.     In *Luminent Mortgage Capital v. Merrill Lynch & Co., Inc., et al.,* filed on December 24, 2007, the complaint alleges fraud against Merrill Lynch in the underwriting and sale of mortgage backed securities.  *See Luminent Mortgage Capital v. Merrill Lynch, et al.*, No. 07-5423, (E.D. Pa. Dec. 24, 2007).  Luminent purchased the mortgage backed securities on

- 84-

EXHIBIT C

August 30, 2005.  After doing its own due diligence to gather information about the underlying mortgage loans, Luminent discovered that a substantial portion of those loans did not meet the standard characteristics of "Alt-A" quality loans, and in fact were more akin to subprime loans and that the characteristics of the portfolio as a whole did not comport with the information provided by Merrill Lynch.

273.    In February 2008, the Massachusetts Secretary of State accused Merrill Lynch of fraud in a civil administrative proceeding over its sales of subprime-related debt to the city of Springfield, Massachusetts ("the City").  *See* Jenny Anderson, *Massachusetts Accuses Merrill of Fraud,* N.Y. Times, Feb. 2, 2008.  According to the complaint, Merrill Lynch understood that it was to invest the City's money only in safe-money-market-like investments that would protect the City's principal and as authorized by City personnel.  *See Respondents' Administrative Complaint* at 2, 3 and 9, *In the Matter of L Merrill Lynch, et al.*, No. 2008-001 (Feb. 1, 2008 Commw. of Mass. of the Sec'y of the Commonwealth).  Instead, without disclosing the nature of these instruments, Merrill Lynch invested approximately $14 million of the City's funds in the securities of three highly illiquid "CDO squareds."  *Id*. at 3, 4.  The instruments appeared with other names on the City's account statements through June 2007, but were "quietly relabeled as CDOs in July."  *Id*. at 4.  Shortly after the sale, the market value for CDOs backed by subprime markets began to plummet and the City's accounts began to lose money, prompting the request that the CDOs be sold.  The City was informed that the auctions had failed, the CDOs could not be sold at any price close to their par value, and there were no buyers.  *Id*. at 5 and18.  In a letter dated November 29, 2007, James Mann, First Vice President and Assistant General Counsel of Merrill Lynch, disclaimed responsibility for these investments stating that the City made its own investment decisions.  *Id*. at 6.  However, contradicting this disclaimer, in February 2008, Merrill

EXHIBIT C

Lynch agreed to buy back the securities at their original value of $13.9 million plus attorneys

fees.  Craig Karmin, *Merrill Buys Back CDOs it Sold to Springfield, Mass.,* Wall St. J, Feb. 1,

2008.

274.    Also in February 2008, the Maine State Treasurer's Office, Maine Attorney

General, and the Maine Office of Securities began examining the circumstances surrounding

Merrill's role in the sale of commercial paper issued by a structured investment vehicle (SIV) to

the State Treasury Department for $20 million.  Shortly after the sale, S&P downgraded the SIV

from the highest rating (AAA) to junk status, thereby rendering the assets frozen.  Maine is

investigating whether any laws or rules were violated.  *See* Svea Herbst-Bayliss, *Maine

Treasurer Criticizes Merrill for Subprime Bet*, Reuters, Nov. 28, 2007.  Consequently, Maine

"kicked Merrill Lynch off its bond underwriting team for serving as a broker on a failed state

investment that exposed taxpayers to risky subprime loans, state Treasurer David Lemoine said

on Friday."  Anastasija Johnson, *Maine Bans Merrill Lynch From Bond Team*, Reuters Apr. 4,

2008.

275.    On March 18, 2008, Merrill Lynch was sued by ASTAR Air Cargo, Inc. for

negligence, fraud, breach of fiduciary duty, and breach of contract connected with the

recommendation and sale of auction rate securities (ARS).  *See In the Matter of Arbitration

Between ASTAR Air Cargo, Inc., v. Merrill Lynch & Co., Inc. et al.,* No. .  In the Financial

Industry Regulatory Authority ("FINRA") Case, ASTAR asserts that Merrill Lynch

recommended that it purchase ARS, representing that they were completely safe and extremely

liquid and promised that if the company ever needed access to its cash between ARS auctions,

Merrill Lynch itself would buy ASTAR's ARS positions.  *Id.*  Beginning in the Fall of 2007,

when auctions for ARS began to fail nationwide, Merrill Lynch assured ASTAR that it would

EXHIBIT C

continue to supports its auctions.  However, in February 2008, Merrill Lynch advised ASTAR

that it would not support its ARS and refused to repurchase the ARS holdings.  Consequently,

ASTAR's investments became illiquid.

276.     Similarly on March 25, 2008, Merrill Lynch was sued for misrepresenting to

investors that auction rate securities were equivalent to cash or money market funds and were

highly liquid, safe investments for short-term investing (in fact, they were just the opposite).  *See*

*Burton v. Merrill Lynch & Co., Inc., et al.,* No.08-3037 (S.D.N.Y. Mar. 25, 2008).  Merrill

Lynch failed to disclose that these securities were only liquid at the time of sale because it

artificially supported and manipulated the auction market to maintain the appearance of liquidity

and stability.  This claim was realized and further supported on February 13, 2008, when 87% of

all auction rate securities failed because Merrill Lynch and other major broker-dealers refused to

continue to support the auction.  The market for auction rate securities subsequently collapsed.

277.     Massachusetts regulators filed another administrative complaint on July 31, 2008,

outlining how Merrill Lynch deceived its clients into believing that ARS were safe cash

equivalent investments when in fact they were inherently risky.

278.     On July 17, when asked about Merrill Lynch's ARS exposure, Thain commented

that the "difficult market conditions continue to impact the ARS market as most auctions

continued to fail during the second quarter…[and that] the SEC ha[s] granted special relief that

established the regulatory framework for the introduction of money market-eligible

securities…provid[ing] closed-end funds with significantly more options to deliver holders of

ARS liquidity at par." Merrill Lynch, *Second Quarter 2008 Talking Points and Q&A*, July 17,

2008.

EXHIBIT C

279.     On August 21, 2008, Merrill announced a regulatory settlement with the New York Attorney General and state securities regulators, as well as an agreement in principle with the SEC, in which Merrill will purchase at par all ARS that were purchased from the firm by its retail clients.  This will cost Merrill between $10-12 billion plus $125 million in fees to the Attorney General of New York.  Merrill Lynch has made only one disclosure regarding its ARS liability, which was the same in its March and June 10-Qs:  "Level 3 trading assets" include auction rate securities of $1.6 billion."  Merrill Lynch, Quarterly Report (Form 10-Q), at 31 (June 27, 2008); Merrill Lynch, Quarterly Report (Form 10-Q), at 29 (Mar. 28, 2008).

280.     FINRA is also investigating if Merrill Lynch properly sold clients money-losing securities tied to subprime mortgages when the market began to collapse.  *See* David Scheer and Jesse Westbrook, *Brokers Probed by FINRA on Mortgage Security Sales, Person Says*, Bloomberg, Jan. 4, 2008.

**F.     Ongoing Concern About Validity Of Merrill Lynch's Financial Statements.**

281.     Analysts continue to speculate that Merrill Lynch has not come clean regarding the full extent of its past misrepresentations and its exposure to subprime-backed securities and CDOs.  Mike Mayo, an analyst at Deutsche Bank, aptly summed up the situation: "We have increasingly lost confidence in the financials of Merrill Lynch.  It's not enough to say the CEO has gone, problem fixed."  Bowley & Anderson, *Where Did the Buck Stop at Merrill*?, *supra*.

282.     Indeed, the SEC is investigating Merrill Lynch for potentially booking inflated prices of mortgage bonds it held despite knowledge that the valuations had dropped.  Pulliam, *Deals with Hedge Funds May Be Helping Merrill Delay Mortgage Losses*, *supra*.

283.     On January 17, 2008, Merrill Lynch released its 2007 year-end financial results which included $23.2 billion in write-downs from CDO and subprime exposure.  *See* Merrill

- 88-

EXHIBIT C

Lynch Current Report 8-K (Jan. 17, 2008), at Ex. 99.1.  Merrill Lynch reported back-to-back

quarterly losses that exceeded the previous two years' net income.

284.     The Company's net loss from continuing operations for the fourth quarter was

$10.3 billion, or $12.57 per diluted share.  In one quarter, Merrill Lynch lost more than its *record*

*breaking* earnings of $7.5 billion for the *entire year* of 2006.  John Thain acknowledged that "the

firm's earnings performance for the year is clearly unacceptable[.]"  *Id.*  Indeed, Merrill Lynch's

quarterly results were the largest loss in the Company's 94-year history.

285.     On January 17, 2008, during Merrill Lynch's Fourth Quarter 2007 Earnings

conference call, John Thain addressed concerns about the $23.2 billion write-down, which was

more than five times the initial value disclosed on October 5, 2007.  Thain was less than

optimistic about Merrill Lynch's ability to recover some of the $23.2 billion losses and diverted

questions about how Merrill Lynch ended up with such high levels of exposure to CDO and

subprime securities and whether it failed to report this to its risk management systems.  *See*

*Merrill Lynch Fourth Quarter 2007 Earnings Call Transcript*, Jan. 17, 2008, at 8.  He ended the

call stating that there was very little trading by anyone in the CDO market in the fourth quarter

and that, moving forward, he intended to sell them and reduce Merrill Lynch's absolute position.

*Id.* at 10.

286.     The day after the Company released its fourth quarter earnings on January 18,

2008, Thain appeared on the "Nightly Business Report" on PBS and conveyed that Merrill

Lynch did not have significant remaining exposure to subprime loans and did not expect any

more changes from its asset based securities (which included CDOs).  *See One on One with*

*Merrill Lynch CEO John Thain, available at* http://www.pbs.org/nbr/site/

onair/transcripts/080117_gharib/, Jan. 19, 2008. Thain was referring to the fact that Merrill

Lynch reported its net CDO exposure as only $5.1 billion.  However, net exposure can be

misleading because as described in herein, *infra* ¶ 7 n. 9, 11 , Merrill ultimately wrote down $46

billion on its CDO and subprime securities, which is more that its initial net exposure of $43

billion, because the Company not only had to write-down the value of the CDO securities

themselves but also take write-downs on the hedges that were ostensibly protecting the company

from losses to the CDO securities.  For example, as explained, *infra* ¶¶ 295, 297-305,  despite

taking write-downs on its CDO portfolio, Merrill Lynch's net exposure increased from $4.8

billion as of Dec. 28, 2007 to $6.7 billion as of Mar 28, 2008 due to failed hedges.

287.    In February 2008, The U.S. Department of Justice ("DOJ") and the U.S.

Attorney's Office in Manhattan initiated another investigation, searching for criminal conduct

relating to Merrill Lynch's handling of mortgage bonds.  The DOJ is also looking at whether

financial firms properly disclosed the risky nature of these bonds to investors and credit-rating

firms and improperly accounted for certain off-balance sheet entities that held mortgage bonds

and insured these bonds after finding out their value was inflated.  *See* Michelle Rama, *DOJ's*

*Manhattan Office May Begin Criminal Probe of Merrill Lynch*, Forbes, Feb. 2, 2008.

288.    On February 25, 2008, Merrill Lynch released its 2007 10-K.  The Company

provided greater detail on its previously disclosed $23.2 billion in write-downs resulting from

CDO and subprime related exposure.  The majority of these write-downs were from Merrill

Lynch's exposure to CDO securities, which totaled $16.7 billion.  In addition, the Company also

wrote down $3.2 billion related to U.S. sub-prime residential mortgage exposure, $2.6 billion in

credit valuation adjustments related to Merrill Lynch's hedges with financial guarantors (mainly

credit default swaps) related to its CDO securities, and $700 million related to subprime related

securities in Merrill Lynch's U.S. banks investment securities portfolio.  2007 10-K, at 22.

EXHIBIT C

289.     The Company also reported its remaining net exposure related to CDO securities as $4.8 billion, which was based on Merrill Lynch's long exposure to CDO securities of $30.4 billion (post write-downs) less its $23.6 billion short exposure and less $2.0 billion for "secondary trading."  2007 10-K, at 36.  The short position primarily consisted of hedges (such as credit default swaps), which involved risk of loss of capital based on the financial viability of the guarantor (many of which were non-investment grade companies).  In fact, Merrill Lynch took $2.6 billion in write-downs from credit valuation adjustments in 2007, demonstrating that some hedging vehicles, such as credit default swaps, introduced new risk of loss to Merrill Lynch's capital base.  *Id.*  Put plainly, reports of net exposure are inadequate, if not misleading, when the hedges that contribute to the net exposure number are not working or are themselves fraught with credit risk.

290.     In addition, unrelated to its CDO and subprime exposure, Merrill Lynch also disclosed off-balance sheet exposures it considered "significant" to be $90 billion as of December of 2007.[47]  This was an increase of 65% from December 2006 and, in fact the majority of that increase was in just one quarter (off-balance sheet exposure rose 52% from September to December of 2007).  *See* Merrill Lynch 2007 Annual Report.

291.     The Company also disclosed $70 billion dollars in off-balance sheet "total return swaps" (*i.e.*, repurchase agreements) as of December 2007, which it used to fund selected assets, including CDOs and CLOs and $4.6 *trillion* in derivative contracts (disclosed as the "maximum payout/notional [value]" for such contracts).

292.     On March 5, 2008, Merrill Lynch issued a press release announcing that it was discontinuing mortgage origination at its First Franklin subsidiary and would explore the sale of

---

[47]/     As of June 27, 2008, Merrill Lynch reported off-balance sheet exposure of $66 billion.  *See* Merrill Lynch, Quarterly Report (Form 10-Q) (date)

EXHIBIT C

Home Loan Services, a mortgage loan servicing unit for First Franklin, due to the deterioration

of the subprime lending market.  *See* Merrill Lynch, *Merrill Lynch Discontinues First Franklin*

*Mortgage Origination; Will Explore Sale of Home Loan Services,* Mar. 5, 2008, *available at*

http://www.ml.com/index.asp?id=7695_7696_8149_88278_92707_92961.  Merrill Lynch

bought First Franklin in late 2006 for $1.3 billion.  As recently as April 2007, Merrill Lynch

boasted on the contribution that First Franklin made to Merrill Lynch's business.  The Company

will spend $60 million to pay for severance and other real estate costs linked to unwinding First

Franklin's operations.  More importantly, the First Franklin acquisition left Merrill Lynch with

huge potential liabilities.

> 293.    Merrill Lynch acknowledged in its First Quarter 2008 10-Q that:

> In connection with residential mortgage loan and other securitization transactions, we typically make representations and warranties about the underlying assets.  If there is a material breach of any such representation or warranty, we may have an obligation to repurchase assets or indemnify the purchaser against any loss.  For residential mortgage loan and other securitizations, the maximum potential amount that could be required to be repurchased is the current outstanding asset balance.  Specifically related to First Franklin activities, there is currently approximately $45 billion (including loans serviced by others) of outstanding loans that First Franklin sold in various asset sales and securitization transactions where management believes we may have an obligation to repurchase the asset or indemnify the purchaser against the loss if claims are made and it is ultimately determined that there has been a material breach related to such loans.  We have recognized a repurchase reserve liability of approximately $458 million at March 28, 2008 arising from these residential mortgage sales and securitization transactions.

*See* Merrill Lynch, Quarterly Report (Form 10-Q) (Mar. 28, 2008) (hereinafter, "First

Quarter 2008 10-Q").

> 294.    On March 27, 2008, Richard Bove, a stock analyst at Punk Ziegel, more than

halved his 2008 earnings forecast for Merrill Lynch and estimated the Company's next write-

down would be approximately $6.79 billion.  "Estimating the earnings of Merrill Lynch has

become a game of estimating what the next write-down will be," Bove said, adding that the various indices that were being used to help Merrill adjust its values were as "fallacious as ever but they are still being used." *UPDATE 1-Punk Ziegel slashes 2008 EPS View for Merrill*, Mar. 27, 2008, *available at* http://www.reuters.com/article/rbssFinancialServicesAndRealEstateNews/idUSBNG2341820080327.

295.   "Unlike in past cycles, this time around MER has found itself with the largest balance sheet exposure to CDO assets among the large capitalization brokerage firms," Hintz of Bernstein Research wrote, warning:  "With $30.4 billion of CDOs still on Merrill's balance sheet at the end of 2007, we believe the 'CDO Overhang' will be an ongoing concern for the firm over the next twenty-four months."  Ed Welsch, *2nd UPDATE: Merrill Lynch 1Q Loss, Up To $6 Billion Write-Down Seen*, Dow Jones Newswires, Mar. 27, 2008.

296.   On April 17, 2008, Merrill Lynch reported large losses related to subprime and CDOs, which appear to contradict Thain's statements on the "Nightly Business Report" on January 19, 2008.  (S*ee* discussion *supra*).  In its First Quarter Earnings Statement Merrill Lynch stated an additional $6.6 billion in write-downs from exposure to mortgages, CDOs and leveraged loans.  *See* Merrill Lynch Current Report 8-K (Apr. 17, 2008), at Ex. 99.1.  These results included about $4.5 billion of write-downs plus $3.1 billion in "comprehensive losses" related to its CDO and subprime exposure. [48]  The current total write-downs related to CDO and subprime exposure is approximately $46 billion.  *See* footnote seven, *supra*.

297.   On April 17, 2008, John Thain held the Company's First Quarter 2008 Earnings Conference Call.  He stated that: "widening of credit spreads forced liquidations, high volatility,

---

[48]   As described in footnote six, *supra*, because the only difference between write-downs and "other comprehensive losses" is whether the securities are held as available-for-sale or held to maturity, for clarity and simplicity we collectively refer to Merrill Lynch's disclosed write-downs and comprehensive losses as "write-downs" related to subprime and CDO exposure.  First Quarter 2008 10-Q; 2007 10-K, pg. 117. *See also*, David Reilly, *A Way for Charges to Stay Off the Bottom Line*, Wall St. J., Apr. 21, 2008.

EXHIBIT C

[and] the lack of market liquidity for many credit products [*e.g.*, CDO and subprime related securities]."  He also stated: "We are planning for a slower and more difficult next couple of months and probably next couple of quarters."  *See Merrill Lynch First Quarter 2008 Earnings Call Transcript*, *available at*

http://www.ml.com/index.asp?id=7695_7696_8149_88278_95339_96026.

298.    Thain discussed moving the Company's principal investing for subprime and CDO securities to third party funds but acknowledged that it is "not very likely [that they] will recover value."  *Id*.  Despite the fact that the Company's long exposure to CDO securities has decreased slightly from $30.4 billion at December 30, 2007 to $26 billion at March 28, 2008, the Company's *net* exposure actually increased from $4.8 billion as of December 30, 2007 to $6.7 billion as of March 28, 2008 due to the failure of its credit default swaps to effectively hedge against the risk of losses from Merrill Lynch's remaining long exposures to CDO securities.

299.    In fact, the financial press has reported that holders of CDO securities, such as Merrill Lynch, purchased credit default swaps for reasons apart from their stated objective (to hedge against the risk of loss to their CDO securities).  A *BusinessWeek* analysis explains that "the insurers' guarantees [*i.e.*, the credit default swaps] turned out to be little more than a subprime shell game" because the "[i]nsurance turned out to be a sort of accounting arbitrage, allowing banks to take advantage of that different set of rules.  By using it, they could offload the price risk to insurers' books to avoid suffering a hit to earnings if the bonds dropped in value."  David Henry and Matthew Goldstein, *Death of a Bond Insurer: Wall Street Used ACA to Hide Loads of Subprime Risk. It Worked—Until the Tiny Company Collapsed,* BusinessWeek, Apr. 3, 2008.

EXHIBIT C

300.    "Bond insurance was an accounting strategy.  It reduced banks' mark-to-market worries" according to Michael E. Satz, the founder and former chief executive officer of ACA[49] (a large bond insurer that collapsed in December of 2007).  *Id.*

301.    On June 9, 2008, Bloomberg reported that Merrill Lynch (along with Citigroup and UBS) may post losses of $10 billion to bond insurance after MBIA Inc. and Ambac Financial Group Inc. had their AAA ratings cut two levels by Standards & Poor's on June 5, 2008, which trimmed ratings on more than $1 trillion of securities they guaranteed.  Jeff Kearns & Bradley Keoun, *Citi, Merrill, UBS Face Monoline Losses, Whitney Says*, Bloomberg, June 9, 2008.

302.    In mid June 2008, Merrill Lynch was downgraded to neutral from strong buy at Buckingham Research Group, which said the bank's CDO and monoline risk remains too high. *Merrill Lynch downgraded to neutral at Buckingham Research on CDO/monoline risk,* Thomson Financial News, June 24, 2008.  "The issues surrounding Merrill's sizable CDO/bond insurance exposures have remained more intractable than we had initially anticipated, with continued hits to book value and potential further capital raising eating away at the upside in the stock," Buckingham said.  *Id.*

303.    Fitch Ratings anticipated that Merrill Lynch would have a fourth consecutive quarterly loss in second quarter 2008 due to ongoing write-downs, the majority of which are related to residential mortgages, monoline and ABS-CDO positions.  *Fitch Places Merrill Lynch's 'A+' IDR on Rating Watch Negative,* Reuters, July 9, 2008.  At the end of the first quarter, Merrill Lynch's exposure to these and other higher risk assets as a percent of capital was significant relative to its peers.  *Id.*

---

[49]/    Merrill Lynch was one of ACA's largest clients.

EXHIBIT C

304.    Federal Reserve Chairman Ben Bernanke stated in testimony before Congress last month that mark-to-market accounting is "one of the major problems we have in the current environment." *Id.*

305.    Credit default swaps offered banks another advantage:  It allowed them to execute "a negative-basis trade," a strategy that essentially allows banks to book profits on CDOs up front, even though they have not actually collected any money yet and might never do so.  *Id.*

306.    Overall, CDOs boosted Merrill Lynch's profits and reduced the amount of capital it had to set aside on its books for the securities.  That freed up money for the Company to funnel back into subprime securities.  "The results of the game were bigger profits for banks, more money to continue cranking out securities built on risky subprime mortgages, and far less clarity about the banks' true exposure to the toxic investments." *Id.*

307.    Merrill Lynch released its March 2008 10-Q on May 6, 2008.  The Company disclosed that its Level 3 assets rose 69% during the first quarter from $48.6 billion on December 28, 2007 to $82.4 billion on March 28, 2008.  Merrill Lynch, Quarterly Report (Form 10-Q) (Mar. 28, 2008).  Merrill Lynch added $7 billion worth of mortgage-laden CDOs to the Level 3 category in the first quarter, along with $2 billion more of derivatives on subprime securities, $18 billion of credit derivatives not related to mortgages, and $7.6 billion in derivatives tied to equities, currencies and commodities.  *Id.*

308.    Both stock analysts and the financial press have expressed concern about the 69% increase in Level 3 assets in just one quarter[50] because "Level 3 assets are those whose valuation is essentially a best guess by the investor, because there is virtually no active trading market for the product to use as a pricing guide."  *See Merrill Lynch Level 3 Assets Increase Through*

---

[50]/    It is also important to note that this increase comes after Merrill Lynch's previous reclassification of a significant amount of CDO and subprime securities in the third quarter of 2007.

EXHIBIT C

*March,* CNNMoney.com, May 6, 2008 *available at http://money.cnn.com/news/newsfeeds*

*/articles/ apwire/c278ee62746c916ea9e0f9913fd59fcf.htm*; *See also* Liz Moyer, *Level 3:  Merrill*

*Keeps Feeling The Crunch*, Forbes, May 6, 2008.

309. "The increase in Level 3 represents an incrementally higher probability--but not a

certainty--that more write-downs are coming," said Fox Pitt Kelton analyst David Trone, in a

research note about Merrill Lynch dated May 6, 2008. *See* Liz Moyer, *For Merrill's Thain, A*

*Tough Road Ahead,* Forbes, May 6, 2008.

310. Moody's Investors Service said that it has placed Merrill Lynch on review for a

possible downgrade after the earnings report,  citing "continued deteriorating conditions in the

mortgage market and the increased expected losses on MER's portfolio of super-senior CDOs

[sic] as measured in Moody's stress test."  Paul Jackson, *Merrill Posts Quarterly Loss, $4.3*

*Billion in Mortgage-Related Write-downs,* HousingWire.com, Apr. 17, 2008, *available at*

www.housingwire.com/2008/04/17/merrill-posts-quarterly-loss

**G.     Material New Facts Have Come to Light Since May 6, 2008 Indicating that Merrill**
**Lynch Continued to Withhold and Misrepresent the Fair Market Value of its CDO**
**Portfolio to Plan Participants and the Public at Large.**

311. On May 22, 2008 (the day after the ERISA, Securities and Derivative

Consolidated Amended Complaints were due and filed), Merrill announced that it had set up a

new group led by Doug Mallach, Merrill's U.S. fixed income sales head, to sell off troubled

assets, including Merrill's CDO portfolio.  Dan Wilchins, *Merrill Lynch Sets Up Group to Shed*

*Bad Assets*, Reuters, May 23, 2008.[51]

---

[51]/    Although Mallach was not officially put in charge of the CDO  liquidation team until May, as alleged in
Complaint at ¶ 281, as early as January 17, 2008, Merrill was attempting to sell its CDO portfolio.  Thain stated
during the 2007 Earnings Call, that despite the fact that "there was very little trading" by anyone in the CDO market
in the fourth quarter, moving forward, he intended to sell them and "reduce [Merrill's] absolute position."  Merrill
Lynch Fourth Quarter 2007 Earnings Call Transcript, Jan. 17, 2008, at 10.

EXHIBIT C

312.     On June 11, 2008, Mallach wrote an internal memo to colleagues discussing his efforts to sell Merrill's CDO portfolio.  Bradley Keoun, *Merrill's Mallach Said to Quit After Being Moved to Lesser Role*, Bloomberg, Aug. 29, 2008. The memo noted that for the last month (even before Merrill's official announcement that Mallach would be dedicated to selling Merrill's CDO portfolio),  Mallach's group spent "a tremendous amount of time speaking to end clients" and had contacted approximately 90 potential clients by mid June 2008 in an effort to sell Merrill Lynch's remaining CDO portfolio.  *Id.*

313.     While Mallach sold approximately $1 billion of distressed assets, he was not able to sell Merrill's CDO securities.  Mallach's inability to sell Merrill's Lynch's CDO portfolio put Merrill on notice by at least June 11, 2008 that additional dramatic write-downs would be required.

314.     Although not reported until August of 2008, Merrill was trying to sell its mortgage related securities in April and May of 2008, but "As Merrill's work-out desk shopped one CDO around Wall Street to dismal bids, reality hit home."  Louis Story, *Merrill's Chief Defends Sale*, N.Y. Times, Aug. 5, 2008.

315.     On July 9, 2008, Fitch Ratings placed Merrill Lynch's long-term debt ratings on Negative Watch.  *See* Merrill Lynch, Quarterly Report (Form 10-Q) (June 27, 2008).

316.     As the NY Times reported on August 5, due to the lack of buyers "Merrill executives knew by late June that it would be forced to take huge write-downs — again — in second-quarter earnings, bringing the total write-downs over a year to more than $40 billion. Immediately, Merrill executives set to work on a number of options to raise money to cover the losses, including negotiating to sell stakes in Bloomberg, the financial data provider; Financial

EXHIBIT C

Data Services, a back-office subsidiary; and  BlackRock, the asset management firm." (Merrill ultimately retained its BlackRock stake).  *Id.*

317.    Indeed, on July 17, 2008, Merrill Lynch announced that it completed the sale of its 20 percent stake in Bloomberg LP, the news and financial data company, to Bloomberg Inc. for $4.43 billion and Merrill Lynch was in negotiations to sell a controlling interest in Financial Data Services, a unit that provides services to mutual funds, in a deal that values the entire unit at $3.5 billion, to provide the additional capital it needed for Merrill Lynch's impending write-down of its CDO portfolio. *Fire Sale at Merrill Put Thain in the Hot Seat*, Reuters, July 29, 2008.

318.    At the same time that Merrill was determining the value of its CDO portfolio for its Second Quarter earnings release, the Company was actively shopping its CDOs to a number of investors, including Dune Capital, which is run by Steven T. Mnuchin. However, Merrill Lynch could not get the price it wanted so the transaction never closed.  *See* Story, *supra.*

319.    On July 17, 2008, when communicating to its employees about its Second Quarter 2008 results, Merrill Lynch's named its "Key Themes" as:  "1)  Against a difficult backdrop, our core franchise continues to deliver revenues; 2)  Significant progress in aggressively reducing risk and managing our balance sheet; 3) Proceeds from assets sales will further enhance our capital position; 4) Liquidity continues to be very strong; and 5) Unique and well-positioned franchise with premier global wealth management platform."  Merrill Lynch, *Second Quarter 2008 Talking Points and Q&*A, July 17, 2008.  In the Q&A session, when asked "How much exposure is still remaining in our CDO business?" Merrill answered, "At the end of the second quarter of 2008 our net exposure to U.S. ABS CDOs were $4.5 billion, down from $6.7 billion at the end of the first quarter of 2008."  *Id.*

EXHIBIT C

320.     On July 17, 2008, Merrill Lynch announced its fourth straight quarterly loss during its Second Quarter Earnings Call.  *Merrill Lynch Second Quarter 2008 Analyst Conference Call*, June 17, 2008.  The Company reported a quarterly loss of nearly $5 billion dollars due to write-downs of $9.4 billion, which was comprised of (1) $3.5 billion from its CDO portfolio down to a $19.9 billion (or 35¢ on the dollar) long position; (2) $2.9 billion in credit valuation adjustments from failed hedges; (3) $1.7 billion from its investment securities (primarily Alt-A securities); and (4) $1.3 billion from residential mortgage exposure. Additionally, Merrill Lynch stated during the call:

> (a)     "Given the market environment we remain prudent in our evaluation approach. We are taking into consideration incremental remittance and other data which was negative during the quarter. As a result we increased our average cumulative loss assumptions for this portfolio across most underlying collateral types in the second quarter." *Merrill Lynch Second Quarter 2008 Analyst Conference Call*, June 17, 2008 at 4.

> (b)     When one analyst asked Merrill's CEO, John Thain, why Merrill did not just take whatever cash bid it got, he answered "we have not simply liquidated stuff at any price we could get.  At some point [based on] the return profiles that people want, you probably wouldn't want us to sell the assets."  . . . "We don't want to do dumb things," he said, adding that liquidating assets on Merrill's books at any price was not an option.  *Id*. at 13.

> (c)     When asked by Jeffery Harte or Sandler O'Neil how Thain was going to explain to employees why stock prices keep falling and losses at the Company continue to grow, Thain answered,  "Well first of all that's part of my job. I have for instance a global town hall session tomorrow morning to answer questions for the entire employee base."  Thain stated that despite the losses announced in the 2nd Quarter, "I think they're excited about how well they're doing." *Id*. at 21.[52]

321.     On July 17, 2008, following the announcement of Merrill's second quarter financial results, Moody's Investors Service, Inc, lowered Merrill's long-term debt rating to A2.

---

[52]     Contrast with N.Y. Times article that reported "So how are employees responding? One Merrill employee, who works in the investment bank in New York, said that people are hopeful about Mr. Thain and like him, but it is just too hard to know if other assets, like residential and commercial mortgage-backed securities, are going to erode." *See* Story, *supra*.

EXHIBIT C

322.    Also on July 17, 2008, both Standard & Poor's Ratings Services and Dominion Bond Rating Service Ltd. affirmed their respective ratings of Merrill's long term debt and the outlook remained Negative at both agencies.  *See* Merrill Lynch, Quarterly Report (Form 10-Q) (June 27, 2008).

323.    On July 18, 2008, Ratings & Investment Information, Inc. (Japan) lowered Merrill's long-term debt rating to "A+" and short-term rating to "a-1" and the outlook on the long-term rating is Negative.  *Id.*

324.    On July 28, 2008, just 11 days after Merrill Lynch announced its Second Quarter results, Merrill Lynch announced that it had agreed to sell $30.6 billion worth of CDO securities to an affiliate of a private equity firm, Lone Star Funds, for only $6.7 billion (or 22 ¢ on the dollar).[53]  *See* Merrill Lynch Press Release, Merrill Lynch Announces Substantial Sale of U.S. ABS CDOs, Exposure Reduction of $11.1 Billion (July 28, 2008).  However the purchase price provides only $1.7 billion in cash (less than 6¢ on the dollar) because 75% of the sale price (17¢ on the dollar) is a note from Merrill to Lone Star.[54]

---

[53]    That deal was primarily negotiated by Merrill's head CDO trader, Donald Quintin, under a direct order from Thain, according to three people familiar with the transaction.

[54]    *See also* Heather Landy, *After Merrill's Sale of Bad Debt, Few Have Followed:  Despite Interest in Unloading Subprime Assets, Firms Are Reluctant to Take Large Losses, Analysts Say*, Washington Post, Tuesday, Aug. 26, 2008 ("Lone Star mitigated much of that risk in its deal with Merrill by getting the firm to finance 75% of the deal. The collateral for the loan was the CDO portfolio itself, so if the securities turn out to be worthless, Merrill will bear most of the loss.").

EXHIBIT C

325.     The first table below shows CDO securities sold to Lone Star (par value $30.6 billion) was valued at $11.1 billion during the July 17, 2008 earnings call, but ultimately sold for $6.7 billion, which caused an additional $5.7 billion write-down in the eleven days after its July 17, 2008 earnings announcement and after it told its employees during a Q&A session that it had $4.6 billion in net exposure (*see* ¶ 319 above).  The second table shows that the $6.7 billion sale only provided $1.7 billion or 6 cents on the dollar of real cash because $5.0 billion (75% of the transaction) was funded by a note Merrill Lynch provided to Lone Star.

| CDO securities sold to Lone Star | Value in billions | Cents on the Dollar |
|---|---|---|
| Par Val | $30.6 | $  1.00 |
| Value announced 7/17/2008 | $11.1 | 0.36 |
| Sold for | $6.7 | 0.22 |
| Write-down for CDOs | $4.4 | 0.14 |
| plus write-down for related hedges | $1.3 | n/a |
| **Total write-down announced 7/28** | **$5.7** | |

| Transaction funding | Value in billions | Cents on the Dollar |
|---|---|---|
| Cash | $1.7 | 0.06 |
| Note | $5.0 | 0.17 |
| Total Price | $6.7 | 0.22 |

326.     Indeed, even after the $5.7 billion write-down, the Company still retains at least an $8.8 billion long position ($1.6 billion in net exposure), which is 45% of its total long position previous to the sale.  The table below shows that while Merrill Lynch can take a write-down of $5.7 billion, which exceeds its total net exposure of $4.3 billion, it still can retain a significant long position of $8.8 billion (or net $1.6 billion).

| Total CDO portfolio in billions (as announced July 17, 2008) | Long Position | Exposure Net of Hedges |
|---|---|---|
| Sold to Lone Star | $11.1 | $2.7 |
| *Retained Securities* | *$8.8* | *$1.6* |
| Total pre-sale value | $19.9 | $4.3 |

EXHIBIT C

327.    However, during a Q&A session with its FA ("Financial Advisors") employees, Merrill Lynch was asked why it decided to finance the purchase of these assets by Lone Star and whether this structure exposes Merrill Lynch to continued risk, the Company simply stated that "The Loan Star deal is important for us as it enables us to cut our CDO portfolio by more than half and meet a significant milestone in our risk-reduction efforts."  Merrill Lynch, *U.S. ABS CDO Sale & ML Common Stock Offering FA Questions & Answers*, July 2008.  However, if the deal falls through or Loan Star defaults, "Merrill Lynch will have recourse on its loans limited to the assets of the purchasing entity, which will consist solely of the CDO Portfolio."  *Id.*   In other words, the CDOs will be back on Merrill Lynch's books.

328.    Because the Lone Star transaction actually provided very little true liquidity (just 6 cents on the dollar), Merrill needed to raise additional capital to offset $15.4 billion in total write-downs to Merrill's CDO portfolio ($5.7 billion on July 28 plus $9.7 billion on July 17).[55] On the same day as the Lone Star sale announcement, Merrill Lynch announced a public offering of $8.55 billion of stock.  As Bloomberg reported, "[t]o cushion the loss on the asset disposal, the firm raised $8.55 billion [the same day] by selling new shares of Merrill stock at a price of $22.50 each, 60 percent less than Merrill's stock price at the beginning of the year."  Bradley Keoun*, Merrill Sells $8.4 Billion of Stock, Unloads CDOs*, Bloomberg, July 29, 2008.

329.    This stock offering diluted the value of the holdings of Plan Participants and current shareholders.  In addition, Merrill Lynch had agreed to give price protection to Temasek and other investors who provided capital infusions in December and January 2007, meaning that

---

[55]    Yet, Merrill Lynch touts the sale as "a substantial [decrease in the] majority of our U.S. super senior ABS CDO portfolio" and that "Merrill Lynch's CDO long exposures will decrease from $19.9 billion at June 27, 2008, to $8.8 billion."  Merrill Lynch, *U.S. ABS CDO Sale & ML Common Stock Offering FA Question & Answers,* July 2008..

EXHIBIT C

they will receive extra compensation now that Merrill Lynch is issuing equity at a lower price. Thus, as a result of the offering announced on July 28, 2008, more than half the shares or share proceeds will go to prior investors, with $2.5 billion paid to compensate Temasek, and another $2.4 billion paid as additional dividends to investors in convertible securities. *Id.*

330.    Following the July 28, 2008 announcements of the Lone Star sale, the additional $5.7 billion Third Quarter write-downs, and the $8.5 billion public offering, Merrill's stock dropped to a nine-year low of $24.33 from its previous close at $27.52 (a 12% drop).

331.    On July 30, 2008, the New York Times reported that, "Somehow, $4.4 billion just evaporated at Merrill Lynch." Louis Story, A *Deal at Merrill Puts Spotlight on Other*, N.Y. Times, July 30, 2008. The article also reported that David Trone, an analyst with Fox-Pitt Kelton, stated that "It's not truly unloading the risk [because] from an accounting standpoint, it's gone, but from a real risk standpoint, it's still there. If the assets deteriorate below their current marks, Lone Star loses the first $1.7 billion, then the losses move to Merrill Lynch. Merrill Lynch could lose up to $5 billion, though the bank may have protections on the deal that it has yet to disclose." *Id.* "Essentially what you've done is you've taken a write-down, and you've put it back on your balance sheet as a loan," Brad Hintz, an analyst with Sanford C. Bernstein, told The Times. *Id.* "What they're trying to do is to clear the balance sheet." *Id.*

332.    On August 6, 2008, Maria Bartiromo interviewed John Thain and reminded him that in March of 2008 he told Brad Hintz, an analyst with Sanford Bernstein, that Merrill Lynch intended to hold on to as many of the CDOs as possible and sell them off gradually as prices recovered and asked, "In this deal, isn't Merrill basically giving away any upside recovery?" Maria Bartiromo, *John Thain on the Fire Sale of Toxic Assets at Merrill*, BusinessWeek, Aug. 6,

2008.  Thain responded, "We are giving away any upside recovery. We are selling 100%, so we're not anticipating any upside recovery. . . . and this is one of the most toxic of assets."  *Id.*

333.    On September 4, 2008, Bloomberg reported that Merrill Lynch is still having trouble disposing of the $8.8 billion (long position) of CDO securities left on its balance sheet. While Merrill Lynch is in negotiations to sell a "significant" amount of bad loans (mortgages and other debt) to Korea Asset Management Corp. for less than $200 million, the talks are faltering because of a dispute over price, said Lee Chol Hwi, the Korean firm's chief executive officer, in a September 3 interview in Seoul.  Bomi Lim, *Merrill May Fail to Sell Bad Loans to Korea Asset (Update3)*, Bloomberg, Sept. 4, 2008.  Failure to reach an agreement may indicate that Merrill Lynch and smaller rival Lehman Brothers Holdings Inc. have to cut prices as mortgage-related losses widen.  Lee said state-run Korea Asset can afford to be patient because the U.S. financial crisis will probably push prices lower.  *Id.*

334.    On September 5, 2008, William Tanona, a Goldman research analyst, downgraded Merrill's stock and added Merrill Lynch to his Americas "Conviction Sell" list based on the fact that the Company has "some of the most significant exposures to troubled assets such as CDOs, mortgages and leveraged loans."  Ed Walsh, *Merrill Shares Fall as Goldman Names it a Conviction Sell,* CNNMoney.com, Sept. 5, 2008.  "Merrill shares look overvalued," he said, "in the face of further write-downs of those assets" and also cited the fact that Merrill has agreed to buy back $10-12 billion in Auction Rate Securities it sold to retail clients as part of a settlement with the SEC, New York Attorney General and state securities regulators.  *Id.*

- 105-

EXHIBIT C

335.     On September 10, 2008, the Wall Street Journal reported that Merrill Lynch's "problem assets" [56]  exceeded its shareholder equity by 1.9 to 1.0.  *See* Susanne Craig, Randall Smith, Serena Ng and Matthew Karnitschnig, *Lehman Faces Mounting Pressures,* Wall St. J., Sept. 10, 2008.

336.     Reasonable inferences from 1) the failure of Merrill Lynch to find a buyer for its portfolio of CDOs in April, May and  June of 2008, 2) the timing of the ultimate sale announcement just 11 days after Merrill Lynch announced its second quarter results, 3) the fact that the sale of the CDOs had apparently been in the works for some time pending resolution of litigation involving hedges on these CDO positions,[57] and 4) Merrill Lynch's preparation to raise additional capital to offset the losses associated with the Lone Star sale announcement, show that Merrill Lynch knew that its CDO portfolio was worth less than the disclosed value of $19.9 billion (long position) it reported on July 17, 2008, and that Merrill Lynch knew long before the July 17, 2008 announcement (at least by June 11, 2008) of the need for further write-downs exceeding those announced following the close of the first quarter.

337.     Taking into account the additional write-downs and losses announced as part of the Lone Star sale, the current CDO and subprime related write-downs total approximately $46 billion, which is greater than Merrill Lynch's initial disclosure of its total net exposure.

338.     As alleged above, Merrill Lynch itself was a Plan fiduciary with knowledge of material facts about its own financial condition, and the Investment Committee and Administrative Committee fiduciaries were already on notice of numerous failures to disclose

---

[56]/    The article defined "problem assets" to include "commercial and residential mortgage, real estate and leveraged finance assets reported for [the] second quarter and adjusted for subsequent asset sales[.]" *Id.*

[57]/     The Press has reported that a "lawsuit [with SCA, over hedges on its CDO securities] were effectively impeding the sale [to Lone Star]."  As soon as Merrill reached a settlement with SCA on July 28, 2008, the CDOs sold to Lone Star were stripped of their CDS insurance so that the sale could occur.

EXHIBIT C

material information which should have caused them to investigate whether there had been full disclosure after May 6, 2008, and to take action to prevent or minimize further losses.

## H.   On September 15, 2008, Merrill Tries to Prevent Further Stock Drop by Selling to Bank of America

339.   During the week of September 8 to September 12, 2008, Merrill Lynch's stock lost 38% of its value due to fears that its assets continued to be subject to write-downs and that, in any event, its highly leveraged balanced sheet continued to be illiquid, notwithstanding recent efforts to raise capital, as described *supra*.  On Friday, September 12, 2008, Merrill closed at $17.05 per share as concerns intensified that Merrill could be forced to file for bankruptcy protection.  *See, e.g.*, Vikas Bajaj, *A Wall Street Goliath Teeters Amid Fears of a Widening Crisis*, N.Y. Times, Sept. 14, 2008.

340.   The Wall Street Journal reported that, over the weekend of September 13-14, 2008, Federal Reserve officials "made it clear that they strongly encouraged a deal to sell Merrill.  They worried the firm could be the next to approach the brink of failure after Lehman Brothers Holdings Inc."  Matthew Karnitschnig, Carrick Mollenkamp and Dan Fitzpatrick, *Bank of America to Buy Merrill*, Wall St. J., Sept.15, 2008.

341.   Underscoring the riskiness of Merrill's stock, the Wall Street Journal reported that Merrill itself was moving quickly to sell the Company, stating that "[s]hould the talks collapse, most on the Street were expecting Merrill's shares to fall even further amid widespread worries about independent broker-dealers."  Matthew Karnitschnig, Carrick Mollenkamp and Dan Fitzpatrick, *Bank of America Reaches Deal for Merrill*, Wall St. J., Sept.15, 2008.  Although Merrill talked to other buyers, Bank of America ("BofA") was able to come to an agreement to buy Merrill after just "48 hours of frenetic negotiating." *Id.*  Both Boards approved the

- 107-

EXHIBIT C

transaction by Sunday night, September 14, 2008, as "Merrill acted to avoid the same fate as Bear Stearns and Lehman." *Id.*

342.    On Monday, September 15, 2008, BofA announced it agreed to acquire Merrill Lynch in an all stock transaction.  Subject to shareholder and regulatory approvals, each share of Merrill Lynch common stock would be exchanged for 0.8595 shares of BofA common stock. Merrill Lynch Press Release, *Bank of America Buys Merrill Lynch, Creating Unique Financial Services Firm* (Sept. 15, 2008).  As a consequence of this deal structure, any decline in the value of BofA stock would reduce the effective purchase price.  The market reacted unfavorably to the deal, causing BofA stock to lose over 20% of its value on the day the transaction was announced, immediately reducing the proposed purchase price by that same 20%, from approximately $29 per share to $22.82 per share.

343.    The transaction is not intended to close until the first quarter of 2009 and some of the "risks" of the transaction stated in the Investor Presentation included due diligence and whether "asset valuations" have been "carefully reviewed."  Bank of America & Merrill Lynch, *Bank of America Corporation acquires Merrill Lynch & Co., Inc. Presentation*, Sept. 15, 2008.

344.    Indeed, the closing price of Merrill's stock on September 15, 2008 of $17.06 reflects the market's assessment that, notwithstanding BofA's tentative agreement to buy Merrill, there is substantial risk that the deal may never close and thus Merrill's stock remains vulnerable to further declines.  Jonathan Stempel and Elinor Comlay, *Bank of America takeover to end independent Merrill*, Reuters, Sept. 15, 2008.  "What's especially worrisome to investors is that a deal of this magnitude might normally take weeks or months to work out.  Instead, it happened within 48 hours – raising the question of whether there was enough time to study the books." Madlen Read, *BofA's Buy is a Coup, But May Be Hard to Carry Off*, AP, Sept 15, 2008.  News

- 108-

EXHIBIT C

sources have also begun to report that given the market's reaction to the announcement of the deal, shareholders may not approve the transaction.  Andrew Bary, *Deal or No Deal? Merrill Buy May Not Fly*, Barron's, Sept. 15, 2008.  Accordingly, Merrill Lynch stock remains an unduly risky investment for pension plans of Merrill Lynch employees.

## I.  Defendants Knew or Should Have Known That Merrill Lynch Stock Was an Imprudent Investment.

345.   Given the facts described above, it is clear that since the beginning of the Revised Class Period, due to Merrill Lynch's CDO and subprime exposure, its other off-balance sheet exposure, its highly-leveraged balance sheet, its mismanagement of its risk and liquidity, and its persistent refusal to disclose all material information about its true financial condition, the Company's stock posed an unduly large risk of significant loss, which could not be prudently borne by Merrill Lynch's employee retirement plans.  Defendants Merrill Lynch and O'Neal knew that the Company had accumulated $43 billion in CDO and subprime exposure on its own balance sheet and was effectively betting the entire book value of the Company on these risky and illiquid securities.  Defendants Merrill Lynch and O'Neal ignored the risk that such a large position in risky and illiquid securities presented and indeed, attempted to conceal that information with false and misleading statements, many directed to the Plans' participant in the form of employee memos and other communications, which caused the price of Merrill Lynch stock to be artificially inflated, and exacerbated the problems.  In the end, when the severity of the circumstances came to light, the Plans suffered staggering losses, all or some of which could have been avoided had the Plans' fiduciaries acted prudently and loyally to protect the interests of Plan participants, as required by ERISA.

346.   At all relevant times, Defendants Merrill Lynch and O'Neal knew that Merrill Lynch stock was an imprudent investment for the Plans due to the numerous operational

- 109-

EXHIBIT C

problems and risk management deficiencies described above, and the tremendous exposure that

Merrill Lynch took on with respect to the CDO and subprime markets.   Defendant Merrill

Lynch knew at least by June 11, 2008 that its CDO portfolio was worth only pennies on the

dollar.

     347.    There is evidence that all Defendants had substantial warnings of the impending

subprime crisis because as early as 2006 the imminent collapse of the subprime lending industry

was widely documented.   To the extent that some of the Defendants did not have actual

knowledge of the extent to which Merrill Lynch stock was inflated due to the Company's

undisclosed CDO and subprime exposure and the losses not reported until October 2007, and the

riskiness of Merrill Lynch stock, the Defendants were on notice of several "red flags" that should

have caused them to investigate the risks posed by Merrill Lynch stock; but in fact they

conducted no such investigation.

     348.    The red flags include:

- During the second half of 2006 the *Wall Street Journal* and other news sources repeatedly reported that demand for CDOs was decreasing;

- Despite the fact that Mr. Ricciardi budgeted no growth in 2006 for underwriting of mortgage related CDOs, Merrill Lynch increased its CDO underwriting deal volume in 2006 and 2007;

- The stagnating CDO market coupled with record breaking CDO underwriting volume indicates that Merrill Lynch must have taken large amounts of CDO securities onto its own balance sheet in 2006 and 2007;

- On September 25, 2006, Merrill Lynch's own analyst (Kenneth Bruce) warned that demand for subprime bonds "could dissipate quickly," and of an "asset fire-sale" which could result in large losses on subprime related securities;

- On September 25, 2006, *Reuters* further reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against the securities since late 2005";

- 110-

EXHIBIT C

- In early December 2006, Ownit Mortgage Solutions, Inc. (an originator Merrill Lynch purchased mortgages from) declared bankruptcy due to defaulting loans;

- On December 5, 2006, a Merrill Lynch analyst reported that falling home prices could trigger losses not only in riskier classes of mortgage-backed securities, but also in investment grade bonds;

- On December 15, 2006, the *Wall Street Journal* reported that investors were watching to see if the effects of falling RMBS would be felt in CDOs;

- On December 20, 2006, the *Center for Responsible Lending* issued a report predicting the worst foreclosure crisis in the modern mortgage market;

- Nonetheless, on January 1, 2007, Merrill Lynch purchased a mortgage company focused on subprime borrowers (First Franklin), despite the fact that the market for subprime loans was souring in a hurry when the deal was announced;

- In February of 2007, the Company published its 2006 10-K which showed:

  (1)     off-balance sheet exposure of $54.5 billion; and

  (2)     CDO issuance increased almost four fold from $44 billion to $14 billion in 2005;

- On March 11, 2007, the *New York Times* reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy;

- On March 14, 2007, *Bloomberg* reported that Mark Adelson, head of structured finance research at Nomura Securities, stated that investors "need to worry a good bit" about subprime delinquencies spilling over into the CDO market;

- In March 2007, Lehman Brothers reported that CDOs backed by asset-backed securities had already lost about $20 billion in value as delinquencies increased;

- On March 29, 2007, the *Wall Street Journal* reported that New Century Financial Corp., the largest U.S. subprime lender at the time, was at the "brink of bankruptcy" because it could not pay back loans it took from Wall Street banks;

- On March 30, 2007, *Reuters* reported that CDOs have a growing appetite for derivatives such as credit default swaps and that other CDO securities (to create CDO squared of cubed securities) could potentially lead to an "absolute bloodbath";

- On April 2, 2007, New Century filed for Chapter 11 bankruptcy;

- In April 2007, the Company published its off-balance sheet exposure, which reached an all time high of $65.8 billion, an increase of 21% in just one quarter;

- 111-

EXHIBIT C

- On May 3, 2007, UBS closed Dillon Read Capital Management due to mortgage losses;

- On May 14, 2007, despite the deteriorating market for CDO and subprime related securities, Dow Kim stated that "we are growing our leading CDO business";

- On June 20, 2007, Merrill Lynch seized $800 million in assets from two Bear Stearns hedge funds that were involved in securities backed by subprime loans, which Merrill Lynch then sold;

- In July 2007, two Bear Stearns subprime hedge funds collapsed;

- In July 2007, the Company published its off-balance sheet exposure for June 2007, which hit an all time high of $69.5 billion;

- Throughout the Summer of 2007, the *Wall Street Journal* published several articles predicting that the banks that were heavily involved in underwriting subprime securities, such as Merrill Lynch, had losses hidden on their books and in off- balance sheet vehicles;

- On August 6, 2007, American Home Mortgage filed for Chapter 11 bankruptcy;

- On August 9, 2007, French bank BNP Paribas stopped valuing three of its funds and suspended all withdrawals by investors because U.S. subprime mortgage woes had caused "a complete evaporation of liquidity";

- On August 14, 2007, Thornburg Mortgage, a jumbo mortgage lender, announced it was delaying its dividend after facing margin calls and disruptions in funding mortgages in the commercial paper and asset-backed securities markets;

- On August 16, 2007, Countrywide Financial Corporation, the largest U.S. mortgage lender, narrowly avoids bankruptcy by taking out an emergency loan of $11 billion from a group of banks;

- On August 31, 2007, President Bush announced a limited bailout of U.S. homeowners unable to pay the rising costs of their debts;

- On August 31, 2007, Ameriquest, the largest subprime lender in the U.S. in 2005, announced it was going out of business;

- On September 14, 2007, precipitated by liquidity problems related to the subprime crisis, there was a run on the bank at Northern Rock in the U.K.;

- On October 15, 2007, a consortium of U.S. banks backed by the U.S. government announced a "super SIV" of $75 billion to purchase mortgage backed securities whose mark-to-market value plummeted in the subprime collapse;

EXHIBIT C

- In November 2007, Merrill Lynch reportedly engaged in improper transactions with hedge funds that artificially inflated the price of Company stock and were designed to hide the Company's true financial condition;

- On December 22, 2007, the *Economist* estimated subprime defaults would reach a level between $200-300 billion;

- From the Fall of 2006 to the end of 2007, the ABX 06-2 index (used to track the value of securities backed by subprime mortgages) lost 80% of its value, falling from 100 to 20; and



**Winning Wager**

This sub-index of the ABX 06-2, a benchmark index reflecting subprime-mortgage-backed securities, tracks the riskiest slices. For much of the year, Goldman had a big bet that it would fall.

Note: Synthetic ABX.HE.BBB- 06-2 Index
Sources: Markit

- On January 11, 2008, Bank of America made an agreement to bail out Countrywide for $7.16 per share, approximately 16% of its value of $44.55 per share less than a year before;

- On May 21, 2008, Plaintiffs in this action filed a Consolidated Amended Complaint detailing the misrepresentations and undue risk presented by Merrill Lynch stock;

- On May 22, 2008, Merrill Lynch officially created a team led by Doug Mallach to liquidate Merrill's CDO and subprime portfolio;

- On July 9, 2008, Fitch Ratings placed Merrill Lynch's long-term debt ratings on Negative Watch;

- On July 17, 2008,  Merrill Lynch publicly announced write-downs for its Second Quarter 2008 of $9.4 billion, which exceeded analyst expectations;

- On July 17, 2008, Merrill Lynch announced that it completed the sale of valuable assets such as its 20 percent stake in Bloomberg LP, the news and financial data

EXHIBIT C

company for $4.43 billion because it needed liquidity to cover $9.4 billion in write-downs it took in the Second Quarter of 2008.  Merrill Lynch also announced that it was in negotiations to sell a controlling interest in Financial Data Services, a unit that provides services to mutual funds, in a deal that values the entire unit at $3.5 billion to provide the additional capital;

- On July 17, 2008, Merrill Lynch disclosed that it still had $61.2 billion in exposure to other mortgage and real estate related debt;

- On July 17, 2008, following the announcement of Merrill's second quarter financial results, Moody's downgraded Merrill's long-term debt rating to A2;

- On July 18, 2008, Ratings & Investment Information, Inc. downgraded Merrill's long-term debt rating to "A+" with a Negative outlook and downgraded the short-term rating to "a-1";

- On July 28, 2008, Merrill Lynch announced it would sell $30.6 billion (par value) of its CDO portfolio to Lone Star for just 6 cents on the dollar in cash and thus will need to raise additional capital again with an $8.55 billion public offering;

- On July 28, 2008, Merrill Lynch announced that it will take an addition $5.7 billion in write-downs connected with the Lone Star transaction bringing its total CDO and subprime write-downs to $46 billion, which is more than the Company disclosed as its initial exposure to these securities (due to failed hedges with financially weak counterparties);

- On August 21, 2008, Merrill Lynch announced a settlement with the SEC, New York Attorney General and state securities regulators whereby it would pay $125 million in fines and buy back $10-12 billion in Auction Rate Securities it sold to retail clients

- On August 29, 2008, Bloomberg reported that Doug Mallach wrote an internal memo on June 11, 2008 describing his efforts and the difficulties he encountered in trying to sell Merrill CDO portfolio.

- On September 5, 2008, William Tanona, a Goldman research analyst, added Merrill Lynch's tock to his "Conviction Sell" list.

- On September 10, 2008, the Wall Street Journal reported that Merrill Lynch's "problem assets" exceeded its shareholder equity by 1.9 to 1.0.

349.    On information and belief, notwithstanding those red flags, even those Defendants who did not have *actual* knowledge or who had only partial knowledge, failed to fulfill their fiduciary obligation to investigate risks posed by Merrill Lynch stock.

- 114-

EXHIBIT C

350.     The fact that Merrill Lynch did not disclose the truth about the value of its CDO and subprime related securities and the fact that the other Defendants did not investigate the Company's exposure, given turmoil in the subprime industry, resulted in the Plans purchasing and holding huge amounts of unduly risky Company stock at inflated prices.

351.     Defendants Merrill Lynch and O'Neal disregarded sound business practices and failed to implement risk-management processes despite the numerous warnings from industry observers and regulators regarding the risks of subprime markets and looming trouble in credit markets.

352.     Despite these facts, Defendants took no meaningful action to protect the heavily Merrill Lynch-invested Plans and their participants from the significant losses that they have incurred.

353.     Prudent fiduciaries of the Plans would not have ignored the numerous red flags described above and allowed the risk of loss to the Plans' participants and beneficiaries to increase to unacceptable levels.  Unfortunately, the Defendants did exactly that and for all intents and purposes wiped out a significant portion of the Plans' assets.

354.     As a result of the Company Defendant's knowledge of and implication in creating and maintaining public misconceptions concerning the Company's true financial condition, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Merrill Lynch stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

355.     Even in the wake of numerous investigations by the SEC and other federal and state authorities, Defendants failed to conduct an appropriate investigation into whether Merrill Lynch stock was a prudent investment for the Plans and failed to provide the Plans' participants

- 115-

EXHIBIT C

with information regarding Merrill Lynch's risky business plan so that participants could make informed decisions regarding their investments in Company stock in the Plans.

356.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Merrill Lynch stock, under these circumstances, was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

357.    Because Defendants knew or should have known that Merrill Lynch stock was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' continued investment in Company stock.

358.    Accordingly, it was imprudent for the Plans' fiduciaries to continue offering Merrill Lynch stock as a Plan investment option, to continue holding Merrill Lynch stock in the Plans, and/or to continue to make new investments in Company stock during the Revised Class Period.  Merrill Lynch stock was an imprudent investment for the Plans as it posed an inordinate risk of significant loss, and this risk is not one that should have been borne by the participants and beneficiaries of the Plans.  The Plans' fiduciaries disregarded the Company's deteriorating and dreadful financial circumstances when it came to managing the Plans' investment in Merrill Lynch stock, and were unwilling or unable to act prudently to rescue the Plans' investments. Under the circumstances, the continued investment of billions of dollars of participants' retirement savings in Merrill Lynch stock was reckless and imprudent, and contrary to the best interests of the Plans' participants and beneficiaries, and an abuse of their discretion as fiduciaries.

- 116-

EXHIBIT C

359.    Defendants had available to them several different options for satisfying their duties, including:  making disclosures to co-fiduciaries; making appropriate public disclosures as necessary; discontinuing or limiting further investment in Merrill Lynch stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants and beneficiaries of the Plans; divesting the Plans of Company stock; and/or resigning as fiduciaries of the Plans to the extent that, as a result of their employment by Merrill Lynch, they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Merrill Lynch stock.

360.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plans' investment in Merrill Lynch stock.

**J.    Defendants Failed to Provide the Plans' Participants, Beneficiaries, and their Co-Fiduciaries with Complete and Accurate Information about the True Risks of Investment in Merrill Lynch Stock in the Plans.**

361.    ERISA mandates that Plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to Plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, Plan participants and beneficiaries.  *Devlin v. Empire Blue Cross & Blue Shield*, 274 F. 3d 76, 88 (2d Cir. 2001) (a fiduciary has "a duty to deal fairly and honestly with its beneficiaries") (quoting *Ballone v. Eastman Kodak Co*. 109 F. 3d 117, 123-124 (2d Cir. 1997); *Mullins v. Pfizer*, 23 F. 3d 663, 669 (2d Cir. 1994) ("when a plan administrator speaks, it must speak truthfully") (quoting *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993)).

EXHIBIT C

362.     During the Revised Class Period, Defendant Merrill Lynch, the Plan Administrator for all of the Plans, and Defendant O'Neal made direct and indirect communications to Plans participants through numerous employee newsletters, memos and letters, and other public statements regarding the financial health of the Company.  The Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company (*e.g.*, numerous employee newsletters, memos and letters, including July 2007 memo and others discussed *supra*) and Company stock which was, far and away, the single largest asset of the Plans.

363.     These communications included, but were not limited to, SEC filings, annual reports, and press releases that were incorporated by reference into Plan documents and Plan-related materials and directed to participants through the 401(k) prospectus (which is part of the Summary Plan Description for the SIP) and the Form S-8 pertaining to the SIP, and, thus, were Plan communications undertaken in a fiduciary capacity.  These communications by Defendant Merrill Lynch assured the participants that the Company was not unduly exposed to risks related to subprime lending and CDOs, and that the Company's risk management practices were appropriate, when in fact the extent of the risks faced by the Company was unduly minimized and the extent of the Company's risk management practices was overstated.

364.     Against the background of these misleading communications from Defendant Merrill Lynch and Defendant O'Neal, both Defendant Merrill Lynch and the Administrative Committee Defendants, each of which had assigned responsibility for communicating with the Plans' participants (who had the ability to reduce their own exposure to Company stock through the Plans) and the remaining fiduciaries, failed to disclose facts that would have apprised the Plans' participants of the risks presented by Company stock that , in turn, would have allowed

EXHIBIT C

them to conclude that their exposure to Company stock through the Plans should be reduced, or that Company stock was not a prudent retirement investment.

365.    Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

> (a)    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

> (b)    Out of loyalty, employees tend to invest in company stock;

> (c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

> (d)    Employees tend not to change their investment option allocations in the plan once made;

> (e)    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

> (f)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

> (g)    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001), *available at* http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf; *See also* Nellie Liang & Scott Weisbenner, *Investor Behavior and the Purchase Of Company Stock in 401(k) Plans - the Importance of Plan Design*, Board of Governors for the Federal Reserve System Finance and Economics Discussion Series, No. 2002-36 (2002), *available at* http://www.federalreserve.gov/pubs/feds/ 2002/200236/200236 pap.pdf.

EXHIBIT C

366.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company stock during the Revised Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plans and their participants from their heavy investment in an imprudent retirement vehicle, Merrill Lynch stock.

367.    In addition, Defendants failed to provide participants and beneficiaries, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company.  As such, participants in the Plans could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plans.

368.    Specifically, Defendants failed to provide the Plans' participants with complete and accurate information regarding the Company's unduly large and risky subprime and CDO investments, the true impact of such investments on the Company financial condition, and the dire circumstances such investments have created for the Company, and the Plans' investment in Merrill Lynch stock.  As such, the participants were not informed of the true risks of investing their retirement assets in the Plans in Merrill Lynch stock.

369.    Defendant O'Neal in particular (as well as other top-ranking officers of the Company and the Company itself) communicated directly with employees/Plan participants regarding the Company's subprime and CDO market exposure but aggressively and falsely downplayed the risks that this exposure presented to the Company.

370.    Defendant Merrill Lynch and Defendant O'Neal, and on information and belief, certain other Defendants, knew all (in the case of the Company) or a portion of the truth about the Company's financial condition and in particular about the risks posed to the Company by its

- 120-

EXHIBIT C

exposure to CDO securities and other risky and hard to value investments, especially those which exposed the Company to subprime lending, as detailed previously.  On information and belief, these Defendants with knowledge of some or all of the risks posed by the Plans' investment in Company stock failed to disclose this information to their co-fiduciaries who served on the Investment Committees and Administrative Committees of the Plans, and were empowered by the documents governing the Plans and ERISA to protect the Plans and their participants and beneficiaries by eliminating or limiting investment in Company stock, selling Company stock, and making appropriate disclosures to the Plans' participants and beneficiaries.

**K.      Defendants Suffered From Conflicts of Interest.**

371.    As ERISA fiduciaries, Defendants are required to manage the Plans' investments, including the investment in Merrill Lynch stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

372.    Conflicts of interest abound when a company that invests plan assets in company stock founders.  This is because, as the situation deteriorates, Plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and Plan participants on the other.  In this case, a stark conflict of interest was built into the structure of the RAP Plan.  Pursuant to Section 3.5 of the RAP Plan Document, the fair market value of stock allocated to the accounts of participants in the Traditional ESOP reduced, by a like amount, the obligation of the Company to contribute to the RAP.  Thus, although the fiduciaries of the RAP had a duty to assure that Company stock was not allocated to accounts in the Traditional ESOP at inflated prices, as this would reduce unduly the Company's obligation to the RAP, any steps

the fiduciaries took to disclose information that would allow Company stock to be allocated at an appropriate price fully reflecting, inter alia, the CDO and subprime exposure of the Company would injure the Company by increasing its obligation to the RAP.  As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'"  *Martin v. Feilen,* 965 F.2d 660, 670 (8th Cir.1992) (citation omitted).  They must avoid "placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan."  *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

373.   Here, the Investment Committee and Administrative Committee Defendants breached this fundamental fiduciary duty of loyalty by failing to conduct a complete and impartial investigation of the risks presented by Merrill Lynch stock notwithstanding the many red flags indicating that such an investigation was necessary.

374.   For Defendant Merrill Lynch and Defendant O'Neal, the breach of the duty of loyalty was even more stark.  Both Defendants  took advantage of the inflated value of Company stock to reduce the Company's obligation to the RAP, when disclosure of the truth about the Company's  CDO and subprime exposure would have reduced the market price of the shares and increased the Company's contribution obligation.

375.   Likewise, Defendant O'Neal sold over 474 thousand shares of Merrill Lynch stock that he personally held for proceeds of over $44.5 million dollars during the Revised Class Period.  His failure to make disclosures to his co-fiduciaries of any of the Plans facilitated the sale of his own shares at inflated prices, benefiting him at the cost of the Plans.

EXHIBIT C

376.    The injury the Defendants imposed on the Plans by their disloyalty far exceeded any financial benefit to themselves.  As a result of the failures to investigate and as disclose detailed above, the RAP not only did not divest itself of any shares in Company stock during the Revised Class Period, it continued to purchase shares of Company stock at prices far greater than would have been paid had the truth about the Company been made known to the market. Similarly, the failure of Defendant O'Neal to make disclosure to his co-fiduciaries who served each of the Plans prevented each of them from divesting Company stock, or limiting or eliminating new investments in Company stock at inflated prices.

## VIII.   THE RELEVANT LAW

377.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a plan participant for relief under ERISA § 409, 29 U.S.C. § 1109.

378.    An individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary.  *See* U.S.C. § 1002(21)(A); s*ee Concha v. London*, 62 F.3d 1493 (9th Cir. 1995); *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262, 124 L. Ed. 2d 161, 113 S. Ct. 2063 (1993).

379.    When fiduciaries put the interests of the company or their own interests ahead of the interests of the Plan participants, they violate ERISA.  A fiduciary may, therefore, be personally liable to the Plan participants for breaching the responsibilities, obligations, or duties imposed under the plan and must restore any losses to the plan with any profits the fiduciary made through use of plan assets.  ERISA § 409(a), 29 U.S.C. § 1109(a).

380.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

EXHIBIT C

381.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise with like aims.

382.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."

*Bierwirth*, 680 F.2d at 272 n.8.

383.    Withholding information that the fiduciary knows or should know participants

need to make informed choices is a breach of the duty of loyalty.  A fiduciary has the duty to

disclose and inform which encompasses:  (1) a negative duty not to misinform; (2) an affirmative

duty to inform when the fiduciary knows or should know that silence might be harmful; and (3)

(a duty to convey complete and accurate information material to the circumstances of

participants and beneficiaries).

384.    A plan fiduciary is also responsible for the investment and monitoring of plan

investments, including in this instance the Merrill Lynch Stock Fund, which invested in Merrill

Lynch stock, ensuring that only prudent investments are offered as plan options, and monitoring

such investments to ensure that they *remain* prudent and suitable for the plan.  *In re ADC*

*Telecomm, ERISA Litig.*, No. 03-2989, 2004 U.S. Dist. LEXIS 14383 (D. Minn. July 26, 2004).

This includes the duty to conduct an independent and thorough investigation into, and to

continually monitor, the merits of all the investment alternatives of a plan, including in this

EXHIBIT C

instance the Merrill Lynch Stock Fund, which invested in Merrill Lynch stock, to ensure that

each investment is a suitable option for the plan.

385.    A fiduciary must avoid conflicts of interest and resolve them promptly when they

do occur.  As such, a plan fiduciary must always administer a plan with an "eye single" to the

interests of the participants and beneficiaries, regardless of the interests of the fiduciaries

themselves or the plan sponsor. *Bierwirth*, 680 F.2d at 271.

386.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary,"

provides, in pertinent part:

> In addition to any liability which he may have under any other provision
> of this part, a fiduciary with respect to a plan shall be liable for a breach of
> fiduciary responsibility of another fiduciary with respect to the same plan
> in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an
> act or omission of such other fiduciary, knowing such act or omission is a
> breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C.
> § 1104(a)(1), in the administration of his specific responsibilities which
> give rise to his status as a fiduciary, he has enabled such other fiduciary to
> commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he
> makes reasonable efforts under the circumstances to remedy the breach.

387.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary

responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be,

as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company

stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit

their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The

result would be a setting in which a major fiduciary breach could occur, but the responsible party

- 125-

EXHIBIT C

could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely

knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [T]he most appropriate steps in th[is] circumstance may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

388.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for

relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches

of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA

§ 405(a).

## IX.    ERISA § 404(C) DEFENSE INAPPLICABLE

389.    ERISA § 404(c) is an affirmative defense that provides a limited exception to

fiduciary liability for losses that result from participants' exercise of control over investment

decisions.  In order for § 404(c) to apply, participants must in fact exercise "independent control"

over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural

and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations

promulgated under it.

390.    Although both the RAP and the SIP were intended to comply with ERISA

§ 404(c), the relief provided by that section does not apply here for several reasons.

391.    First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries'

imprudent decision to select and continue offering Merrill Lynch stock as an investment option

in the Plans as this is not a decision that was made or controlled by the participants.  *See* Final

- 126-

EXHIBIT C

Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan").

392.    Second, ERISA § 404(c) does not apply to any Merrill Lynch stock in the Traditional ESOP, as Plan participants either do not have any control over the decision to invest Plan assets in Merrill Lynch stock in such Plan or are not presented with a broad range of investment alternatives within the Plan into which they can transfer assets on a regular basis. Instead, the Plan fiduciaries controlled such assets.

393.    Third, even as to participant-directed investment in Merrill Lynch stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Merrill Lynch stock.  *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions").  Indeed, pursuant to this regulation a participant's control is not independent in fact if " . . . (ii) A plan fiduciary has concealed material non-public facts regarding the investment from the participant or beneficiary [unless such disclosure would violate applicable law]. . . ."  Here at least Defendant Merrill Lynch and Defendant O'Neal have concealed such facts, as detailed previously.  As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that

- 127-

EXHIBIT C

were invested in Merrill Lynch stock as a result of their investment directions, and the

Defendants remain entirely responsible for losses that result from such investment.

394.     Fourth, in order to be a § 404(c) plan that provides a participant or beneficiary

with an opportunity to exercise control over the assets in his account, an identified plan fiduciary

(or a person or persons designated by the plan fiduciary to act on his behalf) must provide

participants and beneficiaries, in the case of plans that provide an employer stock investment

alternative, "a description of the procedures established to provide for the confidentiality of

information relating to the purchase, holding and sale of employer securities, and the exercise of

voting, tender and similar rights by participants and beneficiaries, and the name, address and

phone number of the plan fiduciary responsible."  29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(vii).  On

information and belief, no such information was provided to participants of the RAP and the SIP.

395.     Because ERISA § 404(c) does not apply here, the Defendants' liability to the

Plans, the Plaintiffs and the Class (as defined below) for losses caused by the Plans' investment

in Merrill Lynch stock is established upon proof that such investments were or became

imprudent and resulted in losses in the value of the assets in the Plans during the Revised Class

Period.

## X.     DEFENDANTS' INVESTMENT IN MERRILL LYNCH STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

396.     Some courts have applied a presumption of prudence to decisions by Plan

fiduciaries to invest plan assets in company stock in plans that qualify as "ESOPs" under the

Internal Revenue Code and rules of the Department of the Treasury promulgated thereunder.

The presumption is based on the dual purpose of an ESOP to allow employee ownership on the

one hand, and save for retirement on the other.  *Moench v. Robertson*, 62 F.3d 553, 569, 571 (3d

Cir. 1995) (explaining dual purpose of ESOP plans and adopting presumption of prudence to

EXHIBIT C

balance these concerns).  While Plaintiffs question the appropriateness of such an extension, some courts have extended the presumption to all eligible individual account plans, without regard to whether they are ESOPs.

397.     As these courts have made clear, when a presumption of prudence applies, "Plaintiffs may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

398.     If the fiduciaries know or if an adequate investigation would reveal that company stock is no longer a prudent investment for the purported ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.  *See Rankin v. Rots*, 278 F. Supp. 2d 853, 878 (E.D. Mich. 2003) ("A fiduciary is not required to blindly follow the Plan's terms.").  Even where a governing plan document requires the investment of plan assets in company stock, such a requirement does "not ipso facto relieve [plan fiduciaries] of their fiduciary obligations." *Id.* at 870.

399.     Here, none of the governing plan documents contain such a requirement.  Neither the RAP nor the SIP requires the Company Stock Fund to be included as a Designated Investment Alternative.  The Investment Committee has the discretion to include Company Stock as a Designated Investment Alternative, and has the discretion to continue the Company Stock Fund as a Designated Investment Alternative.  SIP Plan Document §§ 10.2.3(c) and 11.1.1; (RAP Plan Document §§ 5.1 and 8.3(c).  Additionally, the decision about whether and what portion of a participant's account may be allocated to the Company Stock Fund is left to the discretion of the Administrative Committee.  SIP Plan Document § 11.1.2; RAP Plan Document

EXHIBIT C

§ 5.1.  Further, pursuant to the RAP Plan Document, the Investment Committee is given the discretion to invest that Company Stock Fund's assets in short term fixed income investments. *Id*.  While the Traditional ESOP states that it is designed to invest primarily in qualifying employer securities, no provision of the Traditional ESOP requires that in all circumstances all or a portion of the Plan's assets must remain invested in employer stock; the Investment Committee is granted responsibility for "the investment of Trust assets" and is required to "establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA."  Traditional ESOP § 10.3.

400.  The *Moench* presumption is an evidentiary presumption, not appropriately applied to the allegations of a Complaint before evidence is adduced.  Nevertheless, some courts have applied the presumption by inquiring whether the facts as alleged in the Complaint are sufficient if taken as true to overcome the presumption.  The facts alleged here meet that test.  As alleged in more detail above, not only was Merrill Lynch stock so risky during the Revised Class Period that it was an inappropriate investment for Plans, but due to undisclosed adverse information, the stock was significantly overpriced.  As that information was revealed, the value of the shares was cut in half.  It is never appropriate for a fiduciary to permit a plan to overpay for an asset. Certain fiduciaries, at least the Company and Defendant O'Neal knew the facts that made it imprudent to invest in Company stock, the others either knew or were on notice of red flags that should have triggered an independent investigation that would have revealed risks of investing in Merrill Lynch stock, particularly in light of the conflicts of interest detailed above that burdened the decision making process of the Plans' fiduciaries.

401.  The facts supporting the conclusion that Merrill Lynch stock was an inappropriate and imprudent investment for the Plans include as detailed previously:

EXHIBIT C

- A precipitous stock price decline from over $78.49 to approximately $17.06 during the Revised Class Period;

- Risk of imminent further collapse of the Company's stock price based on the Company's practices as described in detail herein;

- The Company's now $66 billion of off-balance sheet exposure and an extremely leveraged balance sheet with a high level of level 3 assets;

- The Company's seriously deteriorating financial condition as well as Defendants' conflicted status as discussed in detail herein;

- Dishonest, misleading and illegal actions set forth above that caused the price of Merrill Lynch stock to be artificially inflated; and

- Serious, if not gross, mismanagement evidenced by, among other things: (a) the aggressive growth of its CDO business, even after credit markets deteriorated, subprime mortgage defaults increased, and housing prices fell; (b) Merrill Lynch's decision to use its own capital to purchase CDO securities its customers were rejecting in order to continue collecting additional underwriting fees; (c) the accumulation of $43 billion in exposure to CDOs and subprime related securities, which was greater than the entire book value of the Company (as of June 29, 2007); (d) the failure to acknowledge, manage, adequately hedge with creditworthy counterparties and accurately disclose the risks associated with owning such risky and illiquid securities; (e) the inflation of the value of the Company's asset-backed portfolio by mis-marking its subprime and CDO related investments based on assumptions that disregarded the actual housing market, credit market, and liquidity conditions; (f) Merrill Lynch's knowledge of its multiple failed attempts to liquidate its CDO portfolio, which led it to ultimately sell $30.6 billion for pennies on the dollar without truly removing the downside risk of those securities from it's balance sheet; (g) Merrill Lynch's failed efforts to remove risk from its balance sheet by purchasing costly hedges for its CDO and subprime exposure from counterparties with doubtful ability to make good on their obligations in order to create the appearance that risk had been removed from the Company's balance sheet when in fact the risk persisted in the form of credit risk posed by financially weak counterparties and ultimately forced Merrill to take additional write-downs on the credit default swaps that were supposed to protect it from loss to its CDO portfolio; and (h) downgrades by credit agencies as well as underperforming competitors and industry indexes during the Class Period.

402.    While eligible individual account plans, like the Plans here, are excused from the

duty to diversify, they are not excused from the duty to invest prudently. A portfolio with an

undue percentage of very risky investments, no matter how well diversified, is not a prudent

EXHIBIT C

retirement investment.  ERISA's exemption from diversification for company stock does not mean that pension plans are free to invest all or any of their assets in company stock so risky that it would be imprudent to make the same investment in a diversified portfolio comprised of assets presenting a similar level of risk.  The three Plans here were invested as follows at the end of 2006:  Traditional ESOP 99% in Company stock; RAP 38% in Company stock; SIP 28% in Company stock.  The facts supporting the extraordinary riskiness of Merrill Lynch stock are set forth in the allegations above.  To put these facts in context, the level of leverage and exposure to subprime related securities presented by an investment in Company stock during the Revised Class Period was comparable to that presented by Bear Stearns before its collapse.

403.    The imprudence of continued investment by Defendants in Merrill Lynch stock during the Revised Class Period under the circumstances present here is recognized in DOL regulations:

> [B]ecause every investment necessarily causes a plan to forego other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return.

29 C.F.R. 2509.94-1.

404.    Defendants had available to them investment alternatives to Merrill Lynch stock that had either a higher rate of return with risk commensurate to Merrill Lynch stock or an expected rate of return commensurate to Merrill Lynch stock but with less risk.  *See also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 547 (S.D. Tex. 2003).  Based on these circumstances, and the others alleged herein, it was imprudent and an abuse of discretion for Defendants to continue to make and maintain investment in Merrill Lynch stock,

EXHIBIT C

and, effectively, to do nothing at all to protect the Plan from significant losses as a result of such investment during the Revised Class Period.

## XI.     CAUSES OF ACTION

**A.     Count I:  Failure to Prudently and Loyally Manage the Plans and Assets of the Plans**

405.     Plaintiffs incorporate by this reference the paragraphs above.

406.     This Count alleges fiduciary breach against the following Defendants:  the Investment Committee Defendants with respect to each Plan, the Administrative Committee Defendants with respect to the RAP and the SIP, and Defendant Merrill Lynch with respect to each Plan (collectively, the "Prudence Defendants").

407.     As alleged above, during the Revised Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

408.     As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  As such, certain of the Prudence Defendants (the Investment Committee Defendants with respect to the RAP and the SIP) were responsible for, among other things, selecting prudent Designated Investment Alternatives and eliminating imprudent Designated Investment Alternatives for the RAP and the SIP.  Further, with respect to the RAP, the Investment Committee was responsible for, among other things, determining whether and to what extent the assets of the Plans (including those that would otherwise be invested in Company stock) should be held in short term low risk investments.  Other Prudence Defendants (the

- 133-

EXHIBIT C

Administrative Committee Defendants with respect to the RAP and the SIP, respectively) were responsible for determining the extent to which employees would be permitted to invest in those Designated Investment Alternatives (including the Company Stock Fund). With respect to the Traditional ESOP, certain of the Prudence Defendants (the Investment Committee Defendants with respect to the Traditional ESOP) were responsible for the reinvestment of dividends within the Traditional ESOP and whether to liquidate all or a portion of the Plan's investment in Company stock. As alleged previously, the remaining Prudence Defendant (Defendant Merrill Lynch) exercised *de facto* authority and control with respect to the *de jure* responsibilities of the other Prudence Defendants, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing Plan documents to the other Prudence Defendants, without relieving them of any such responsibility. In carrying out these responsibilities, the Prudence Defendants were required to evaluate the merits of the Plans' investments on an ongoing basis and take all necessary steps to ensure that the Plans' assets were invested prudently.

409. Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plans. Specifically, during the Revised Class Period, these Defendants knew or should have known that Merrill Lynch common stock was no longer a suitable and appropriate investment for the Plans, but was, instead, a highly speculative, risky investment in light of the Company's improper business practices, serious mismanagement, misstatements and omissions that caused the price of Merrill Lynch stock to be artificially inflated. The impending collapse of the price of the stock resulted from these dire circumstances. Nonetheless, during the Revised Class Period, these Defendants exercised the authority and control that made them fiduciaries to continue to offer Merrill Lynch

stock as a Designated Investment Alternative in the RAP and the SIP without any limitations on new investments or the amounts that could be invested in such the Defendants continued to: (a) fully invest the Employer Stock Funds within these Plans in employer stock; and (b)fully invest the Traditional ESOP in employer stock except as required by the terms of the Plan.

410.    Defendant Merrill Lynch, throughout the Revised Class Period had actual knowledge that its shares had become a risky and inappropriate investment due to facts previously alleged including, but not limited to, the following:  (a) The Company aggressively grew its CDO business, even as credit markets deteriorated, subprime mortgage defaults increased, and  housing prices fell; (b) Merrill Lynch used its own capital to purchase CDO securities its customers were rejecting in order to continue collecting additional underwriting fees and in the face of a stagnating CDO market, it was forced to purchase large amounts of CDO issuances; (c) by June 29, 2007, Merrill Lynch accumulated $43 billion in exposure to CDOs and subprime related securities, which was greater than the entire equity value of the Company; (d) Merrill Lynch continued to mis-mark its subprime and CDO related investments throughout 2006 and 2007 based on assumptions that disregarded the actual housing market, credit market, and liquidity conditions; (e) Merrill Lynch's desperation to reduce its CDO and subprime exposure led the Company to purchase costly hedges for its CDO and subprime exposure, which has created potentially higher downside risk because many of its counterparties are insolvent;  **(f) Merrill Lynch's knowledge of its multiple failed attempts to liquidate its CDO portfolio, which led it to ultimately sell $30.6 billion for pennies on the dollar without truly removing the downside risk of those securities from it's balance sheet;** (g) Merrill Lynch's increasingly leveraged balance sheet rose steadily from 15.2x in 2003 to 19.9x in 2006 and then steeply increased to 27.8x in 2007; (h) Merrill Lynch's  off-balance sheet exposure was

EXHIBIT C

at least $66 billion; and (i) even Merrill Lynch's on-balance sheet assets were becoming increasingly illiquid and more difficult to value, as evidenced by the fact that the Company continued to shift greater assets from Level 2 to Level 3.

411.    Moreover, the Prudence Defendants, other than Defendant Merrill Lynch, knew or should have known of the facts causing an investment in Merrill Lynch stock to be imprudent and would have learned such facts had they conducted an appropriate independent investigation in light of the red flags listed above, and in light of the conflicts of interests that should have made them especially sensitive to the need for such an independent investigation with respect to the RAP where the overvaluation of Merrill Lynch stock effectively reduced the Company's contribution obligation to the RAP.  Further weighing in favor of an independent investigation was the enormous size of the Plans' exposure to Company stock, such that the Prudence Defendant had a heightened duty to assure that this large portion of the Plans' portfolios did not become unduly risky, not as a matter of diversification, but simply because it is never appropriate for a high percentage of pension fund assets to be invested in high risk securities, no matter how well diversified by industry, geography and asset class.  Nevertheless, the Prudence Defendants failed to conduct such an appropriate independent investigation of the merits of continued investment in Merrill Lynch stock in light of the Company's highly risky and inappropriate practices and the particular dangers that these practices posed to the Plans.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investments in Merrill Lynch stock under these circumstances.

412.    The Prudence Defendants' decisions respecting the Plans' investment in Merrill Lynch stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have

EXHIBIT C

made different investment decisions.  Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plans' contributions and assets in Merrill Lynch stock was in keeping with the Plans' settlor's expectations of how a prudent fiduciary would operate.

413.    The Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

414.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

415.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Merrill Lynch stock.

416.    The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  On information and belief, the

EXHIBIT C

compensation and tenure of the Prudence Defendants was tied to the performance of Merrill

Lynch stock and/or the publicly reported financial performance of Merrill Lynch.  More

specifically, as previously alleged, the Prudence Fiduciaries with respect to the RAP were aware

that the fair market value of the stock allocated to participants' accounts in the Traditional ESOP

reduced the amount of the Company's contribution obligation to the RAP, dollar for dollar.

Accordingly, to the extent that Merrill Lynch stock was inflated by the existence of undisclosed

material information that upon disclosure would cause the stock to be revalued downward, the

RAP and its participants and beneficiaries were injured and the Company benefited.  Since the

Prudence Defendants, with respect to the RAP, encompass the Company itself and certain of its

officers and employees, these fiduciaries faced a stark conflict:  exposing the truth about the risks

presented by Company stock would benefit the RAP at the expense of the Company.  Fiduciaries

laboring under such conflicts, must, in order to comply with the duty of loyalty, make special

efforts to assure that their decision making process is untainted by the conflict and made in a

disinterested fashion, typically by seeking independent financial and legal advice obtained only

on behalf of the plan.

417.    The Prudence Defendants breached their duty to avoid conflicts of interest and to

promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could

make independent judgments concerning the Plans' investment in Merrill Lynch; failing to notify

appropriate federal agencies, including the DOL, of the facts and circumstances that made

Merrill Lynch stock an unsuitable investment for the Plans; and failing to take such other steps as

were necessary to ensure that participants' interests were loyally and prudently served.  With

respect to each of these above failures, doing so in order to avoid adversely impacting their own

compensation or drawing attention to Merrill Lynch's inappropriate practices; and by otherwise

EXHIBIT C

placing their own and Merrill Lynch's improper interests above the interests of the participants with respect to the Plans' investment in Merrill Lynch stock.

418.     As a consequence of the Prudence Defendants' breaches of fiduciary duties alleged in this Count, the Plans suffered significant losses.  If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost over one billion dollars of retirement savings.

419.     Defendant Merrill Lynch profited from its breach of this duty because its failure to perform its duty resulted in a diminution of the contribution obligation it owed to the RAP.

420.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.     Count II:  Failure to Monitor Fiduciaries.**

421.     Plaintiffs incorporate by this reference the allegations above.

422.     This Count alleges fiduciary breach against the following Defendants:  Defendant Merrill Lynch and the Senior Vice President, Human Resources Defendants (the "Monitoring Defendants").

423.     As alleged above, during the Revised Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus,

- 139-

EXHIBIT C

they were bound by the duties of loyalty, exclusive purpose, and prudence set forth in ERISA

§ 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

424.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring

Defendants included the responsibility to appoint and remove, and thus, monitor the performance

of other fiduciaries, as follows.  The Senior Vice President, Human Resources Defendants were

responsible for appointing and monitoring the Investment Committee Defendants and the

Administrative Committee Defendants with respect to each of the Plans.  Defendant Merrill

Lynch through its authority to amend the Plans and separately through its authority to name and

remove the Senior Vice President, Human Resources Defendants, was responsible for appointing

and monitoring the Senior Vice President, Human Resources Defendants.  In addition, by dint of

exercising *de facto* control over the conduct of the Senior Vice President, Human Resources

Defendants, and by actually controlling the appointment of the Investment Committee

Defendants, and the Administrative Committee Defendants, Defendant Merrill Lynch became

responsible for appointing and monitoring the Investment Committee Defendants and the

Administrative Committee Defendants with respect to each of the Plans.

425.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

are performing their fiduciary obligations, including those with respect to the investment and

holding of plan assets, and must take prompt and effective action to protect the plan and

participants when they are not.

426.    The monitoring duty further requires that appointing fiduciaries have procedures

in place so that on an ongoing basis they may review and evaluate whether the "hands-on"

fiduciaries and the appointing fiduciaries whom they appoint are doing an adequate job (for

example, by requiring periodic reports on their work and the plan's performance, and by

EXHIBIT C

ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to Plan participants or for deciding whether to retain or remove them.

427.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

428.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Merrill Lynch's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Merrill Lynch stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Merrill Lynch stock despite their knowledge of practices that rendered Merrill Lynch stock an imprudent investment during the Revised Class Period for

EXHIBIT C

participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

429.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiffs and the other Class members, lost over one billion dollars of retirement savings.

430.    Defendant Merrill Lynch profited from its breach of this duty because its failure to perform its duty resulted in a diminution of the contribution obligation it owed to the RAP.

431.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count, to disgorge profits made and to provide other equitable relief as appropriate.

## C.    Count III:  Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries.

432.    Plaintiffs incorporate by this reference the allegations above.

433.    This Count alleges fiduciary breach against the following Defendants:  Defendant Merrill Lynch and Defendant O'Neal.

434.    Pursuant to the duties of prudence and loyalty which every ERISA fiduciary owes to the plans that he serves pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), such fiduciaries are required to disclose to their co-fiduciaries information that they know is unavailable to their co-fiduciaries, but that such co-fiduciaries need to protect the

EXHIBIT C

interests of the plan. *See Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities*, 93 F.3d 1171 (3rd Cir. 1996)

435.    The following fiduciaries of the Plans possessed non-public information during the Revised Class Period about the risks posed by Merrill Lynch stock, which they knew could be used by other fiduciaries of the Plans (in particular the Investment Committee Defendants and the Administrative Committee Defendants with respect to each Plan) to protect the Plans and their participants and beneficiaries:  (1) Defendant Merrill Lynch, which was a *de jure* fiduciary to the Plans by dint of serving as statutory Plan Administrator, as the fiduciary who appointed the Senior Vice President Human Resources Defendants, as well as a *de facto* fiduciary that exercised authority and control over the conduct of the Senior Vice President Human Resources Defendants, the Investment Committee Defendants and the Administrative Committee Defendants; and (2) the Defendant O'Neal who was a fiduciary of the Plans by dint of his authority to appoint and remove the Trustees of the Plans, and as *de facto* fiduciary as a result of his communication directed to Plan participants.

436.    As previously alleged, the Investment Committee Defendants and the Administrative Committee Defendants should have sought information concerning the risks posed by an investment in Company stock as part of a thorough and careful investigation of the merits of investment in Company stock during the Revised Class Period, but failed to do so. Nevertheless, those fiduciaries in possession of such knowledge should have supplied that information to the Investment Committee Defendants and the Administrative Committee Defendants voluntarily in the fulfillment of the fiduciary duties they owed to the Plans.

437.    Defendant Merrill Lynch and Defendant O'Neal profited from their breach of this duty.

- 143-

EXHIBIT C

438.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendant Merrill Lynch and the Defendant O'Neal are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count, to disgorge any profits made through their breach and to provide other equitable relief as appropriate.

**D.      Count IV:  Breach of Fiduciary Duty – Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries.**

439.    Plaintiffs incorporate by this reference the allegations above.

440.    This Count alleges fiduciary breach against Defendant Merrill Lynch and the Administrative Committee Defendants with respect to each Plan, and Defendant O'Neal (the "Communications Defendants").

441.    At all relevant times, as alleged above, Defendants listed in this Count were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

442.    At all relevant times, the scope of the fiduciary responsibility of Defendant Merrill Lynch and the Administrative Committee Defendants with respect to each Plan included the communications and material disclosures to the Plans' participants and beneficiaries.  In addition, Defendant O'Neal acted as a *de facto* communicating fiduciary as a result of his extensive communications directly with employees/Plan participants regarding the Company and its likely future prospects.  Defendant O'Neal knew that the employees' retirement savings were invested significantly in Merrill Lynch stock in the Plans, that his communications concerned this investment, and, thus, concerned Plan benefits, and constituted acts of Plan administration under ERISA.

443.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information

EXHIBIT C

that participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all of the Plans' investment options, including investment in Merrill Lynch stock.

444.   Because investments in the Plans were not diversified (*i.e.* the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested heavily in Merrill Lynch stock), such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Merrill Lynch stock.

445.   The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Merrill Lynch's serious mismanagement and improper business practices, public misrepresentations, and the consequential artificial inflation of the value of Merrill Lynch stock, and, generally, by conveying incomplete information regarding the soundness of Merrill Lynch stock and the prudence of investing and holding retirement contributions in Merrill Lynch equity. These failures were particularly devastating to the Plans and their participants; a heavy percentage of the Plans' assets were invested in Merrill Lynch stock during the Revised Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

446.   Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts because, in the absence of the information, participants

- 145-

EXHIBIT C

did not know the true risks presented by the Plans' investment in Merrill Lynch stock. Since disclosures to the Plans' participants and beneficiaries of material information about Merrill Lynch stock would have necessitated broader disclosures to the market under the securities laws, acquisition of shares by the Plans during the Revised Class Period would have occurred at a price more reflective of the information disclosed and the stock allocated to participants' accounts in the Traditional ESOP would have been more fairly valued, resulting in a smaller reduction in Defendant Merrill Lynch's obligation to the RAP.

447.    Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plans' participants.

448.    Defendant Merrill Lynch was unjustly enriched by the fiduciary breaches described in this Count.

449.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

450.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count, and to disgorge any profits made through their breach.

**E.      Count V:  Co-Fiduciary Liability**

451.    Plaintiffs incorporate by this reference the allegations above.

452.    This Count alleges co-fiduciary liability against the following Defendants:  all Defendants (the "Co-Fiduciary Defendants").

- 146-

EXHIBIT C

453.     As alleged above, during the Revised Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

454.     As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

455.     **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  As detailed below, each Defendant knew of certain breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

456.     The Investment Committee Defendants and the Administrative Committee Defendants were aware of each other's failure to conduct an independent investigation of the merits of the Plans' investments in Company stock.  These Defendants were likewise aware of Defendant Merrill Lynch's direction of their activities which resulted in the breach of their own duties, and, at various times in the Revised Class Period, the Company's failure to provide them with information they needed to perform their duties as it related to the Plans' investment in Company stock.

- 147-

EXHIBIT C

457.     Senior Vice President Human Resources Defendants were aware of the failure of the Investment Committee Defendants and the Administrative Committee Defendants to conduct an independent investigation of the merits of the Plans' investments in Company stock and of Defendant Merrill Lynch's role in the breaches of fiduciary duty of those defendants and its own breaches.

458.     Defendant O'Neal was aware of the failure of the Investment Committee Defendants and the Administrative Committee Defendants to conduct an independent investigation of the merits of the Plans' investments in Company stock.

459.     Defendant Merrill Lynch was aware of the breaches of each of the other fiduciaries.

460.     Because Defendants knew of the breaches of other Defendants detailed above, yet failed to undertake any effort to remedy these breaches, they are each liable for those breaches.

461.     **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Defendant Merrill Lynch knowingly participated in the fiduciary breaches of the other Prudence Defendants and the Monitoring Defendants in that it exercised control over their conduct and benefited from the diminution in the contribution obligation to the RAP that resulted from the failure to disclose information which would have resulted in a more proper valuation of the stock allocated to the Traditional ESOP participants' accounts.

462.     **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the

administration of his specific responsibilities which gives rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

463.    Each of the Defendants (other than the Investment Committee Defendants and the Administrative Committee Defendants), by committing the breaches described previously, enabled the breaches of the Investment Committee Defendants and the Administrative Committee Defendants.

464.    As a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost over one billion dollars of retirement savings.

465.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XII.   CAUSATION

466.    The Plans suffered nearly $3.0 billion dollars in losses because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in Merrill Lynch stock during the Revised Class Period, in breach of Defendants' fiduciary duties.

467.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Merrill Lynch stock as an investment alternative when it became imprudent, limiting its availability for investment and/or new investment, and divesting the Plans of Merrill Lynch stock when maintaining such an investment became imprudent, causing the disclosure of complete and accurate material information about Merrill

- 149-

EXHIBIT C

Lynch stock to co-fiduciaries and to participants and beneficiaries the Plans would have avoided some or all of the losses that they and, indirectly, the participants and beneficiaries suffered.

## XIII.   REMEDY FOR BREACHES OF FIDUCIARY DUTY

468.   The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in Merrill Lynch stock during the Revised Class Period.

469.   As a consequence of the Defendants' breaches, the Plans suffered significant losses.

470.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…." and the disgorgement of profits made from a breach.  Here, in addition to causing losses, Defendant Merrill Lynch profited from the its breaches and the breaches of its co-fiduciaries by allowing stock to be allocated to participants' accounts in the Traditional ESOP at prices inflated by the failure to disclose material information, resulting in the reduction of its contribution obligation to the RAP. These profits must be disgorged to the RAP.

471.   With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them.  Alternatively, losses may be measured not only with reference to the decline

EXHIBIT C

in stock price relative to alternative investments, but also by calculating the additional shares of Merrill Lynch stock that the Plans would have acquired had the Plans' fiduciaries taken appropriate steps to protect the Plans. The Court should adopt the measure of loss most advantageous to the Plans. In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

472.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of:  (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

473.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## XIV.   CLASS ACTION ALLEGATIONS

474.    **Class Definition.**  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

EXHIBIT C

475.    All persons, other than Defendants, who were participants in or beneficiaries of the Plans at any time between September 25, 2006 to the present and whose accounts included investments in Merrill Lynch stock.

476.    **Revised Class Period.**  The fiduciaries of the Plans knew or should have known at least by September 25, 2006 that the Company's material weaknesses were so pervasive that Merrill Lynch stock could no longer be offered as a prudent investment for retirement Plans, and/or that corrective disclosures to participants and beneficiaries were required.

477.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, based on the Plans' Form 5500s for Plan year 2005, over 57 thousand participants or beneficiaries in the SIP, and over 47 thousand participants in both the RAP and the Traditional ESOP.

478.    **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are; whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class; whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries; whether Defendants violated ERISA; and

whether the Plans have suffered losses and, if so, what is the proper measure of damages.

479.    **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiffs seek relief on behalf of the Plans pursuant to ERISA

EXHIBIT C

§ 502(a)(2), their claim on behalf of the Plans is not only typical to, but identical to a claim under

this section brought by any Class member; and (2) to the extent Plaintiffs seek relief under

ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class

members equally.

480.    **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the

members of the Class and have retained counsel competent and experienced in class action,

complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with

those of the Class.

481.    **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is

warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the

Class would create a risk of adjudications with respect to individual members of the Class which

would, as a practical matter, be dispositive of the interests of the other members not parties to the

actions, or substantially impair or impede their ability to protect their interests.

482.    **Other Rule 23(b) Requirements.**  Class action status is also warranted under the

other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of

the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect

to the Class as a whole; and (3) questions of law or fact common to members of the Class

predominate over any questions affecting only individual members and a class action is superior

to the other available methods for the fair and efficient adjudication of this controversy.

EXHIBIT C

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Merrill Lynch stock;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

EXHIBIT C

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine,

29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and

injunctive relief against the Defendants.

| Dated: September 23, 2008 | Respectfully submitted,<br><br>**KELLER ROHRBACK P.L.C.**<br><br>By: _____<br>David Preminger (DP-1057)<br>275 Madison Ave<br>Suite 1425<br>New York, NY  10016<br>Telephone:  (212) 878-8890<br>Facsimile:  (212) 878-8895<br>dpreminger@kellerrohrback.com<br><br>**KELLER ROHRBACK L.L.P.**<br>Lynn L. Sarko<br>Derek W. Loeser<br>Erin M. Riley<br>1201 Third Avenue<br>Suite 3200<br>Seattle, WA  98101<br>Telephone:  (206) 623-1900<br><br>Facsimile:  (206) 623-3384<br>lsarko@kellerrohrback.com<br>dloeser@kellerrohrback.com<br>eriley@kellerrohrback.com<br><br>**KELLER ROHRBACK P.L.C.**<br>Gary Gotto<br>3101 North Central Avenue<br>Suite 1400<br>Phoenix, AZ  85012<br>Telephone:  (602) 248-0088<br>Facsimile:  (602) 248-2822<br>ggotto@kellerrohrback.com |

EXHIBIT C

**COHEN, MILSTEIN, HAUSFELD
& TOLL P.L.L.C.**
Lynda J. Grant (LG-4784)
150 East 52nd Street
Thirtieth Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745
lgrant@cmht.com

**COHEN, MILSTEIN, HAUSFELD
& TOLL P.L.L.C.**
Bruce F. Rinaldi
Michelle C. Yau
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
brinaldi@cmht.com
myau@cmht.com

**COHEN, MILSTEIN, HAUSFELD
& TOLL P.L.L.C.**
Marc I. Machiz
Medical Tower Building, Suite 1307
255 S. 17th Street
Philadelphia, PA  19103
Telephone:  (267) 773-4682
Facsimile:  (267) 773-4690
mmachiz@cmht.com

*Interim Co-Lead Counsel for Plaintiffs*

**SHALOV STONE BONNER & ROCCO LLP**
Ralph M. Stone
Thomas George Ciarlone, Jr.
Amanda C. Scuder
485 Seventh Avenue, Suite 1000
New York, NY 10018
Phone: 212-239-4340
Fax:    212-239-4310
rstone@lawssb.com
tciarlone@lawssb.com
ascuder@lawssb.com
*Counsel for Plaintiff Mary Gidaro*

- 156-

EXHIBIT C

**ZIMMERMAN REED, P.L.L.P.**
Carolyn G. Anderson
Timothy J. Becker
Anne T. Regan
Kirsten D. Hedberg
651 Nicollet Mall, Suite 501
Minneapolis, Minnesota 55402
Phone: 612-341-0400
Fax:    612-341-0844
cga@zimmreed.com
tjb@zimmreed.com
atr@zimmreed.com
kdh@zimmreed.com

*Counsel for Plaintiffs Barbara Boland and Alan Maltzman*

*Other Plaintiffs Counsel in Consolidated ERISA Cases:*

LAW OFFICE OF CURTIS V. TRINKO, LLP
Curtis V. Trinko
*Estey v. Merrill Lynch & Co., Inc., et al.,* No. 07-10268
*Moore v. Merrill Lynch & Co., Inc., et al.,* No. 07-10398

HARWOOD FEFFER LLP
Robert I. Harwood
*Donlon v. Merrill Lynch & Co., Inc., et al.,* No. 07-10661

SCHATZ NOBEL IZARD P.C.
Robert A. Izard
*Shaughnessey v. Merrill Lynch & Co., Inc., et al.,* No. 07-10710

ABBEY SPANIER RODD & ABRAMS, LLP
Jill S. Abrams
*Summers v. Merrill Lynch & Co., Inc., et al.,* No. 07-11615

MILBERG L.L.P.
Lori G. Feldman
*Eastman v. Merrill Lynch & Co., Inc., et al.,* No. 08-0058

EXHIBIT C

|  | GAINEY & McKENNA<br>Thomas J. McKenna<br>Pascullo v. Merrill Lynch & Co., Inc., et al., No. 08-1116 |
|---|---|

EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------

| | | |
|---|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | : : : : : : : | Master File No.: 07cv9633 (LBS)(AJP)(DFE)  **CLASS ACTION** |
| This Document Relates To: ERISA ACTION | : : : | Case No.: 07-CV-10268 (LBS)(AJP)(DFE) |

------------------------------------

### CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2008, a true and correct copy of the foregoing

document was served via first class mail upon the counsel as set forth below:

| PLAINTIFF'S COUNSEL | |
|---|---|
| Carolyn G. Anderson<br>Timothy J. Becker<br>Anne T. Regan<br>Kirsten D. Hedberg<br>**ZIMMERMAN REED, P.L.L.P.**<br>651 Nicollet Mall, Suite 501<br>Minneapolis, Minnesota 55402 | Robert M. Roseman<br>Theodore M. Lieverman<br>Andrew D. Abramowitz<br>David Felderman<br>**SPECTOR ROSEMAN & DOKROFF, P.C.**<br>1818 Market Street, Suite 2500<br>Philadelphia, PA 19103 |
| Ralph M. Stone<br>Thomas George Ciarlone, Jr.<br>Amanda C. Scuder, Esq.<br>**SHALOV STONE BONNER & ROCCO, LLP**<br>485 Seventh Avenue, Suite 1000<br>New York, NY 10018 | Ronen Sarraf<br>**SARRAF GENTILE, LLP**<br>11 Hanover Square<br>New York, NY 10005 |
| William Edward Bernarduci, Esq.<br>Robert A. Izard, Esq.<br>**SCHATZ NOBEL IZARD P.C.** | Curtis V. Trinko<br>Wai Kin Chan<br>**LAW OFFICE OF CURTIS V. TRINKO, LLP** |

EXHIBIT C

| 20 Church Street, Suite 1700<br>Hartford, CT 06103 | 16 West 46th Street, 7th Floor<br>New York, NY 10036 |
|---|---|
| Edwin J. Mills<br>**STULL STULL & BRODY**<br>6 East 4th Street, 5th Floor<br>New York, NY 10017 | Robert I. Harwood, Esq.<br>Samuel Kenneth Rosen, Esq.<br>**HARWOOD FEFFER LLP**<br>488 Madison Avenue, 8th Floor<br>New York, NY 10022 |
| Robert B. Weiser<br>**THE WEISER LAW FIRM**<br>121 N. Wayne Avenue, Suite 100<br>Wayne, PA 19087 | Jill S. Abrams<br>**ABBEY SPANIER RODD & ABRAMS, LLP**<br>212 East 39th Street<br>New York, NY 10016 |
| William T. Payne<br>**STEMBER FEINSTEIN DOYLE & PAYNE, LLC**<br>Pittsburgh North Office<br>1007 Mt. Royal Boulevard<br>Pittsburgh, PA 15223 | Gregg M. Fishbein<br>**LOCKRIDGE GRINDAL NAUEN, P.L.L.P.**<br>100 Washington Avenue So., Suite 2200<br>Minneapolis, Minnesota 55401 |
| Ellen M. Doyle<br>**STEMBER FEINSTEIN DOYLE & PAYNE, LLC**<br>1705 Allegheny Building<br>429 Forbes Avenue<br>Pittsburgh, PA 15219 | |

| **DEFENDANTS' COUNSEL** | |
|---|---|
| Jay B. Kasner<br>Skadden, Arps, Slate, Meagher<br>  & Flom LLP<br>Four Times Square<br>New York, NY 10036<br>Phone:  212-735-2628<br>Fax:  212-777-2628<br>jkasner@skadden.com<br><br>*Counsel for Merrill Lynch & Co.* | |
| Adam S. Hakki<br>Stuart J. Baskin<br>Brian Polovoy<br>Shearman & Sterling, LLP<br>599 Lexington Avenue | Michael J. Chepiga<br>Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, NY  10017-3954<br>Phone:  (212) 455-2000 |

EXHIBIT C

New York, NY 10022-6069
Phone:  212-848-4000
Fax:  212-848-7179
Email: ahakki@shearman.com
        sbaskin@shearman.com
        bpolovoy@shearman.com

*Counsel for Defendants the Investment
Committee of the Merrill Lynch & Co., Inc.
401(k) Savings and Investment Plan,
Employee Stock Ownership Plan, and
Retirement Accumulation Plan, and its
Committee Members; the Administrative
Committee of the Same Plans and its
Committee Members; Merrill Lynch & Co.,
Inc.'s Senior Vice President, Leadership and
Talent Management; and the members of the
Board of Directors of Merrill Lynch Named
as Individual Defendants Carol T. Christ,
Armando M. Codina, Virgis W. Colbert, Jill
K. Conway, Alberto Cribiore, John D.
Finnegan, Judith Mayhew Jonas, David K.
Newbigging, Aulana L. Peters, Joseph W.
Prueher, Ann N. Reese, and Charles O.
Rossotti*

Fax:  (212) 455-2502
Email:  mchepiga@stblaw.com

*Counsel for Defendant E. Stanley O'Neal*

David S. Preminger

EXHIBIT C