

Merrill Lynch

# WEALTHBUILDER
## Account Plan

WEALTHBUILDER ACCOUNT PLAN

Revised April 2, 2001

FOR INTERNAL USE ONLY

EXHIBIT C

ML000329



## Answers to Commonly Asked Questions
## About the WealthBuilder Account

**1.  Q. What are the eligibility requirements for having a WealthBuilder Account?**

> **A.** You must have eligible compensation of $250,000 or more; attained the title of Vice President or above; and be in the Chairman's Club or above. Other criteria may apply; please see the Plan Document for details.

**2.  Q. How does my WealthBuilder Account work?**

> **A.** If you are eligible to have a WealthBuilder Account, all supplemental Awards that you have earned in the WealthBuilder Program have been credited to this account. Awards are credited in a dollar-denominated value. You may select from the available benchmark funds and cash equivalent funds to earn returns (which may be positive or negative) as if your Awards had been invested, at net asset value (NAV), in Class A shares of the benchmark funds. **All Awards are initially benchmarked against Ready Assets Trust, but you may immediately allocate your account to one or more of the other available indexes.**

**3.  Q. Does this change how the Financial Consultant Capital Accumulation Award Plan (FCCAAP) Account works?**

> **A.** No. The operation of the FCCAAP Account is unaffected by the creation of the WealthBuilder Account.

**4.  Q. Will I own shares of the mutual funds I select?**

> **A.** No. For tax reasons, you do not own the selected benchmark funds. As long as you have an Account Balance in this plan, you will be an unsecured general creditor of Merrill Lynch (same status as FCCAAP).

**5.  Q. How often can I change my Merrill Lynch fund allocations?**

> **A.** You may change your selections as many as 12 times per calendar year, among any of the available benchmark funds, and may reallocate in any whole percentage increments. You may change your selections by calling (800) MER-401k.

**6.  Q. Who administers the WealthBuilder Account?**

> **A.** Benefits & Investment Solutions (BIS) will administer your WealthBuilder Account. You will receive a letter from them assigning you a "PIN" number that enables you to access your account. If you already have a "PIN" assigned by BIS, that "PIN" will also allow you to access your WealthBuilder Account. You can call BIS at (800) MER-401k.

FOR INTERNAL USE ONLY

EXHIBIT C

**7.**  **Q. What happens to my Awards if I do not select benchmark funds?**

    A.  Your Awards will remain benchmarked against ML Ready Assets Trust.

**8.**  **Q. How often will I receive WealthBuilder statements?**

    A.  You will receive statements quarterly from BIS in addition to confirmations of any reallocations you choose to make.

**9.**  **Q. When does the WealthBuilder Account become vested?**

    A.  Vesting generally occurs when you become eligible for retirement. A Financial Advisor (FA) is eligible to retire at age 55, as long as he or she also has at least 10 years of service with Merrill Lynch, or at age 65 with no length of service requirement. However, if you terminate prior to age 55 and have 20 years of service, you will be treated as having retired and become vested. Your balance, however, will be reduced by 1% for each year, or part thereof, prior to your 55th birthday, and payment will begin after your 55th birthday. If you terminate prior to vesting, your entire Account Balance is forfeited.

**10.**  **Q. When do I receive the monies in the Account?**

    A.  Under current procedures you will receive 50% of your Account Balance the January following retirement, with the remaining 50% to be paid the following January. If you have earned an award after your retirement, 50% of the award will be paid when awards are credited, with the remaining balance to be paid the following January.

**11.**  **Q. Are taxes withheld when the award is paid?**

    A.  Yes. Federal, state and local taxes are withheld upon payment of the Award, based on the valuation of the Account Balance on the payment date. Medicare and, where applicable, OASDI are withheld from each Award upon vesting.

**12.**  **Q. What happens if I transfer out of production or if I am no longer eligible for WealthBuilder?**

    A.  Your Account Balance will continue to earn returns based upon your selected benchmark funds and be paid to you in two annual installments at retirement. You will not receive any additional Awards unless you transfer to another eligible population.

FOR INTERNAL USE ONLY

EXHIBIT C

ML000331



**13.** **Q.** **If I were "vested" in my Account Balance but leave Merrill Lynch for the competition, do I take a portion of my WealthBuilder Account Balance with me?**

    **A.** No. Under the WealthBuilder Account Plan, participants who compete with ML & Co. within two years after termination **forfeit** any remaining balance in their WealthBuilder Account. This noncompete provision is fully described in the WealthBuilder Account Plan document.

**14.** **Q.** **Can I assign the right to receive the WealthBuilder Award?**

    **A.** No. You are not entitled to the Award until it is vested, and even then it is subject to forfeiture if you go to work for the competition. Under the terms of the Plan, rights under WealthBuilder cannot be assigned and cannot become subject to qualified Domestic Relations Orders or other such arrangements.

**15.** **Q.** **What happens to my Account Balance in the event of my death?**

    **A.** The Account Balance will be paid to your Beneficiary. If no Beneficiary has been named, the Account Balance will be paid to your estate.

**16.** **Q.** **Is my Designation of Beneficiary the same as my Beneficiary for my life insurance?**

    **A.** No. You must complete the WealthBuilder section of Designation of Beneficiary, available on the Advisory Division Web site. If you do not have access to the Advisory Division Web site, please call (609) 282-1759 and request a hard copy of the Designation of Beneficiary.

**17.** **Q.** **What should I do if I want to change my Beneficiary?**

    **A.** You must complete the Designation of Beneficiary, available on the Advisory Division Web Site. If you do not have access to the Advisory Division Web site, please call (609) 282-1759 and request a hard copy. You may also change prior designations by completing this form.

**18.** **Q.** **How do I find out more information about this program?**

    **A.** Talk with your Resident Vice President (RVP) or call Private Client Compensation at (609) 282-5654.

---

> Note: All terms and conditions of WealthBuilder are governed by the Plan document. However, these questions simply attempt to explain certain features of WealthBuilder.

FOR INTERNAL USE ONLY

EXHIBIT C

ML000332

# WEALTHBUILDER BENCHMARK FUNDS WORKSHEET

*Initially your award will be benchmarked against ML Ready Assets Trust. You may subsequently allocate your WealthBuilder Award against the available benchmark funds. You may make your allocations in 10% increments and change those allocations up to 12 times per year. It should be noted that these benchmark funds are subject to change over time.*

**To make your allocation and obtain a current listing of available benchmark funds, please call BIS at (800) MER-401k.**

Before deciding which benchmark funds to select, you should read the prospectuses for the funds. To obtain prospectuses, please call Business Financial Services at (800) MER-401k or, for international employees, (732) 563-7301.

FOR INTERNAL USE ONLY

EXHIBIT C

ML000333

# Notes

FOR INTERNAL USE ONLY

EXHIBIT C

ML000334

EXH. C



Merrill Lynch

# WEALTHBUILDER
## Account Plan

WEALTHBUILDER ACCOUNT PLAN
FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES

As amended through April 2, 2001

FOR INTERNAL USE ONLY

EXHIBIT C

ML000335

# WEALTHBUILDER ACCOUNT PLAN
## FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES

### Table of Contents

ARTICLE I  Name, Purpose, and Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ARTICLE II  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ARTICLE III  Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
   3.1 Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

ARTICLE IV  Annual Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
   4.1 Amount of Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
   4.2 Crediting of Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

ARTICLE V  Benchmark Return Options; Adjustment of Accounts . . . . . . . . . . . .5
   5.1 Election Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
   5.2 Adjustment of Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
   5.3 Statement of Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

ARTICLE VI  Forfeiture of Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
   6.1 Forfeiture for Early Separation . . . . . . . . . . . . . . . . . . . . . . . . . . .7
   6.2 Forfeiture for Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
   6.3 Forfeiture for Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

ARTICLE VII  Status of Awards and Accounts . . . . . . . . . . . . . . . . . . . . . . . .8
   7.1 No Trust or Fund Created; General Creditor Status . . . . . . . . . . . . . . . . .8
   7.2 Non-Assignability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

ARTICLE VIII  Payment of Account Balances . . . . . . . . . . . . . . . . . . . . . . . .8
   8.1 General Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
   8.2 Early Qualifying Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
   8.3 Withholding of Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
   8.4 Termination of Employment After a Change In Control . . . . . . . . . . . . . . .9
   8.5 Payment on Behalf of Incompetents . . . . . . . . . . . . . . . . . . . . . . . .11

ARTICLE IX  Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
   9.1 Designation of Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
   9.2 Change of Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
   9.3 Beneficiary Death After Commencement of Payments . . . . . . . . . . . . . . .12

ARTICLE X  Amendment and Termination . . . . . . . . . . . . . . . . . . . . . . . . .12
   10.1 Reservation of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

ARTICLE XI  Administration of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . .12
   11.1 Powers Of The Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . .12
   11.2 Claims Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

ARTICLE XII  Miscellaneous Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   12.1 Books and Records Controlling . . . . . . . . . . . . . . . . . . . . . . . . . .13
   12.2 Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   12.3 Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   12.4 Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   12.5 Headings Are Not Controlling . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   12.8 Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

FOR INTERNAL USE ONLY

EXHIBIT C

ML000336

# WEALTHBUILDER ACCOUNT PLAN
# FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES

## ARTICLE I

### Name, Purpose, and Effective Date

The name of the Plan is the WealthBuilder Account Plan for a Select Group of Eligible Employees.

The Plan, established under the WealthBuilder Program as in effect from time to time, is intended to be unfunded and maintained primarily for the purpose of providing deferred compensation for the members of a select group of management or highly compensated employees, within the meaning of Title I of ERISA, who remain in the employ of the Company until retirement or completion of a substantial period of service as specified in this Plan. All decisions concerning who is to be considered a member of that select group and how the Plan is to be administered and interpreted shall be consistent with this intention.

The Plan is effective commencing January 1, 1994, and each year thereafter, unless terminated in accordance with Section 10.1 hereof.

## ARTICLE II

### Definitions

Unless otherwise required by the context, each of the following terms shall have the meaning indicated for that term:

*"Account"* means a Participant's account established under Article IV to which all credits and debits are made with respect to the individual's Annual Awards credited hereunder.

*"Account Balance"* means, as of any date, the Annual Awards credited to a Participant's Account adjusted in accordance with Section 5.2 to reflect the performance of the Participant's Selected Benchmark Return Options, adjustments made as a result of any Capital Call Default and the Debit Balance and any payments made from the Account prior to that date.

*"Administrator"* means the Head of Human Resources of ML & Co., or his or her functional successor.

*"Affiliate"* means any corporation partnership, or other organization of which ML & Co. owns or controls, directly or indirectly, not less than 50% of the total combined voting power of all classes of stock or other equity interest.

*"Annual Award"* means an annual award determined under the Program for credit to a Participant's Account.

*"Applicable Federal Rate"* means the applicable federal rate for short-term (0-3 years) obligations of the United States Treasury established in January of each year.

*"Available Balance"* means amounts in a Participant's Account that are indexed to Benchmark Return Options with daily liquidity after all Capital Calls with respect to ML Ventures have been completed and an Account's Debit Balance, if any, has been reduced to zero.

*"Average Leveraged Principal Amount"* means, for each Participant, for any period, the sum of the Leveraged Principal Amounts outstanding at the end of each day in the period divided by the number of days in such period.

PAGE ONE

FOR INTERNAL USE ONLY

EXHIBIT C

ML000337



*"Benchmark Return Options"* means such investment vehicles as the Administrator may from time to time designate for the purpose of indexing Accounts hereunder. In the event a Benchmark Return Option ceases to exist or is no longer to be a Benchmark Return Option, the Administrator may designate a substitute Benchmark Return Option for such discontinued option.

*"Beneficiary"* means any person(s) or entity(ies) designated as such in accordance with Article IX.

*"Board of Directors"* means the Board of Directors of ML & Co.

*"Capital Call"* means the periodic demands for funds from a Participant's Account that will be equal to and occur simultaneously with capital calls made by [private equity funds (including ML Ventures) chosen by the Participant].

*"Capital Call Default"* means the result of there being an insufficient Liquid Balance in the Participant's Account to fund a Capital Call.

*"Capital Demand Default Adjustment"* means the negative adjustment described in Section 5.4 in the number of "units" (including units acquired by "Leverage") attributed to a private equity Benchmark Return Option that will be the consequence under the Plan of a Capital Call Default.

*"Cash Compensation"* means base salary plus Adjusted Compensation paid in a particular year, plus any cash bonus paid in the particular year for the immediately prior year's performance, such as a Household Incentive Program awards, but does not include payments made under the Investment Certificate Program.

*"Code"* means the Internal Revenue Code of 1986, as amended from time to time.

*"Company"* means ML & Co. and all of its Affiliates.

*"Debit Balance"* means, as of any date, the dollar amount, if any, representing any Leveraged Principal Amount (together with any pro rata Interest Amounts determined in accordance with Section 5.4(e), if applicable), as reduced by any distributions recorded from ML Ventures Units recorded in a Participant's Account.

*"Disability"* means a physical or mental impairment of a Participant which, during the first six months thereof, counts towards the individual's satisfaction of the waiting period under the ML & Co. Basic Long Term Disability Plan, as amended from time to time, and which thereafter entitles the individual to receive benefits under that plan.

*"Eligible Compensation"* for a given year means base earning for the performance year to which an award relates, Adjusted Compensation earned in the performance year and cash incentive compensation paid in the award year, including OMICP, household incentive bonus and premier incentive compensation and/or managers money fund.

*"Eligible Employee"* means, for a given year an Employee who (a) meets the criteria outlined in Section 3.1(a) and is paid from the Company's domestic based payroll (but is not a U.S. citizen or "green card" holder who is employed outside the United States).

*"Employee"* means a Financial Advisor (including a resident manager or producing manager), or any other employee group that the Administrator, in his or her sole discretion, determines are employees for purposes of eligibility for Annual Awards under the Plan. An individual who held such position during a Plan Year but who transfers to another position within the Company shall continue to be an Employee with respect to such Plan Year as long as his or her employment with the Company continues. No individual who would otherwise be eligible for an Annual Award but who is not an employee of the Company at the date of grant shall be entitled to an Annual Award under the Plan unless such individual's employment was terminated as a result of death, Disability or Qualifying Termination.

**PAGE TWO**

FOR INTERNAL USE ONLY

EXHIBIT C

ML000338



*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended from time to time.

*"Fiscal Quarter"* means the quarterly period used by ML & Co. for financial accounting purposes.

*"Fiscal Year"* for a given Plan Year means the annual period used by ML & Co. for financial accounting purposes that ends with or prior to December 31 of that Plan Year.

*"Initial Leveraged Amount"* means the initial dollar amount by which a Participant's deferral into ML Ventures Units is leveraged as determined in accordance with Section 5.4(c).

*"Interest"* means the hypothetical interest accruing on a Participant's Average Leveraged Principal Amount at the Applicable Federal Rate.

*"Interest Amounts"* means, for any Participant, as of any date, the amount of Interest that has accrued to such date on such Participant's Average Leveraged Principal Amount, from the date on which a Participant's Leveraged Principal Amount is established, or from the most recent date that Interest Amounts were added to the Leveraged Principal Amount.

*"ML Ventures Return Option"* means, for eligible Participants, the option of indexing returns hereunder to the performance of a ML Ventures limited partnership, on a leveraged or unleveraged basis. Participants will be eligible to choose the ML Ventures Return Option only if, they received Cash Compensation of at least $200,000 in each of 1999 and 1998.

*"ML Ventures Units"* means the record-keeping units credited to the Accounts of Participants who have chosen the ML Ventures Return Option.

*"Leveraged or Unleveraged Distributions"* means the distributions to a Participant's Account attributable to the leveraged or unleveraged portion (as the case may be) of a Participant's ML Ventures Units.

*"Leverage-Eligible Participants"* means persons who (1) are accredited investors within the meaning of the Securities Act of 1933, and (2) received Cash Compensation of at least $250,000 in 1999, and (3) received Cash Compensation of at least $200,000 in 1998 and otherwise qualify, in accordance with standards determined by the Administrator, to select a ML Ventures Return Option on a leverage basis.

*"Leveraged Principal Amount"* means a Participant's Initial Leveraged Amount, if any, as adjusted to reflect the addition of Interest Amounts (or any pro rata Interest Amounts).

*"Liquid Balance"* means, as of any date, the Deferred Amounts credited to a Participant's Account, adjusted (either up or down) to reflect: (1) the performance of the Participant's Mutual Fund Return Balances as provided in Section 5.4(f); (2) distributions with respect to ML Ventures Units made in accordance with Section 5.4(d); (3) reduction of any Debit Balance as provided in Section 5.4(e) to zero; and (4) any payments to the Participant under Article VIII hereof.

*"ML & Co."* means Merrill Lynch & Co., Inc.

*"MLPF&S"* means Merrill Lynch, Pierce, Fenner & Smith Incorporated.

*"Mutual Fund Return Options"* means the mutual funds chosen as Benchmark Return Options by the Administrator.

*"Advisory Division Management"* means the appropriate members of management of the domestic Advisory Division of MLPF&S or its functional successor.

*"Net Asset Value"* means, with respect to each Benchmark Return Option that is a mutual fund or other commingled investment vehicle for which such values are determined in the normal course of business, the net asset value, on the date in question, of the Selected Benchmark Return Option for which the value is to be determined.

PAGE THREE

FOR INTERNAL USE ONLY

EXHIBIT C

ML000339



"*Participant*" for a given Plan Year means an Eligible Employee who has satisfied the criteria set forth in Article III for receiving an allocation to his or her Account.

"*Plan*" means this WealthBuilder Account Plan for a Select Group of Eligible Employees.

"*Private Fund Return Option(s)*" means one or more private funds that are chosen by the Administrator to be offered—with such limitations as may be required—to eligible Participants as Benchmark Return Options.

"*Private Fund Unit(s)*" means the record-keeping units credited to the Accounts of Participants who have chosen one or more Private Fund Return Options.

"*Program*" means the WealthBuilder Program of which this Plan is a part.

"*Qualification Year*" means the calendar year immediately preceding the year for which the eligibility determination is being made.

"*Qualifying Termination*" means termination of employment with the Company for reasons other than for cause:

    (i) on or after an individual's 65th birthday; or

    (ii) on or after an individual's 55th birthday with at least 10 Years of Service; or

    (iii) at any age, but only after at least 20 Years of Service; or

    (iv) at any age regardless of the number of Years of Service, but only with the express approval of the Administrator, which may be granted subject to whatever conditions (including reductions in the Participant's Account Balance) and restrictions the Administrator may impose and only if the termination is found by the Administrator to be in, or not contrary to, the best interests of the Company.

"*Selected Benchmark Return Option*" means a Benchmark Return Option selected by the Participant in accordance with Section 5.1.

"*Years of Service*" means the number of "years of service" reflected on the records of the Company for purposes of determining the Participant's rights under the Merrill Lynch & Co., Inc. Retirement Accumulation Plan.

### ARTICLE III

### Participation

**3.1 Participation**

    **(a) General Rule.** An eligible employee will be a Participant in any year only if he or she (i) has more than $250,000 of Eligible Compensation in both the Qualification Year and the year in which the award is made, (ii) has attained at least the title of Vice President or holds a Advisory Division Management position with the Company (a "Advisory Manager"),

    **(b) Newly Employed Individuals.** Subject to the approval of the Administrator in his or her sole discretion, an Eligible Employee who is newly employed by the Company can be a Participant if his or her Eligible Compensation is greater than $250,000 [and he or she is either employed as a Advisory Division Manager or is to be nominated for at least the title of Vice President at the first opportunity following the individual's commencement of employment with the Company.]

FOR INTERNAL USE ONLY

EXHIBIT C

ML000340

## ARTICLE IV

### Awards

#### 4.1 Amount of Awards

Annual Awards under this Plan shall be made only to Eligible Employees who are employed by the Corporation on the date that Awards are to be credited to the Participant's Account. The amount of each Participant's Award in any given year shall be determined in accordance with the Program.

#### 4.2 Crediting of Accounts

A Participant's Award shall be credited to the Participant's Account as soon as practicable after the last day of the prior Fiscal Year.

## ARTICLE V

### Benchmark Return Options; Adjustment of Accounts

#### 5.1 Election Limitations

A Participant must choose one or more Benchmark Return Options and the percentage of the Participant's Account to be adjusted to reflect the performance of each Selected Benchmark Return Option; *provided,* that if for any reason the Participant does not effectively designate Benchmark Return Options with respect to his or her entire Account, until such time as an effective description is provided, the Participant's Selected Benchmark Return Option shall be the default Benchmark Return Option specified by the Administrator. All elections of Selected Benchmark Return Options shall be in multiples of 1%. A Participant may, by complying with such procedure as the Administrator may prescribe on a uniform and nondiscriminatory basis, including procedures specifying the frequency with respect to which such changes may be effected (but not more than twelve times in any calendar year), change the Selected Benchmark Return Options to be applicable with respect to his or her Account.

#### 5.2 Return Option; Adjustment of Accounts

(a) **Selection of ML Ventures Return Option or Private Fund Return Options.** In any year that a ML Ventures partnership [or other Private Fund partnership is offered,] eligible Participants may select the ML Ventures Return Option (and designate any Leverage Percentage) or select a Private Fund Return Option. **Participants should be aware that (1) once the closing of the relevant fund has occurred, Participants will not be able to alter their elections; and (2) that Payments of a Participant's Account Balance on Retirement may be delayed by the selection of ML Ventures. Participants should also be aware that in the event of a Capital Call Default, for certain private equity funds, including ML Ventures, they may be penalized by having their Accounts adjusted downward in accordance with Section 5.4(d).**

(b) **Selection of Mutual Fund Return Options.** Coincident with the Participant's election to defer Compensation, the Participant must select the percentage of the Participant's Account to be adjusted to reflect the performance of Mutual Fund Return Options, for use when a Participant's Account has a Liquid Balance. All elections shall be in multiples of 1%. A Participant may, by complying with such procedures as the Administrator may prescribe on a uniform and nondiscriminatory basis, including procedures specifying the frequency with respect to which such changes may be effected (but not more than 12 times in any calendar year), change the Selected Benchmark Return Options to be applicable with respect to his or her Account.

PAGE FIVE

FOR INTERNAL USE ONLY

EXHIBIT C

ML000341

**(c) Selection of the ML Ventures Leverage Percentage by Eligible Participants.** Prior to the closing of the offering of a ML Ventures partnership, Leverage-Eligible Participants who select the ML Ventures Return Option on a leveraged basis must choose their Leverage Percentage, in accordance with standards determined by the Administrator, by submitting such forms as the Administrator shall prescribe. Prior to the closing of a ML Ventures partnership, the Administrator will determine each Leverage-Eligible Participant's Initial Leveraged Amount by applying such Participant's Leverage Percentage to the dollar value of the portion of the Participant's Account Balance allocated to the ML Ventures Return Option. The Initial Leveraged Amount will be recorded as the Leveraged Principal Amount, to which amount Interest Amounts will be added annually in accordance with Section 5.4(e).

**(d) Adjustments of ML Ventures and other Private Fund Return Options.**

    (i)   Whenever a distribution is paid on an actual unit of a ML Ventures partnership or other similar private fund return option, an amount equal to such per unit distribution times the number of units in the Participant's Account will first be applied against any Debit Balance, as provided in Section 5.4(e), and then, if any portion of such distribution remains after the Debit Balance is reduced to zero, be credited to the Participant's Account to be indexed to the Mutual Fund Return Option(s) chosen by the Participant.

    (ii)  In the event of a Capital Call Default, a Participant's investment in the relevant fund will be capped. If this occurs, the number of units represented by the return option (including, in the case of ML Ventures, any leveraged units) will be adjusted downward to reflect a smaller investment and resulting lower leverage.

**(e) Adjustment of Debit Balance.** Any Debit Balance shall be reduced as soon as possible any distributions relating to ML Ventures Units. Reductions of the Debit Balance, as provided in the foregoing sentence, shall be applied first to reduce the Debit Balance attributable to accrued Annual Charges and then, after all such accrued Annual Charges have been satisfied, to reduce any Leveraged Principal Amount. As of the last day of each Fiscal Year, Interest Amounts computed by the Administrator shall be added to the Leveraged Principal Amount. If on any date the Leveraged Principal Amount would be discharged completely as a result of distributions or chargeoffs, Interest Amounts will be computed through such date and added to the Leveraged Principal Amount as of such date.

**(f) Adjustment of Mutual Fund Return Balances.** While each Participant's Account does not represent the Participant's ownership of, or any ownership interest in, any particular assets, the Account shall be adjusted to reflect the investment experience of the Participant's Selected Benchmark Return Options in the same manner as if investments in accordance with the Participant's elections had actually been made through the ML Benefit Services Platform and ML II Core Recordkeeping System, or any successor system used for keeping records of Participants' Accounts (the "ML II System"). In adjusting Accounts, the timing of receipt of Participant instructions by the ML II System shall control the timing and pricing of the notional investments in the Participant's Selected Benchmark Return Options in accordance with the rules of operation of the ML II System and its requirements for placing corresponding investment orders, as if orders to make corresponding investments were actually to be made, except that in connection with the crediting of Annual Awards to the Participant's Account and distributions from the Account, appropriate allocation instructions shall be treated as received from the Participant prior to the close of transactions through the ML II System on the relevant day. Each Selected Benchmark Return Option shall be valued using the Net Asset Value of the Selected Benchmark Return Option as of the relevant day; *provided,* that, in valuing a Selected Benchmark Return Option for which a Net Asset Value is not computed, the value of the security involved for determining Participants' rights under the Plan shall be the price reported for actual transactions in that security through the ML II System on the relevant day, without giving effect to any transaction charges or costs associated with such transactions; *provided further,* that, if there are



PAGE SIX

FOR INTERNAL USE ONLY

EXHIBIT C

ML000342

no such transactions effected through the ML II System on the relevant day, the value of the security shall be:

    **(A)** if the security is listed for trading on one or more national securities exchanges, the average of the high and low sale prices for that day on the principal exchange for such security or if such security is not traded on such principal exchange on that day, the average of the high and low sales prices on such exchange on the first day prior thereto on which such security was so traded;

    **(B)** if the security is not listed for trading on a national securities exchange but is traded in the over-the-counter market, the average of the highest and lowest bid prices for such security on the relevant day; or

    **(C)** if neither clause (a) nor (b) applies, the value determined by the Administrator by whatever means he considers appropriate in his sole discretion.

**5.3 Statement of Account**

For each Fiscal Quarter, each Participant for whom an Account is maintained under the Plan will receive a statement that reports the value of the Account as of the end of the Fiscal Quarter.

### ARTICLE VI

### Forfeiture of Accounts

**6.1 Forfeiture for Early Separation**

A Participant's entire Account (including any Leverage associated with a ML Ventures Return Option) shall be forfeited in the event of the Participant's termination of employment with the Company for any reason prior to his or her death, Disability or Qualifying Termination.

**6.2 Forfeiture for Competition**

**(a) Forfeiture Procedure.** A Participant's Account (including any Leverage associated with a ML Ventures Return Option) is subject to forfeiture in the event the Administrator, in his or her sole discretion, determines that the Participant has been in Competition with the Company at any time during the period ending two years after the Participant's Qualifying Termination.

**(b) Competition Defined.** For purposes of Section 6.1(a), *"Competition"* means the Participant's application for or acceptance of Employment with, or direct or indirect inducement or recruitment of any other employee of the Company to apply for or accept Employment with, any other person or entity for the purpose of providing or offering to provide any Related Product or Service to any Client that has a Known Relationship. For purposes of this Section 6.1(b),

    (i) the term *"Employment"* shall include the performance of services as an employee and as an independent contractor or consultant;

    (ii) the term *"Client"* means any person or entity to whom the Company provides or has provided, within the two-year period ending on the date of the Participant's Qualifying Termination, any Related Product or Service;

    (iii) The term *"Related Product or Service"* means (A) with respect to an individual Client, any financial product or service; or (B) with respect to any institutional client, any financial product or service provided by the Company to the Client in the course of the Known Relationship or any financial product or service related thereto; and



PAGE SEVEN

FOR INTERNAL USE ONLY

EXHIBIT C

ML000343



(iv) the term *"Known Relationship"* means a relationship between the Client and the Company of which the Participant has or had actual knowledge that was acquired prior to Qualifying Termination, which acquisition occurred (A) as consequence of the performance by the Participant of responsibilities as an employee of the Company acting within the scope of his or her employment; or (B) under circumstances indicating that the information acquired was non-public.

### 6.3 Forfeiture for Misconduct

A Participant's entire Account (including any Leverage associated with a ML Ventures Return Option) is subject to forfeiture in the event the Administrator, in his or her sole discretion, determines that the Participant has engaged in any misconduct relating to his or her employment with the Company, including any violation of any law, regulation or Company policy. In the event of any allegation of any such misconduct, any scheduled payment of the Account Balance will not be made unless and until the Administrator, upon consultation with the Director of Compliance of MLPF&S or his or her designee or functional successor, has determined that payment is appropriate under the circumstances.

### ARTICLE VII

### Status of Awards and Accounts

### 7.1 No Trust or Fund Created; General Creditor Status

Nothing contained herein and no action taken pursuant hereto will be construed to obligate the Administrator to invest any assets of ML & Co. in any Selected Benchmark Return Option, nor to establish a trust or separate fund of any kind or a fiduciary relationship between ML & Co. and a Participant, Participant's Beneficiary or estate, or any other person or entity. The Administrator may, if it so chooses, earmark any assets of ML & Co. to meet its obligations hereunder. Title to and beneficial ownership of any funds represented by the Account will at all times remain in ML & Co.; such funds will continue for all purposes to be a part of the general funds of ML & Co. and may be used for any corporate purpose. No person will, by virtue of the provisions of this Plan, have any interest whatsoever in any specific assets of the Company, including any such funds. TO THE EXTENT THAT ANY PERSON ACQUIRES A RIGHT TO RECEIVE PAYMENTS FROM ML & CO. UNDER THIS PLAN, SUCH RIGHT WILL BE NO GREATER THAN THE RIGHT OF ANY UNSECURED GENERAL CREDITOR OF ML & CO.

### 7.2 Non-Assignability

The right of a Participant, or of any other person with reference to the Participant, to the Account Balance, or any other benefits hereunder, shall be: (a) subject to forfeiture as explained above; and (b) cannot be assigned, alienated, sold, garnished, transferred, pledged, or encumbered except by a written designation of Beneficiary under this Plan, by written will, or by the laws of descent and distribution.

### ARTICLE VIII

### Payment of Account Balances

### 8. 1 General Rule

Subject to Article VI above and Section 8.2 below, the payment of a Participant's Account hereunder shall be made only upon a Participant's Qualifying Termination, death or, Disability: (a) in case of Qualifying Termination, in two annual installments (or such higher number of installments, not in excess of nine, as established on a uniform and nondiscriminatory basis by the Administrator in his or her sole discretion), the first of which shall be paid at the end of the calendar year in which the Qualifying Termination occurs (or if Qualifying Termination occurs prior to the grant of an Annual Award, as soon as practicable after such grant) and the remainder of which shall be paid at the end of the subsequent

FOR INTERNAL USE ONLY

EXHIBIT C

ML000344

calendar year(s); and (b) in case of Disability or death, a single sum. In the event a Participant dies prior to the payment of the entire Account, then the unpaid balance of the Account will be paid to the Beneficiary in a single sum as soon as practicable following the Participant's death. **In the event that immediately prior to the payment, all or any portion of a Participant's Account Balance remains indexed to ML Ventures, such payments will only be made from the Available Account Balance (after the Debit Balance has been reduced to zero) and further payments shall be made only as distributions are made from ML Ventures.**

### 8.2 Early Qualifying Termination

In the event of a Participant's Qualifying Termination before the Participant's 55th birthday, then:

    (a)   the Participant's Available Balance as of the date of such Qualifying Termination shall be first reduced by 1 per cent for each year, or part thereof, that the Qualifying Termination occurs before such 55th birthday; and

    (b)   payment of the Participant's Account shall begin only after the Participant's 55th birthday.

### 8.3 Withholding of Taxes

The Company will deduct or withhold from any amounts to be credited to an Account, or from any payments to be made hereunder, any federal, state, local income or employment taxes as required under applicable laws to be withheld, or require the Participant or the Beneficiary to pay any such amount, or the balance of any such amount.

### 8.4 Termination of Employment After a Change In Control

**(a) Payment Upon Change in Control.** Any other provision of this Plan to the contrary notwithstanding, in the event that a Change in Control of ML & Co. occurs and thereafter a Participant's employment is terminated by the Company without Cause or by the Participant for Good Reason, the Participant's Available Account Balance will be paid to the Participant (or to the Participant's Beneficiary in the event of death) in cash in a single sum, as promptly as possible after such termination of employment.

**(b) Definition of "Change in Control."** A *"Change in Control"* means a change in control of ML & Co. of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not ML & Co. is then subject to such reporting requirement; *__provided, however,__* that, without limitation, a Change in Control shall be deemed to have occurred if:

    (i)   any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, or any syndicate or group deemed to be a person under Section 14(d)(2) of the Exchange Act, other than ML & Co.'s Employee Stock Ownership Plan, is or becomes the "beneficial owner" (as defined in Rule 13d-3 of the General Rules and Regulations under the Exchange Act), directly or indirectly, of securities of ML & Co. representing 30% or more of the combined voting power of ML & Co.'s then outstanding securities entitled to vote in the election of directors of ML & Co.; or

    (ii)  during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of ML & Co. and any new directors, whose election by the Board of Directors or nomination for election by the stockholders of ML & Co. was approved by a vote of at least 3/4 of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof; or

    (iii) all or substantially all of the assets of ML & Co. are liquidated or distributed.

PAGE NINE

EXHIBIT C

ML000345





**(c) Agreement Concerning a Change in Control.** If ML & Co. executes an agreement, the consummation of which would result in the occurrence of the Change in Control as described in Section 8.4(b), then, with respect to a termination of employment, unless such termination is by the Company for Cause, or by the Participant other than for Good Reason, occurring after the execution of such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.

**(d) Amendments Subsequent to Change in Control.** In the event of a Change in Control, no changes in the Plan and no adjustments, determinations or other exercises or discretion by the Administrator or ML & Co., that were made subsequent to the Change in Control and that would have the effect of diminishing a Participant's rights or payments under the Plan, or of causing the Participant to recognize income (for federal income tax purposes) with respect to the Participant's Account Balance prior to the actual distribution in cash to a Participant of such Account Balance, shall be effective.

**(e) Cause.** Termination of a Participant's employment by the Company for "Cause" shall mean termination upon:

    (i) the Participant's willful and continued failure substantially to perform the Participant's duties with the Company (other than any such failure resulting from the Participant's incapacity due to physical or mental illness or any such actual or anticipated failure resulting from termination by the Participant for Good Reason) after a written demand for substantial performance is delivered to the Participant by Advisory Division Management, which demand specifically identifies the manner in which Advisory Division Management believes that the Participant has not substantially performed his or her duties; or

    (ii) the willful engaging by the Participant in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise.

No act or failure to act by the Participant shall be deemed "willful" unless done, or omitted to be done, by the Participant not in good faith and without reasonable belief that this action or omission was in the best interest of the Company.

Notwithstanding the foregoing, a Participant shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to the Participant a copy of a written finding by Advisory Division Management (issued after reasonable notice to the Participant and an opportunity for the Participant, together with counsel, to be heard), that, in the good faith opinion of Advisory Division Management, the Participant was guilty of conduct set forth above in clause (i) or (ii) of the first sentence of this Section 8.4(e) and specifying the particulars thereof in detail.

**(f) "Good Reason"** shall mean a Participant's termination of his or her employment with the Company if, without the Participant's written consent, any of the following circumstances shall occur:

    (i) a meaningful and detrimental alteration in the Participant's position or in the nature or status of the Participant's responsibilities from those in effect immediately prior to the Change in Control;

    (ii) a reduction by the Company of the Participant's base salary as in effect just prior to the Change in Control;

    (iii) the relocation of the office of the Company where the Participant was employed at the time of the Change in Control (the "CIC Location") to a location more than fifty miles away from the CIC Location (except for required travel on the Company's business to an extent substantially consistent with the Participant's business travel obligations just prior to the Change in Control);

FOR INTERNAL USE ONLY

EXHIBIT C

ML000346

(iv) the failure of the Company to continue in effect any benefit or compensation plan, including, but not limited to, this Plan, the Company's retirement program, or the Company's Long-Term Incentive Compensation Plan, Employee Stock Purchase Plan, 1978 Incentive Equity Purchase Plan, cash incentive compensation or other plans adopted prior to the Change in Control, in which the Participant is participating at the time of the Change in Control, unless an equitable arrangement (embodied in an ongoing substitute or alternative plan) has been made with respect to such plan in connection with the Change in Control, or the failure by the Company to continue the Participant's participation therein on at least as favorable a basis, in terms of both the amount of benefits provided and the level of the Participant's participation relative to other participants, as existed at the time of the Change in Control; or

(v) the failure of the Company to continue to provide the Participant with benefits at least as favorable as those enjoyed by the Participant under any of the Company's pension, life insurance, medical, health and accident disability, deferred compensation or savings plans in which the Participant was participating at the time of the Change in Control, the taking of any action by the Company which would directly or indirectly materially reduce any of such benefits or deprive the Participant of any material fringe benefit enjoyed by the Participant at the time of the Change in Control, or the failure by the Company to provide accordance with the Company's normal vacation policy in effect at the time of the Change in Control.

**8.5 Payment on Behalf of Incompetents**

If, in his or her sole discretion, the Administrator finds that any person who is entitled to receive any payment hereunder is a minor or is unable to care for his or her affairs because of disability or incompetence, payment of the Available Balance may be made to anyone found by the Administrator to be the committee or other authorized representative of such person, or to be otherwise entitled to such payment, in the manner and under the conditions that the Administrator determines. Such payment will be a complete discharge of the liabilities of the Company hereunder with respect to the amount so paid.

### ARTICLE IX

### Beneficiary

**9.1 Designation of Beneficiary**

A Participant may designate, in a writing delivered to the Administrator or his or her designee before the Participant's death, a Beneficiary to receive payments in the event of the Participant's death. The Participant may also designate a contingent Beneficiary to receive payments in accordance with this Plan if the primary Beneficiary does not survive the Participant. The Participant may designate more than one person as the Beneficiary or contingent Beneficiary, in which case (i) no contingent Beneficiary would receive any payment unless all of the primary beneficiaries predeceased the Participant; and (ii) the surviving beneficiaries in any class shall share in any payments in proportion to the percentages of interest assigned to them by the Participant. If the Participant dies without a surviving Beneficiary, the Participant's estate will be considered the Beneficiary.

**9.2 Change of Beneficiary**

A Participant may change the Beneficiary or contingent Beneficiary (without the consent of any prior Beneficiary) in a writing delivered to the Administrator or his or her designee before the Participant's death. Unless otherwise stated in writing, any change in Beneficiary or contingent Beneficiary designation will automatically revoke prior such designations, as applicable, under this Plan.



PAGE ELEVEN

FOR INTERNAL USE ONLY

EXHIBIT C

ML000347



### 9.3 Beneficiary Death After Commencement of Payments

If, after a Participant's death, a Beneficiary entitled to receive, or actually receiving, payments hereunder dies before receiving full payment, the Account Balance to which the Beneficiary was entitled will be paid as soon as practicable in one lump sum to such primary Beneficiary's estate.

### ARTICLE X

### Amendment and Termination

### 10.1 Reservation of Rights

ML & Co., through the Administrator, reserves the right to amend or terminate this Plan in whole or in part, at any time for any reason; *provided, however,* that no such action shall reduce a Participant's Account Balance as of the effective date of that action, or otherwise deprive the Participant or a Beneficiary of any entitlement thereto.

### ARTICLE XI

### Administration of the Plan

### 11.1 Powers Of The Administrator

The Administrator has full power, discretion and authority to interpret, construe, and administer this Plan so as to ensure that it provides deferred compensation to Participants who are members of a select group of management or highly compensated employees within the meaning of Title I of ERISA. The Administrator's interpretations and construction hereof, and actions hereunder, including any determinations regarding the amount or recipient of any payments, will be binding and conclusive on all persons for all purposes. The Administrator will not be liable to any person for any action taken or omitted in connection with the interpretation and administration of this Plan unless attributable to willful misconduct or lack of good faith. The Administrator may designate persons to carry out the specified responsibilities of the Administrator and shall not be liable for any act or omission of a person as designated.

### 11.2 Claims Procedure

**(a) Initial Claim.** An application for payments under this Plan shall be in a form acceptable to, and in compliance with all required information as deemed necessary by, the Administrator. If an application for payments is denied, in whole or in part, the Administrator shall promptly give the applicant written notice of the denial, setting forth the specific reasons therefor. The notice shall include the following:

    (i)   The basis for the denial;

    (ii)  A reference to the appropriate provisions of the Plan on which the denial is based;

    (iii) A description of any additional information required of the applicant; and

    (iv)  An explanation of the procedure for having a denied application reviewed under this Plan.

**(b) Appeal Procedure.** The applicant may, upon receipt of a notice of denial, request a review of the application by the Administrator. Such request shall be delivered in writing to the Administrator. After the Administrator has reviewed the application, the final decision shall be communicated in writing to the applicant. Such communication shall set forth the specific reasons for the decision with reference to the appropriate provisions of the Plan.

PAGE TWELVE

FOR INTERNAL USE ONLY

EXHIBIT C

ML000348

## ARTICLE XII

### Miscellaneous Provisions

#### 12.1 Books and Records Controlling

The books and records of the Company will be controlling in the event a question arises hereunder concerning the amount of Production Credits, Eligible Compensation, Annual Awards, Accounts, designations of Beneficiary(ies), or any similar matters.

#### 12.2 Successors and Assigns

The provisions of this Plan will be binding upon and inure to the benefit of the Company and its successors and assigns, the Participants and their designated Beneficiary(ies), and their respective heirs, executors, administrators, and legal representatives.

#### 12.3 Severability

If any provision of this Plan, or the application thereof, shall for any reason be invalid or unenforceable, such provision shall be limited only to the extent necessary in the circumstances to make it valid and enforceable. In any event, the remaining provisions of this Plan will continue in full force and effect.

#### 12.4 Litigation

The Company shall have the right to contest, at its expense, any ruling or decision, administrative or judicial, on an issue that is related to the Plan and that the Administrator believes to be important to the Participants, and to conduct any such contest or any litigation arising therefrom to a final decision.

#### 12.5 Headings Are Not Controlling

The headings contained in this Plan are for convenience only and will not control or affect the meaning or construction of any of the terms or provisions of this Plan.

#### 12.8 Governing Law

This Plan will be construed in accordance with and governed by the laws of the State of New York, to the extent not preempted by ERISA or any other federal law, as to all matters, including, but not limited to, matters of validity, construction, and performance.

PAGE THIRTEEN

FOR INTERNAL USE ONLY

EXHIBIT C

ML000349

# Notes

FOR INTERNAL USE ONLY

EXHIBIT C

ML000350

EXH. C

# Notes

PAGE FIFTEEN

FOR INTERNAL USE ONLY

EXHIBIT C

ML000351



EXH. C

FOR INTERNAL USE ONLY

EXHIBIT C

ML000352